```
 1                                            Pages 1-26

 2                  UNITED STATES DISTRICT COURT

 3                NORTHERN DISTRICT OF CALIFORNIA

 4
     Before The Honorable James Donato, Judge
 5                                  )
       FARANGIS EMAMI, et al.,      )
 6                                  )
              Plaintiffs,           )
 7                                  )
          vs.                       ) No. 18-cv-01587-JD
 8                                  )
       KIRSTJEN NIELSEN, et al.,    )
 9                                  )
              Defendants.           )
10     _____  )
                          San Francisco, California
11                          December 13, 2018

12                  TRANSCRIPT OF PROCEEDINGS

13   APPEARANCES:
     For Plaintiffs:
14
                          MUSLIM ADVOCATES
15                        P.O. Box 34440
                          Washington, DC  20043
16                  BY:  Sirine Shebaya
                         Joseph E. Saei
17                       Nimra Azmi
                         Veronica Sustic
18                       Shabna Lotfi
                         Jonathan Smith
19
     For Defendants:
20
                          US DEPARTMENT OF JUSTICE-CIVIL DIVISION
21                        950 Pennsylvania Avenue NW, Room 3613
                          Washington, DC  20530
22                  BY:  August Flentje

23                        US DEPARTMENT OF JUSTICE-CIVIL DIVISION
                          P.O. Box 868, Ben Franklin Station
24                        Washington, DC  20044
                    BY:  P. Angel Martinez
25
     REPORTED BY:  MARLA F. KNOX, RPR, CRR
```

```
 1   Thursday, December 13, 2018                    10:35 a.m.

 2                    P R O C E E D I N G S

 3                         .oOo.

 4         (Whereupon, the following proceedings commenced

 5   in open court:)

 6         THE CLERK:  Calling civil 18-1587, Emami versus

 7   Nielsen, et al.  Counsel, please state your appearances

 8   for the record.

 9         MS. SHEBAYA:  Good morning, your Honor, Sirine

10   Shebaya on behalf of the Plaintiffs.

11         MS. LOTFI:  Shabnam Lotfi on behalf of the

12   Plaintiffs.

13         MS. SUSTIC:  Veronica Sustic on behalf of the

14   Plaintiffs.

15         MR. SMITH:  Jonathan Smith on behalf of

16   Plaintiffs.

17         MS. AZMI:  Nimra Azmi on behalf of the

18   Plaintiffs.

19         MR. SAEI:  Joseph Saei on behalf of the

20   Plaintiffs.

21         MR. FLENTJE:  August Flentje for the Defendants.

22         MR. MARTINEZ:  Good morning, your Honor, Angel

23   Martinez on behalf of the Defendants.

24         THE COURT:  Okay.  Who is going take the lead for

25   the Plaintiffs?
```

1          MS. SHEBAYA:  I am.

2          THE COURT:  And the Defendants?

3          MR. FLENTJE:  I am, your Honor.

4          THE COURT:  Okay.

5          MR. FLENTJE:  May it please the Court, I'm August

6    Flentje with the Justice Department on behalf of the

7    United States.  Before I get into the Motion to Dismiss

8    argument, I wanted to just flag the filing we made last

9    night.  We had asked the Court in Seattle to transfer a

10   case that we view as related to the Northern District of

11   California; and late yesterday the Court, Judge Robart,

12   did decide to transfer it to the Northern District of

13   California.  It is probably not here yet, and obviously

14   there are issues on -- we would probably file at the

15   appropriate time something noticed as related.  There is

16   also a pending Motion to Dismiss in that case.

17          THE COURT:  Oh, there is?

18          MR. FLENTJE:  Yes.

19          THE COURT:  That was filed in Seattle?

20          MR. FLENTJE:  It was filed in Seattle.  There are

21   some other motions pending as well.  I think in the

22   Government's view -- we are prepared to go forward today,

23   but we also think it might be more efficient if some of

24   those issues with the linking of the cases were addressed

25   before we got too far into the dismissal issues.

```
 1          THE COURT:  Well, I saw the transfer order
 2   probably in your filing.  Are you all handling that one?
 3          MS. SHEBAYA:  The counsel for Pars is separate
 4   from our team.  We actually had a chance to confer with
 5   them yesterday, and both of our teams would be very happy
 6   to coordinate schedules and proceed however, your Honor,
 7   wishes to proceed.
 8          THE COURT:  Well, I'm glad you mentioned that.
 9   So I had two thoughts.  The first is once it lands here --
10   it is not here yet.  I know it is not here yet -- you have
11   to file a notice.  You know, it is randomly assigned.
12   There is a possibility I will just get it.  The odds are I
13   won't.  You have to file a Notice of related case.  Just
14   one of you does that.  And based on the order, which I
15   actually read last night, it looks to me like it is
16   related.  If you -- if somebody wants to fight about it,
17   we can do that.  It looked related to me.
18              Assuming that we get to that point and it
19   is related, the next issue is consolidation.  Now, Ms.
20   Lotfi?
21          MS. SHEBAYA:  Shebaya, Sirine Shebaya.
22          THE COURT:  Ms. Shebaya, once -- consolidated
23   means they are basically melded together, and you would do
24   a consolidated complaint; and you would maybe look at the
25   parties and combine the claims if there are some claims
```

1  that are in one and not in the other and make up one

2  unitary case.  We are getting far ahead, but it might

3  affect what we do today.  Are you thinking -- you have

4  talked to the other team.  You know their case.  You think

5  this is possible the consolidation would be done?

6        MS. SHEBAYA:  Well, I would also flag for, your

7  Honor, that one of the attorneys from the Pars team is

8  here in case that is relevant; but we have spoken.  We

9  think that formal consolidation may not be necessary.  Our

10  teams are very happy to coordinate everything on schedule

11  and to kind of proceed.  Their Motion to Dismiss has been

12  fully briefed, and so -- most of the issues are

13  overlapping.  I think they have one or two claims that we

14  don't have.  We have a mandamus claim that they don't

15  have.  Otherwise, the issues are entirely overlapping.

16        THE COURT:  It is about waivers under the

17  proclamation?

18        MS. SHEBAYA:  Yes.  So potentially we would be --

19  would prefer to proceed as two cases but on the same

20  schedule with maybe --

21        THE COURT:  I'm not going to do it twice.

22        MS. SHEBAYA:  Yes.

23        THE COURT:  So, I mean, we don't have to solve

24  this today.  I do want to go forward.  We have invested a

25  lot of time in this.  No matter what, we are going to go

1   forward today.  There is a slight possibility -- I thought

2   if you were completely gung ho on consolidation -- I might

3   wait; but you are not so --

4          MS. SHEBAYA:  We are not.

5          THE COURT:  All right.  So that's done.  Let's

6   hear from the Justice Department.

7          MR. FLENTJE:  Thank you, your Honor.  It has

8   always been time consuming and challenging to obtain a

9   visa to come to the United States from countries where

10  there are some significant security threats.  As you saw

11  in the complaint, many of the Plaintiffs were waiting for

12  long periods even before the Proclamation issued and --

13  became operative in late 2017.

14          With the Proclamation, which identified

15  basic and ongoing identification and vetting problems for

16  five countries, it has become even more difficult.  The

17  President properly and lawfully halted travel from those

18  countries subject to a limited discretionary waiver.  At

19  the same time the numbers of people seeking to come to the

20  United States is high.  Extensive work is required to

21  consider waiver requests from nationals of the five

22  countries, in particular the security aspect of those

23  waiver requests given the heightened identity and security

24  concerns that the President identified in the order and

25  the Supreme Court said were valid concerns.

1          Consular professionals around the world at

2   the State Department are working tirelessly on these cases

3   under appropriate guidance and using established

4   procedures.  Waivers are not hypothetical or imaginary or

5   a sham.  They are real, and they are granted in

6   significant numbers in appropriate cases while at the same

7   time implementing the executive order travel restrictions.

8          THE COURT:  Let me jump in for a second.  That

9   may be, but you have asked to dismiss the complaint.

10   These are sounding more like fighting about what the

11   evidence might be.  I'm perfectly fine with that, though I

12   have to say, it does occur to me that this may be

13   something for summary judgment and not for a 12(b)6

14   motion.

15          MR. FLENTJE:  I mean, I did -- I wanted to

16   provide a framework and update of kind of where things

17   are; and I can turn now to the actual legal dismissal

18   arguments, but I just did want --

19          THE COURT:  Why don't you do that?  I will tell

20   you a little bit more of what I'm thinking, and maybe you

21   don't have to react to it; and maybe it will factor in.

22   The idea of this waiver program being a sham is certainly

23   an essential part of the claim, and it came up in *Trump v*

24   *Hawaii* a couple months ago; most notably in Justice

25   Breyer's descent.

1          There is a footnote from Chief Justice

2   Roberts' majority opinion -- Chief note 7 -- it kind of

3   says -- effectively he is skeptical that it is a sham; but

4   we have to see the evidence.  And why isn't that the case

5   here?  Why shouldn't this go forward to an evidentiary

6   proceeding?

7          MR. FLENTJE:  I mean, that's -- if you don't

8   agree with our legal arguments, obviously that would be

9   the next step.  We do think that there are several legal

10  barriers to the suit as it is currently structured, and I

11  can kind of go through those one at a time.  I don't know

12  if this is going to be directly in response to the

13  question; but, you know, I don't think the Supreme Court

14  sort of -- envisioned a sort of departure from the normal

15  consular reviewability and APA principles in deciding

16  how -- in anticipating what the suit would become and what

17  the claims would be.

18          If you look at the particular claims in

19  this case, they are pretty limited.  They ask for

20  guidance -- additional guidance and they ask for -- I'm

21  sorry -- a more quick -- a quicker process and --

22          THE COURT:  I think the term you said was orderly

23  process.

24          MR. FLENTJE:  Yeah, but if you look at the

25  regulations, there is nothing that suggests that this is

1    sort of outside of the normal consular processing in their

2    complaint.  The policy which is the guidance that they ask

3    for has actually been issued.

4         THE COURT:  Now where is that?

5         MR. FLENTJE:  Well, there are -- there is outward

6    facing guidance.  Admittedly, it is limited.  It is on the

7    website of the State Department.  It explains the nature

8    of the waiver inquiry, undue burden, national interest and

9    the national security piece of it.  It explains that the

10   Applicant should -- the waiver will be considered based on

11   the visa application and then the visa interview.  There

12   is always a visa interview.  So issues on the undue harm

13   and the national interest would be raised at the

14   interview.

15         The Proclamation itself is pretty detailed

16   in the examples of what might meet those first two pieces

17   of it -- the undue and the national interest -- and it

18   goes through ten different examples.  And that is kind of

19   the guidance that the State Department put out there.

20   That is the President's guidance, and that is the guidance

21   of the State --

22         THE COURT:  On that issue, so the President's

23   proclamation, Proclamation 9645, says in Section 3(c) that

24   Department -- Secretary of State, Secretary of Homeland

25   Security shall coordinate to adopt guidance.  Now, the

1   Government's position is that what is posted on that State

2   Department website is the guidance that the President was

3   contemplating?

4        MR. FLENTJE:  That is the outward facing

5   guidance, and it really kind of sticks to the terms of the

6   Proclamation and sort of tells people how to apply.  So

7   that is the guidance that is outward facing.

8             There is also internal guidance that the

9   State has distributed to consuls around the world.  That

10  is not in the complaint and obviously there is a limit --

11  I can't rely on it too much in a Motion to Dismiss

12  posture; but that guidance which was internally

13  distributed -- and there is nothing that requires it to be

14  outward facing in the Proclamation.  It is actually now

15  public or large pieces of it or at least are public

16  through a FOIA request.  So it is actually out there --

17  and, again, this might be more appropriate for summary

18  judgment type posture -- but it is out there and has been

19  distributed, and then there is also additional tables and

20  other types of guidance that will be internal State

21  Department guidance.

22             As for their claims, the Proclamation in

23  talking about issuing guidance doesn't require it all be

24  outward facing.  It is very understandable why a lot of it

25  would need to be confidential to avoid manipulation of the

1   process.

2               A lot of the -- in 3(c)II, which talks

3   about the sort of things that should be in the guidance,

4   almost all of those are sort of inward facing concerns

5   that the President expressed to make sure that this waiver

6   process would not cause national security problems, and

7   that type of guidance really isn't suited for public

8   consumption.  That is sort of making sure that the kind of

9   vetting that they can't do -- because these countries

10  don't have good identity management policies -- can be

11  done by the State Department with government partners who

12  deal in national security issues.

13              So I think a lot of those details in 3(c)II

14  A, B, C, D and E are all talking about making sure the

15  national security vetting can be done for this group where

16  the partnership of the nation is just not working well

17  enough to get the good background and good identity

18  information for individuals seeking visas.

19              THE COURT:  I hear that, and it was in your

20  papers.  How does that foreclose the sham allegations?

21  Maybe there is an issue they didn't do the guidance, and

22  maybe there is a fact issue they did.  Maybe it is even --

23  I don't know -- what they are saying is guidance or not,

24  the policy in effect has been no waivers.  So how does

25  that get dismissed as a 12(b)6 issue?

1          MR. FLENTJE:  I guess that gets us to our basic

2     APA points.  Ultimately, when you are -- what the

3     Plaintiffs are seeking is to look at these consular

4     determinations.  If they are saying none -- they are not

5     being done properly in large numbers -- that is like

6     consular non-reviewability writ large.  I think our

7     argument would be that the Court shouldn't get into

8     managing that process.

9               A lot of their -- you know, the allegations

10    in their complaint aren't really it is a sham.  The

11    specific allegations are a little more focused on the

12    issuance of guidance, and they say that the State

13    Department should comply with its rules; and there is

14    nothing in the policy that says don't comply with the

15    rules.  I don't quite understand how that claim can go

16    forward.  They say they want the Court to order the

17    creation of an orderly process.

18              Well, I mean, again, the process the State

19    Department has created is appropriate to this national

20    security waiver.  There is certainly nothing in the

21    statute or regulations that require a different process

22    than asking -- asking applicants to request the waiver at

23    the visa interviews.  In fact, you know, thousands and

24    thousands of determinations are made after these visa

25    interviews all the time across the world.  It's a brief

1  process.  It is nothing like a court hearing.  These

2  things happen fast.  There are hundreds, and I think there

3  are probably millions of applicants around the world.  So

4  these things have to happen quickly.

5         THE COURT:  You are talking about the subset of

6  countries?

7         MR. FLENTJE:  No.  I'm talking more big picture.

8  I think what they are envisioning here is kind of

9  micromanagement of those consular decisions.  When do they

10 need more evidence?  When do they have enough evidence?

11 How do they apply the undue burden test to certain family

12 units and whether they meet that test or whether they

13 don't meet that test, and I guess --

14        THE COURT:  I hear that, and there is obviously

15 law on that under the ability of the specific consular

16 decisions.  The claim here is that nobody is doing

17 anything ever, and that is a de facto policy that the

18 State Department has adopted.  I don't see how I would

19 have to look at any specific individual waiver

20 determinations.  I would look at:  Is this really

21 something that is being stonewalled or is this something

22 that is being done in good-faith.  And, you know,

23 certainly a citizen has the right to say the government

24 has put up a sham program without having to get into the

25 details.  You are either doing it or not.  Not as granular

1   as you are suggesting it has to be.

2   MR. FLENTJE:  I mean, I guess we would say they

3   have to identify in their complaint policies that they

4   think are unlawful if they are going to bring an APA case.

5   It has to be some sort of a final agency action.  Sort of

6   a this procedure doesn't work is not a claim.  They need

7   to point to policies that they don't like.  If they don't

8   think it is appropriate to have the interview -- have the

9   waiver be made at the interview, that is a policy that is

10  on the State Department website.  That is something that

11  we can evaluate the legality of.

12          If they come and say, It just doesn't work,

13  that is not a claim that survives a Motion to Dismiss.  It

14  is too vague.  It's too amorphous, and it doesn't point to

15  something the complaint has -- it's a lot of material, but

16  it doesn't have a lot of material focusing on what they

17  think is illegal.  That is really important for evaluating

18  a Motion to Dismiss.  If they haven't put it together in a

19  concrete way to identify the policies or the things that

20  are happening that are in violation of law, we would think

21  the dismissal would be appropriate perhaps for more of an

22  equal type ground.

23          They haven't explained the nature, and I

24  will give you one example.  They focus a lot in their

25  briefing on consular officials not accepting additional

1    evidence when requested.  If we look at the complaint,

2    that appears in one paragraph of the complaint, paragraph

3    78.  It cites an e-mail interaction between some

4    lawyers -- a lawyer for a visa applicant and consulate

5    lawyer -- the consulate in, I believe, Abu Dhabi, and

6    there is some back and forth -- and the ultimate e-mail

7    they quote a lot is:  We don't need anymore information

8    about the waiver.  The waiver has moved forward.

9             Again, each of those kind of assessments by

10   the consular official about whether more evidence is

11   needed is -- is really digging into the heartland of the

12   consular non-reviewability area.  That consular official

13   understood he needed more evidence at that time.  He said

14   the waiver was moving forward.  It is very -- and it is

15   not even one of the Plaintiffs in this case.  We don't

16   really know much about that interaction -- the history of

17   it or how that can support their overarching claim that

18   additional evidence is not allowed.

19            Now, the regulations say there are certain

20   circumstances where you can submit additional evidence.

21   There is nothing in the policy that says those regulations

22   don't apply.  They talk about --

23            THE COURT:  Let me jump in.  You mentioned FOIA

24   earlier.  Are you saying that -- I'm going to ask if you

25   have these -- earlier you mentioned there might be some

1  internal guidelines under Proclamation Section 3(c)i(2)

2  and there is no problem with FOIA requests for those?  In

3  other words, the Plaintiffs can get those?

4        MR. FLENTJE:  Sure.  I believe they are -- some

5  of the same people are involved in the FOIA litigation.

6  There have been a lot of documents released under FOIA.

7  We know a lot more than we did when the complaint was

8  filed, and the guidance issued in January of 2018 is one

9  of those FOIA documents.

10        THE COURT:  That's what you have been calling the

11  internal side of the guidance?

12        MR. FLENTJE:  Yes.  It is redacted, so there is

13  still parts of that that is not suitable for public

14  release.  I'm sure Plaintiffs are aware of that document.

15        THE COURT:  Do you have those?

16        MS. SHEBAYA:  Yes, your Honor.  After briefing

17  concluded, the Government produced some of those internal

18  guidance documents.  We don't believe that they address

19  some of the issues in our case; and, in fact, if anything,

20  we think that they reinforce some of our claims; that the

21  agency is not following its own guidance.  I just --

22        THE COURT:  Okay, hold on.  I wanted to make sure

23  you had them.  Let me ask you this:  For the APA claim,

24  what is the final agency action that you are challenging?

25        MS. SHEBAYA:  Your Honor, the APA claim in this

1   case is under the line of cases about the agency not

2   following its own policies, and in this case the policies

3   that we point to are essentially two conflicting

4   requirements that the agency has placed.

5           The Proclamation itself as incorporated

6   into the agency's guidance places the burden on applicants

7   to demonstrate that they meet three eligibility criteria.

8   We have provided ample allegations and supported by

9   declaration from former consular officials and attorneys,

10  that applicants are not being provided with a way of

11  making that demonstration.

12          The APA claim fundamentally rests on that

13  idea that when an agency holds itself forth as providing a

14  process, it must actually provide that process; and it

15  can't go against its own guidelines.

16          THE COURT:  Now, where do you ground that in the

17  INA, though?  What portion of the INA is something they

18  should be implementing but they are not?

19          MS. SHEBAYA:  Your Honor, we think that the

20  applicable law here and the applicable guidance is the

21  Proclamation; and the guidance that is issued around the

22  Proclamation.  It is not a particular provision of the

23  INA.

24          THE COURT:  I do want to make sure I fully

25  understand where we are.  So the first claim to relieve

1 the APA claim is not premised on any specific section of

2 the INA; is that right?

3          MS. SHEBAYA:  Yes, your Honor.

4          THE COURT:  Okay.  I was looking at your

5 paragraph 319.  That's where I'm keying off of here; and

6 for that first claim, what constitutional provision are

7 you relying on?

8          MS. SHEBAYA:  Sorry, I'm just catching up here.

9 For the APA claim?

10          THE COURT:  Yes, claim 1.

11          MS. SHEBAYA:  For claim 1 we are primarily

12 alleging that the agency has violated APA by not following

13 its own guidelines.

14          THE COURT:  I understand that.  So there is

15 nothing in the INA itself you are relying on for the APA

16 claim.  Is it the U.S. Constitution reference, just an

17 effect of the due process clause?

18          MS. SHEBAYA:  Yes.

19          THE COURT:  Is there anything else?

20          MS. SHEBAYA:  It is the due process clause.

21          THE COURT:  Okay.  And then tell me about the

22 Proclamation and what you are relying on for the APA claim

23 in the Proclamation.

24          MS. SHEBAYA:  Your Honor, in the Proclamation

25 Section 3(c) describes a waiver process that allows an

1  individual to demonstrate that they meet three eligibility

2  criteria; and, in fact, places the burden on that

3  individual for making that demonstration.  Fundamentally

4  what we are alleging is that when individuals have tried

5  to make that demonstration, they have either been stopped

6  from doing that or decisions have been taken before they

7  ever had a chance to apply or make the required

8  demonstration.

9           So at its core this is really a -- our

10 claim is that when the agency says, Here are three

11 eligibility criteria, we have defined them according to

12 our discretion; and we haven't given you any clue about

13 what those definitions are.  It is your burden to actually

14 meet -- to actually show that you meet the definitions.

15 The least the agency should do is to provide an orderly

16 way for individuals to make that demonstration.

17      THE COURT:  You agree that the State Department

18 has posted something for the public to look at when you

19 can get a waiver; is that right?

20      MS. SHEBAYA:  Yes, your Honor.  Those guidelines

21 don't actually clue individuals in to any kind of process

22 for actually applying for a waiver.  The guidelines say

23 the consular officials are adjudicating waiver requests at

24 the interview; but, in fact, for Plaintiff after

25 Plaintiff -- and not just in the one paragraph -- but for

1   each Plaintiff, we have alleged that the consular official

2   hasn't adjudicated the waiver request at the interview.

3          We have also submitted a declaration from a

4   former consular official stating that he did not believe

5   that consular officials had the discretion to grant the

6   waiver.  So the guidance itself on its face makes

7   statements that we believe are contradicted by the way

8   that the process itself is playing out.  That is

9   fundamentally why we think that it is not being -- that

10  the agency isn't following its own guidelines and

11  following the terms of the Proclamation to allow

12  individuals -- every individual on a case-by-case basis to

13  make that demonstration.

14          THE COURT:  Okay.  But get back to where I

15  started, is there a specific something you consider to be

16  an final agency action by the APA?

17          MS. SHEBAYA:  Yes, your Honor.  We consider the

18  Proclamation text as incorporated into the agency's

19  guidance for a waiver process to be the final agency

20  action that represents the consummation of the agency's

21  decisionmaking process, about how they are going to

22  implement the waiver process; and it affects the legal

23  rights of individuals who are applying for visas seeking

24  to come to the United States as well as their U.S.

25  citizen family members.

1          THE COURT:  For the mandamus claim, what are you

2     asking to be held?

3          MS. SHEBAYA:  Your Honor, I would say the core of

4     our claim is the APA and the constitutional claims.  If,

5     your Honor, reaches the mandamus claim, what we are asking

6     for is the issuance of guidance, which, again -- according

7     to the allegations of the complaint, the guidance is

8     either not issued or issued in an insufficient manner that

9     doesn't give applicants information that they need in

10    order to make the demonstration that the proclamation

11    requires them to make.

12          The mandamus claim would basically be that

13    they should issue such guidance, and they should create an

14    orderly process whereby individuals can apply.

15          THE COURT:  Anything else you would like to add?

16          MS. SHEBAYA:  Well, your Honor, I would just

17    note -- in relation to some of the things that my

18    colleagues said, we don't believe that the doctrine of

19    non-reviewability applies as, your Honor, alluded.

20          We also think that the D.C. District Court

21    case, *Davis versus Nielsen*, provides a really good, sort

22    of comfortable, situation where there was an agency policy

23    that the agency wasn't following that concluded -- for

24    boilerplate disclaimer of judicial review; but the Court

25    nonetheless reviewed the action.  Found that the two

1  criteria are -- whether it is binding on the agency and

2  whether it is intended to -- and on that basis found that

3  it was reviewable and proceeded to the mandamus.

4          THE COURT:  Mr. Flentje?

5          MR. FLENTJE:  Just a couple points.  I mean, one

6  reason this case is strange is because normally you would

7  have a case.  Someone asks for a visa.  It is denied.

8  There would be a record, and they would sue; but consular

9  of non-reviewability prevents that.  Plaintiffs can't

10  focus on an individual case because of consular of

11  non-reviewability.  Therefore, they need to focus on

12  policy that they think is unlawful.  The policies they

13  have identified in their complaint are not unlawful.

14              The value to the State's issue that just

15  came out under FOIA, they can challenge that and say it is

16  inadequate.  It goes into a lot of detail about all these

17  issues that they are hoping for guidance on.  The stuff

18  that is redacted is more on the national security side.

19              I just want to say one other thing about

20  the process.  The guidance explains that you look at the

21  burden --

22          THE COURT:  Can I just jump in?  So you have

23  heard your opponent's statement that there is not clear

24  guidance on the mechanics, when to apply, how to apply,

25  what to say.

1          MR. FLENTJE:  The guidance is clear on that.

2          THE COURT:  Are you saying that the materials

3    that were just released are clearer on that?

4          MR. FLENTJE:  No.  I will say the guidance was

5    clear on that from the beginning.  It says you ask at the

6    interview, and you explain the circumstances at the

7    interview that would entitle you -- it will help you meet

8    the burden and the national interest test.  Those are much

9    more straightforward than the national security piece of

10   this, and the national security piece of this is what is

11   causing a lot of the delay.  So I would say that the

12   guidance is very clear on when and how you apply.  I will

13   also say that there are regulations that the Plaintiffs

14   cite about when consular officials can ask for and

15   supplement and when someone can seek reconsideration.

16   Those regulations are all in force.  There is nothing in

17   any of the policies that say that those don't apply.

18          They ask -- so if they identified a policy

19   that said, Now, we are not going to follow those

20   regulations for this waiver, that would be something for

21   the Court to look at.  Do the regulations apply here --

22          THE COURT:  Let me jump in.  If people just don't

23   do it, you don't have to have it written down for it to be

24   actual.  You can have a policy from a pattern.

25          MR. FLENTJE:  There is absolutely a route to

1   review that, and *Patel* in the Ninth Circuit says you can

2   bring a mandamus action after a period of time seeking

3   action on the visa request.  And, you know, they mention

4   that in the complaint; but I don't think that is the

5   heartland of this case.  And if that were the case, then

6   we would come in and say:  Person X, well, this person is

7   going to -- you know, there is a national security risk or

8   we would give whatever explanation we had; but it would be

9   focused on the delay in an individual case.

10          The Plaintiffs are saying, Well, there is

11  delay in a lot of cases; and it takes a long time.  I

12  think that is just not focused enough to survive a Motion

13  to Dismiss on a *Patel*-type theory where you would look at

14  the -- does the agency have to act now on something.  Is

15  there an agency action that needs to be taken?  If you say

16  they are all moving too slowly, I just -- I don't think

17  there is law to apply there to say the fact that it moves

18  slowly is illegal, violates law, the sort of things you

19  would look at in an APA case.

20          THE COURT:  It is your complaint.  I will let you

21  have the last say if you have anything to add.

22          MS. SHEBAYA:  Your Honor, I would just say the

23  core of our complaint is not that there is delay or that

24  there is any particular individual cases that this Court

25  should look at.  And, in fact, I would just note that a

1  lot of the factual assertions that opposing counsel made

2  are more appropriate for a summary judgment posture.  At

3  this stage in our complaint we have alleged that people

4  are not actually getting any chance to demonstrate.  Most

5  have -- our Plaintiff as well as a number of others in the

6  punitive class -- who had their interviews well before the

7  Proclamation came into effect.

8          THE COURT:  Are you contending this is a sham

9  program?

10          MS. SHEBAYA:  Yes, your Honor.

11          THE COURT:  You are.

12          MS. SHEBAYA:  We are.

13          THE COURT:  So you are contending that, and you

14  are contending in a big way -- unless you tell me

15  differently -- that regardless of what the guidance says

16  and regardless of whatever the vibe is coming out of the

17  State Department, the reality is nobody is getting these

18  waivers; and that is intentional and it is all a sham.  Is

19  that fair?

20          MS. SHEBAYA:  Yes.  I don't know if we are saying

21  that nobody is getting waivers.  We are just saying it is

22  being implemented in an arbitrary capricious way.  It is a

23  sham, and they are not actually following preservation of

24  the eligibility criteria as they should.

25          THE COURT:  All right.  I will have this out

1   relatively soon.  In the meantime, why don't we just wait

2   for case management until the other case arrives; and that

3   way we can have a better interaction.  In the meantime,

4   why don't we just wait for me to get the motion out and

5   not do anything else other than land the case here, okay.

6   So no -- just wait until I have that order done and see

7   where we are.

8              No matter what happens -- and I'm not sure

9   yet there will be an option to amend -- so it is not going

10  away at this stage.  All right.  It very well -- I don't

11  know.  It may not even reach amendment.  It might be

12  perfectly fine.  This helped clarify a couple issues.  I

13  appreciate that.  Thank you very much.

14       MS. SHEBAYA:  Thank you, your Honor.

15            (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTER

4

5        I, MARLA KNOX, Official Court Reporter for the

6   United States Court, Northern District of California, do

7   hereby certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled

9   matter.

10

11

12        /s/_____

13        MARLA F. KNOX, RPR, CRR
          U.S. Court Reporter
14
          Date:  Wednesday, January 2, 2019
15

16

17

18

19

20

21

22

23

24

25