UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FARANGIS EMAMI, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>KIRSTJEN NIELSEN, et al.,<br><br>　　　　　Defendants. | Case No. 18-cv-01587-JD<br><br>**ORDER RE MOTION TO DISMISS**<br>Re: Dkt. No. 42 |

This case is a putative class action brought by thirty-six named plaintiffs against the United States Department of Homeland Security, the Department of State, the agencies for Customs and Border Protection and Citizenship and Immigration Services, and their senior leaders. Dkt. No. 34. Plaintiffs challenge the government's conduct in connection with a waiver program that would permit the entry into the United States of foreign nationals banned by Presidential Proclamation 9645. This order resolves defendants' motion to dismiss plaintiffs' complaint, which was brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 42.

## BACKGROUND

**I. THE LEGAL CONTEXT**

The complaint arises out of Presidential Proclamation 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," which President Trump signed on September 24, 2017. 82 Fed. Reg. 45161 (2017) (the "Proclamation"). The President states that he issued the Proclamation after ordering a "worldwide review of whether, and if so what, additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat." 82 Fed. Reg. at 45161. The Secretary of

Homeland Security concluded from the review that "a small number of countries . . . remain deficient . . . with respect to their identity-management and information-sharing capabilities, protocols, and practices." *Id*. To advance the "policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices," the President ordered a sharp curtailment, and in some cases a complete suspension, of entry into the United States by nationals of eight countries: Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen and Somalia. *Id*. at 45162, 45165-67.

The complaint focuses on Iran, Libya, Somalia, Syria and Yemen. Dkt. No. 34 ¶ 4.[1] For Iranian nationals, the President limited entry into the United States to holders of visas for students (F and M) or exchange visitors (J), and no others. 82 Fed. Reg. at 45165. For Libyan nationals, the President suspended all immigrant entry, and nonimmigrant entry on business (B-1), tourist (B-2) and business/tourist (B-1/B-2) visas. *Id*. at 45166. For Somali nationals, the President suspended all entry into the United States as immigrants, and required "additional scrutiny" of nonimmigrant entry for ties to terrorist organizations or other threats to the United States. *Id*. at 45167. For nationals of Syria, entry as immigrants and nonimmigrants was suspended *in toto*. *Id*. at 45166. For Yemeni nationals, entry as immigrants was suspended, as well as entry as nonimmigrants on business (B-1), tourist (B-2) and business/tourist (B-1/B-2) visas. *Id*. at 45167.

The President also ordered the waiver program that is at the center of this dispute. As Section 3(c) of the Proclamation provides, "a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis . . . ." 82 Fed. Reg. at 45168. "A waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that: (A) denying entry would cause the foreign national undue hardship; (B) entry would not pose a threat to the national security or public safety of the United States; and (C) entry would be in the national interest." *Id*. (Sec. 3(c)(i)).

---

[1] The restrictions on nationals of Chad have been lifted. Presidential Proclamation No. 9723, 83 Fed. Reg 15937 (Apr. 10, 2018).

2

1    The President directed the Secretary of State and the Secretary of Homeland Security to
2    "coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate
3    for foreign nationals seeking entry as immigrants or nonimmigrants." *Id*. (Sec. 3(c)). The
4    Proclamation left the format of the guidance up to the agencies, but provided examples of
5    circumstances when a waiver would be appropriate. These situations included a foreign national
6    who "seeks to enter the United States to visit or reside with a close family member (*e.g.*, a spouse,
7    child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully
8    admitted on a valid nonimmigrant visa," and for whom "the denial of entry would cause . . . undue
9    hardship." *Id*. at 45169 (Sec. 3(iv)(D)). They also included a "foreign national [who] seeks to
10   enter the United States for significant business or professional obligations and the denial of entry
11   would impair those obligations." *Id*. (Sec. 3(iv)(C)).

A lawsuit brought in this circuit challenged the legality of the Proclamation, but the United States Supreme Court upheld it as a proper exercise of the President's discretion to suspend the entry of aliens into the United States under Section 1182(f) of the Immigration and Nationality Act. *Trump v. Hawaii*, 138 S.Ct. 2392, 2408 (2018). The plaintiffs had sought to enjoin the Proclamation on the grounds, among others, that it was issued "for the unconstitutional purpose of excluding Muslims" in violation of the Establishment Clause of the First Amendment. *Id*. at 2415. The Supreme Court concluded that the plaintiffs were not likely to succeed on the merits. The Court applied a rational basis review to find that "the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id*. at 2420-23. The Court also assumed without deciding that the plaintiffs' statutory claims could be heard notwithstanding the doctrine of consular nonreviewability. *Id*. at 2407.

The allowance for waivers in the Proclamation was an important reason why the five-justice majority upheld it as serving a legitimate national security interest. The majority cited the waiver program as one of "three additional features" of the President's policy -- along with the subsequent removal of restrictions on three "Muslim-majority" countries and an allowance for "significant exceptions" for nonimmigrant entry -- that effectively dispelled concerns of religious animus or discrimination in the Proclamation. *Id*. at 2422. The majority put substantial emphasis

3

on the fact that DHS and the State Department were directed to "issue guidance elaborating upon the circumstances that would justify a waiver," in the apparent expectation that this would establish a program similar to the "humanitarian exceptions" implemented by President Carter during the Iran hostage crisis. *Id*.

The four dissenting justices took a different view. Most relevant here is Justice Breyer's attention to the majority's observations about the waiver program. He suggested that, while the words might be reassuring, the incipient evidence available to the Court indicated that waivers were not being granted in practice. At the least, this evidence raised a serious question about whether the program was mere "window dressing." *Id*. at 2432-33. This matters because, if the government was not in fact actually administering the waiver program, "its argument for the Proclamation's lawfulness becomes significantly weaker." *Id*. at 2430.

## II. THE FACTUAL CONTEXT

That is the main legal context of the complaint. The factual circumstances are provided by a number of State Department statements about the Proclamation and the waiver program that are attached to the complaint and incorporated by reference, and so are properly considered for the motion to dismiss. To start, on December 4, 2017, the Department posted on its website an informational statement about the Proclamation that included some "Frequently Asked Questions" and the answers to those questions. The post included these statements: "In accordance with the Presidential Proclamation, for nationals of the eight designated countries, a consular officer will make a determination whether an applicant . . . may be eligible for a waiver under the Proclamation and therefore issued a visa." Dkt. No. 34-4 (Ex. C) at ECF p. 4. "As specified in the Proclamation, consular officers may issue a visa based on a listed waiver category to nationals of countries identified in the PP on a case-by-case basis, when they determine: that issuance is in the national interest, the applicant poses no national security or public safety threat to the United States, and denial of the visa would cause undue hardship. There is no separate application for a waiver. An individual who seeks to travel to the United States should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver." *Id*. at ECF p. 6.

4

On April 10, 2018, the Department posted to its website about "Revisions to Presidential Proclamation 9645." Dkt. No. 34-7 (Ex. F). It explained that "[t]he new P.P. removes the visa restrictions imposed on nationals of Chad by the earlier P.P." *Id*. at ECF p. 2. The new statement once again affirmed that "[a]s specified in the Proclamation, consular officers may issue a visa based on a listed waiver category to nationals of countries identified in the PP on a case-by-case basis, when they determine" the waiver factors are satisfied. *Id*. at ECF pp. 4-5. The revised statement's "Frequently Asked Questions" section also said that "[a]n individual who wishes to apply for an immigrant visa should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for an exception or waiver per the Proclamation. A consular officer will carefully review each case to determine whether the applicant is affected by the Proclamation and, if so, whether the case qualifies for an exception or a waiver." *Id*. at ECF p. 6.

Another "frequently asked" question posed this inquiry: "I've heard that the Department of State does not grant waivers of the Proclamation. Is this correct?" The State Department answered,

> This information is incorrect. As specified in the Proclamation, consular officers may issue a visa to nationals of countries covered by the Proclamation with a waiver on a case-by-case basis, when they determine: that issuance is in the national interest, the applicant poses no national security or public safety threat to the United States, and denial of the visa would cause undue hardship. There is no separate application for a waiver. An individual who seeks to travel to the United States should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver. From December 8, 2017 through April 1, 2018, more than 430 applicants were cleared for waivers after a consular officer determined the applicants satisfied all criteria and completed all required processing. Many of those applicants already have received their visas.

*Id*. at ECF p. 7.

In addition to these comments that the State Department published on the internet, the complaint attached two letters from Mary K. Waters, Assistant Secretary of Legislative Affairs at the Department of State, to United States Senator Chris Van Hollen. The first, dated February 22, 2018, referred expressly to Section 3(c) of the Proclamation, and stated, "[t]he entry restrictions of

5

the Proclamation may be waived if a consular officer determines that the applicant meets each of the following three criteria: (1) denying entry would cause the foreign national undue hardship; (2) entry would not pose a threat to the national security or public safety of the United States; and (3) entry would be in the national interest." Dkt. No. 34-6 (Ex. E) at ECF p. 2. The letter added, "[c]onsular officers may grant waivers on a case-by-case basis when the applicant demonstrates to the officer's satisfaction that he or she meets the three criteria discussed above." *Id*. at ECF p. 3. After addressing each criteria more specifically, Ms. Waters stated, "If the consular officer determines, after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met, a visa may be issued with the concurrence of a consular manager." *Id*. The letter also said that "Section 3(c)(iv) of the Proclamation provides examples of the circumstances in which a waiver might be appropriate. The Department's worldwide guidance to consular officers regarding waivers is drawn directly from the Proclamation. Further, consular officers may consult with the Visa Office if a consular officer believes a case may warrant a waiver but the applicant's circumstances do not align with one of the examples in the Proclamation." *Id*. Ms. Waters attached a chart to the letter which showed that a total of 2 waivers had been approved as of February 15, 2018, out of 8,406 applications for nonimmigrant and immigrant visas that had been received and processed from nationals subject to Proclamation 9645 between December 8, 2017, to January 8, 2018. *Id*. at ECF p. 5. The Court's math indicates that this amounts to an approval rate of 0.02%.[2]

Ms. Waters sent a second letter to Senator Van Hollen six months later, on June 22, 2018. That letter confirmed that, "[a]s discussed in our February 22 letter, the Department's worldwide guidance to consular officers regarding when a waiver pursuant to section 3(c) of PP 9645 may be granted is drawn directly from PP 9645 itself." Dkt. No. 34-11 (Ex. J) at ECF p. 2. The letter included another chart stating that, "as of April 30 unless otherwise stated," waivers were approved for "579 (768 as of May 31)" applicants out of 33,176 applications that had been

---

[2] Ms. Waters' chart contains a number of deductions, *e.g.*, for "applicants refused for reasons unrelated to the Proclamation" (1,723) and "applicants who failed to meet the criteria for a waiver" (6,282). But even with those deductions, out of 273 applicants who presumptively qualified for a waiver, only 2 were granted. That amounts to a 0.73% approval rate.

received "from impacted nationalities." *Id*. at ECF p. 4. The Court's math indicates that this amounts to approval rates of 1.75% and 2.3%, for April 30, 2018, and May 31, 2018, respectively.[3]

Other exhibits in the complaint provide additional factual background. These include a declaration by a former consular officer, Christopher Richardson, Esq., who was employed by the United States Department of State from 2011 to 2018, and most recently as American Citizens Services Chief at the United States Embassy in Madrid, Spain. Dkt. No. 34-3 (Ex. B) ¶ 3. Mr. Richardson states that he had access to "all the state department guidance, cables, sample Q's and A's and instructions regarding" the Proclamation, and when read together, it was "understood that there really is no waiver and the Supreme Court was correct to point out that the waiver is merely 'window dressing.'" *Id*. ¶¶ 4, 10. Furthermore, "[a]s a Consular officer previously employed by the State Department [his] impression and interpretation of how we as officers were to apply the waiver process was" that "we were not allowed to exercise that discretion [to grant a waiver]. We were mandated to send notice to Washington that we found this applicant eligible to apply and Washington would then make the decision to grant or deny the waiver." *Id*. ¶ 11.

Plaintiffs have also provided a sample waiver denial letter from the Consular Section of the United States Embassy for Yerevan, Armenia. Dkt. No. 34-10 (Ex. I). It reads, "Dear Applicant: This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645. Today's decision cannot be appealed." *Id*. The letter offers only two options for the consular officer to choose. The first option states: "Taking into account the provisions of the Proclamation, a waiver will not be granted in your case." *Id*. The second states: "The consular officer is reviewing your eligibility for a waiver under the Proclamation. . . . You will be contacted with a final determination on your visa application as soon as practicable." *Id*. The sample form comes with

---

[3] Again, even excluding Ms. Waters' figures for those applicants "found ineligible for reasons other than those covered in P.P. 9645" (4,900) and those applicants "who received a visa under an exception from P.P. 9645" (4,900), results in waiver approval rates of 2.13% and 2.83% as of April 30, 2018, and May 30, 2018, respectively.

7

the first box pre-checked to show that a waiver was denied. No box is provided in the form to show that a waiver has been granted.

### III. PLAINTIFFS' CLAIMS

The named plaintiffs and putative class members are United States citizens, and lawful permanent residents and foreign nationals hailing from Iran, Libya, Somalia, Syria and Yemen. Dkt. No. 34 ¶ 4. The complaint organizes plaintiffs into two groups. In the Family Member Class are United States citizens and lawful permanent residents whose family members are subject to the entry restrictions imposed by the Proclamation. *Id*. ¶ 11. In the Visa Applicant Class are the Iranian, Libyan, Somali, Syrian and Yemeni visa applicants themselves whom the Proclamation would bar from the United States absent a waiver. *Id*. ¶ 12.

The number of named plaintiffs is quite sizable, and so the Court highlights just a few representative accounts of their waiver experiences as alleged in the complaint. Plaintiff Tanaz Toloubeydokhti is a United States citizen of Iranian origin who lives in San Diego, California, and works in obstetrics and gynecology. Dkt. No. 34 ¶¶ 98-99. In 2016, Ms. Toloubeydokhti petitioned for immigrant visas for her parents, plaintiffs Fathollah Tolou Beydokhti and Behnaz Malekghaeini, who are both Iranian nationals. The petitions were approved and her parents' visa interviews were scheduled for December 21, 2017, at the United States Embassy in Yerevan, Armenia. *Id*. ¶ 100. Her parents had "put together documents they believed would demonstrate that they meet the criteria for a waiver under the terms of the Proclamation." *Id*. ¶ 101. But "when they attempted to present those documents to the consular official, the official refused to review them, stated that they did not qualify for a waiver, and stated that their visas were denied." *Id*. Because of the denial, Mr. Beydokhti and Ms. Malekghaeini were unable to enter the United States to be with their daughter and newborn grandchild. *Id*. ¶ 103.

Plaintiff Malik Almathil is a United States citizen living in New York City who petitioned in March 2015 for entry of his Yemeni wife currently residing in Jordan. *Id*. ¶ 132-33. The petition was approved, and Mrs. Almathil attended her visa interview in Djibouti on July 31, 2017, before the Proclamation went into effect. *Id*. ¶ 133. On December 17, 2017, soon after the Proclamation was promulgated, she received "a boilerplate denial of a visa and waiver," without

ever being given the opportunity to submit documents to demonstrate her eligibility for a waiver. *Id*. ¶¶ 134-36. Because of the situation in Yemen, Mrs. Almathil "had to leave the country in 2015 and is unable to return." *Id*. ¶ 138. And because Mr. Almathil had to "return to the United States to resume earning a living so that he can provide for himself and his wife," husband and wife are currently living in separate countries. *Id*.

Plaintiff Ismail Alghazali is a United States citizen of Yemeni origin currently residing in Djibouti. *Id*. ¶ 123. He petitioned for a family-based immigrant visa for his wife in mid-2016, and the petition was approved in late 2016. *Id*. ¶ 124. She attended her interview at the United States consulate in Djibouti on January 3, 2018, and "was informed immediately that her visa was denied and that she would not be considered for a waiver." *Id*. ¶¶ 124-25. She was never informed that she could seek to demonstrate her eligibility for a waiver, nor given an opportunity to submit documents in support of a waiver application. *Id*. ¶¶ 126-27. She was pregnant at the time of her interview and gave birth (in a taxi cab with no medical assistance) about a month after. *Id*. ¶ 130. Mr. Alghazali was forced to leave the United States and his job here so that he could be with his wife and infant son in Djibouti. *Id*. ¶ 129.

Plaintiff Soheil Vazehrad is a United States citizen of Iranian origin currently residing in Napa, California. *Id*. ¶ 181. He applied for a fiancé visa for plaintiff Atefehossadat Motavaliabyazani, an Iranian national currently in Iran, in April 2016, and the petition was approved in May 2016. *Id*. ¶¶ 182-83. Ms. Motavaliabyazani attended her interview at the United States embassy in Yerevan, Armenia, on October 20, 2016, almost a year before the Proclamation was issued, and on January 4, 2018, received an email identical in substance to the letter attached as Exhibit I to plaintiffs' complaint and described above. *Id*. ¶¶ 184-85. Like the letter, the email contained only two options -- either denying a waiver or informing the applicant that "[t]he consular officer is reviewing your eligibility for a waiver" -- and like the sample letter attached to the complaint, the email Ms. Motavaliabyazani received had the first box checked, informing her that a waiver would not be granted in her case. Dkt. No. 34-13 (Ex. L). She was never informed that she could seek to demonstrate her eligibility for a waiver, nor given the opportunity to submit documents in support of a waiver application. Dkt. No. 34 ¶¶ 186-87.

Plaintiff Hoda Mehrabi Mohammad Abadi is an Iranian national who invested $500,000.00 in the United States as part of her petition for an employment-based fifth preference (EB-5) investment visa. *Id*. ¶ 255. Her petition was approved in June 2016, and she attended her immigrant visa interview at the United States embassy in Yerevan, Armenia, on February 23, 2017, seven months before the Proclamation was issued. *Id*. ¶ 256. On December 14, 2017, "her attorney received the same boilerplate email denying her a visa and a waiver under the Proclamation." *Id*. ¶ 257. Even after her attorney contacted the embassy requesting that Ms. Mehrabi Mohammad Abadi's case be considered for a waiver, the embassy responded, "Unfortunately, your case is not eligible for a waiver under Presidential Proclamation 9645." *Id*. ¶ 260. Ms. Mehrabi Mohammad Abadi asserts that she consequently was "unable to submit documents in support of a waiver application." *Id*. ¶ 261.

The complaint provides similar accounts of family separation and dislocation for the other named plaintiffs. On the basis of these factual allegations, plaintiffs assert three legal claims: violation of the Administrative Procedure Act, 5 U.S.C. § 706; violation of the Due Process Clause of the Fifth Amendment to the United States Constitution; and for a writ of mandamus.

**LEGAL STANDARDS**

The standards governing defendants' motion to dismiss are well-established. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To meet that rule and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This does not impose a probability requirement at the pleading stage. "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the conduct challenged by plaintiff. *Id*. at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In addition, the allegations in the complaint must be sufficiently clear and concrete to give the defendant an "idea [of] where to begin" in preparing a response to the complaint. *Twombly*, 550 U.S. at 565 n.10.

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The Court will assume that plaintiffs' factual allegations are true, and will draw all reasonable inferences in their favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But it will not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quotation omitted). If the complaint is dismissed, an opportunity to amend will be provided unless the Court determines that no cure is possible by new allegations of fact. *Lopez v. Smith*, 203 F.3d 1122, 1130-31 (9th Cir. 2000).

**DISCUSSION**

**I. JUSTICIABILITY AND THE SCOPE OF PLAINTIFFS' CLAIMS**

The first question raised in the government's motion is whether plaintiffs' claims are justiciable, or whether they should be dismissed, as the government contends, under the doctrine of the nonreviewability of consular decisions. This is one of the government's main contentions for dismissal. *See*, *e.g.*, Dkt. No. 42 at 1 ("[C]onsular nonreviewability prevents a court [from] overturning consular officers' decisions or interfering with their decision-making."); *id*. at 3 ("Plaintiffs' claims are barred by 5 U.S.C. § 701(a)(1) because the INA precludes judicial review of consular visa decisions."); *id*. at 4 ("Consular officers' decisions to grant or deny waivers and to revoke visas are committed to their discretion by law and therefore judicially unreviewable."); *id*. at 6 ("Although plaintiffs' challenge is styled as a challenge to the waiver process, they seek APA review of consular officers' individual decisions to deny visas.").

It is certainly true that certain immigration or exclusion decisions are not reviewable in court. *See Hawaii*, 138 S.Ct. at 2407; *Rivas v. Napolitano*, 714 F.3d 1108, 1110-11 (9th Cir. 2013). Because the complaint is at points rather loosely worded, it might seem on occasion that plaintiffs are straying into unreviewable areas. But plaintiffs substantially clarified and narrowed the scope of their claims in their opposition brief and during oral argument. In response to the government's contention, plaintiffs expressly state that they "do not challenge individual consular

11

officer decisions on the merits and do not challenge the outcome of any particular consular officer's decision in a given case." Dkt. No. 57 at 1; *see also id.* at 2 ("this is not a case seeking review of an individual consular officer's discretionary decision"); *id.* at 5 ("individual visa denials" are "not at issue here"). That is entirely consistent with a fair reading of the complaint, which leaves no doubt that plaintiffs are challenging systemic practices with respect to the waiver program, and not individualized determinations for any specific person. The gravamen of the complaint is that the government has flouted its own guidelines and statements about case-by-case determinations of waiver applications in favor of a policy of blanket denials. *See* Dkt. No. 68 at 17:12-15 (plaintiffs' statement at the motion hearing that their "APA claim fundamentally rests on that idea that when an agency holds itself forth as providing a process, it must actually provide that process; and it can't go against its own guidelines."). Those issues do not require review of an individual consular officer's decision. Consequently, dismissal for lack of a justiciable controversy is denied.

Another important clarification by plaintiffs concerns the scope of the APA claim. The complaint suggests in places that plaintiffs might be contemplating a violation of the Immigration and Nationality Act as the basis of their APA claim. *See*, *e.g.*, Dkt. No. 34 ¶ 319 ("Defendants have acted arbitrarily and capriciously and in contravention of . . . the INA . . . , and they have thus violated the APA."); *id.* at 68 (Prayer for Relief, ¶ 4) (seeking declaration that "defendants' refusal to give full and fair consideration for waivers to all visa applicants from the banned countries violates . . . the INA"). At the motion hearing, plaintiffs expressly disclaimed an APA claim premised on any "particular provision of the INA" or any claim that defendants violated "any specific section of the INA." Dkt. No. 68 at 17:16-18:3. The complaint will be construed in light of this clarification. Plaintiffs also acknowledged, as the Supreme Court's opinion in *Hawaii* essentially compels, that they "do not challenge the Proclamation itself." Dkt. No. 57 at 1.

Nor do plaintiffs seek to enforce the terms of the Proclamation. Rather, they are pursuing an APA claim based on the allegation that the State Department is not following its own waiver guidance. Consequently, the Court need not address the issue of whether a private citizen can sue

12

to enforce a Presidential Proclamation, which is by no means a self-evident proposition. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250 (9th Cir. 2018).

**II. APA CLAIM**

The Administrative Procedure Act creates a "basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 139 S.Ct. 361, 370 (2018) (alterations in original; quotation omitted). Our circuit has construed the APA to provide for "broad judicial review of agency action: 'A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'" *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 494 (9th Cir. 2018) (quoting 5 U.S.C. § 702). The APA also states that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Section 706 authorizes the reviewing court to "compel agency action unlawfully withheld" as well as to set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(1) and (2)(A).

Plaintiffs' APA claim has solid legal support in the "well-established" proposition that "agencies may be required to abide by certain internal policies." *Alcaraz v. Immigration and Naturalization Serv.*, 384 F.3d 1150, 1162 (9th Cir. 2004). This proposition was first recognized in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which involved an immigration dispute with overtones similar to this one. The plaintiff in *Accardi* was an Italian immigrant who challenged the validity of a decision by the Board of Immigration Appeals ("BIA") that denied his deportation appeal. *Id*. at 262-63. The Supreme Court reversed and ordered a new appeal hearing because the BIA had not acted in conformance with its governing regulations. Those regulations required the BIA to exercise its own judgment and discretion when considering appeals, but the record indicated that the BIA had summarily denied Accardi's appeal because he was on a list sent from the Attorney General of "unsavory characters" slated for deportation. *Id*. at 264-67. The Supreme Court concluded that the BIA's decision was invalid

because it had not, in fact, exercised its discretion as required by the regulations, but had instead allowed the Attorney General to dictate the result. *Id.*

The holding that administrative agencies are bound to follow their rules and guidelines has since been called the *Accardi* doctrine. The Supreme Court reinvigorated the principle in *Morton v. Ruiz*, 415 U.S. 199, 235 (1974): "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." The doctrine applies to an agency's procedures however they might be denominated. *See, e.g.*, *Church of Scientology of Cal. v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990) ("Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."); *see also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985) (noting that the INS can be bound by its "operations instructions"). What is critical under the doctrine is that an agency can be sued for failing to abide by the rules and procedures it formulates to perform its duties.

The government does not seriously contest this point, *see* Dkt. No. 58 at 6 n.4, and for good reason. The State Department is without doubt an agency for purposes of the APA. *Allen v. Milas*, 896 F.3d 1094, 1102-03 (9th Cir. 2018). The State Department created rules and procedures for the waiver program, as detailed in plaintiffs' exhibits, and recognized the materials it promulgated as such. *See*, *e.g.*, Dkt. No. 68 at 9:5-7 (State Department's online postings were its "outward facing guidance" for waivers). The heart of the APA claim is that the State Department has acted arbitrarily and unlawfully by disregarding its own procedures and rules in administering the waiver program. That is a legally sound claim, and other courts have also allowed APA claims in similar circumstances. *See Torres v. U.S. Dep't of Homeland Sec.*, No. 17cv1840 JM (NLS), 2017 WL 4340385, at *5 (S.D. Cal. Sept. 29, 2017) (APA claim based on DHS failure to follow Deferred Action for Childhood Arrivals program rules and standard operating procedures) (citing *Accardi*, 347 U.S. at 268, and *Alcaraz*, 384 F.3d at 1162); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 335-38 (D.D.C. 2018) (APA claim based on DHS failure to comply with an ICE Parole Directive).

The next question is whether plaintiffs have alleged enough in the way of facts to state a plausible APA claim under *Accardi*. They have. To start, the parties agree that individuals subject to the Proclamation who seek a waiver in order to travel to the United States are required to "disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver." Dkt. No. 34-4 (Ex. C) at ECF p. 6. The government repeatedly affirmed this point and emphasized the importance of the visa interview to the waiver program process at the motion hearing. *See*, *e.g.*, Dkt. No. 68 at 9:11-14 ("There is always a visa interview. So issues on the undue harm and the national interest would be raised at the interview."); *id*. at 23:4-8 ("[T]he guidance was clear on that from the beginning. It says you ask at the interview, and you explain the circumstances at the interview that would entitle you -- it will help you meet the burden and the national interest test.").

Plaintiffs allege many instances where applicants whose visa interviews took place before the Proclamation were denied a visa and a waiver in summary fashion after the Proclamation was signed, and with no further interview or opportunity to submit documents and demonstrate eligibility for a waiver. *See*, *e.g.*, Dkt. No. 34 ¶¶ 133-36, 184-87. Plaintiffs have identified other occasions on which consular officers refused to consider or even accept documents offered to them, on one occasion at the visa interview. *Id*. ¶ 101; *see also id*. ¶¶ 257-61. These facts adequately allege that the State Department has not followed its own guidance with respect to its requirement that visa applicants must disclose at their visa interviews any information that might demonstrate that the applicant is eligible for a waiver.

Plaintiffs allege other failures by the State Department to adhere to its own rules. For example, the waiver guidance states that individual consular officers will exercise discretion to grant waivers on a case-by-case basis when they find the requirements for a waiver to be satisfied. *See*, *e.g.*, Dkt. No. 34-4 (Ex. C) at ECF p. 6 ("consular officers may issue a visa based on a listed waiver category to nationals of countries identified in the PP on a case-by-case basis, when they determine . . . ."). Contrary to this avowed process, plaintiffs allege facts plausibly demonstrating that a *de facto* policy of blanket denials has usurped individualized waiver decisions. These facts include the declaration of a former consular officer who states that "we were not allowed to

15

exercise that discretion" and that "there really is no waiver," Dkt. No. 34-3 (Ex. B), and evidence showing that the sample waiver letter had the "denied" box pre-checked and contained no option for the grant of a waiver at all. Dkt. No. 34-10 (Ex. I). And as discussed, the complaint also offers the testimonials of applicants who were summarily denied waivers and visas, in some cases with the same form letter and in others without ever having had a post-Proclamation visa interview or any other opportunity to make his or her case for a waiver.

Consequently, the Court concludes that plaintiffs have stated an APA claim under the *Accardi* doctrine. The government has not persuasively argued otherwise. It puts substantial emphasis on a number of factual matters, *see, e.g.,* Dkt. No. 58 at 1, 9 (asserting facts about waiver reviews and approval figures), but those issues are of course properly addressed in a summary judgment motion (if truly undisputed) or at trial, and not in a motion to dismiss. The government also suggests that the Supreme Court already rejected in *Hawaii* any claim that the waiver process is a sham, but that reading goes too far. The footnote in the majority opinion about the evidentiary record, 138 S.Ct. at 2423 n.7, hardly constitutes a clear holding that bars the door to plaintiffs' claims here. To the contrary, the better conclusion is that the government's conduct should be tested on a full record, as plaintiffs propose to do in this case.

### III. FIFTH AMENDMENT CLAIM

Plaintiffs also allege claims under the Fifth Amendment to the United States Constitution for substantive and procedural due process deprivations, and an equal protection violation. Dkt. No. 34 ¶¶ 322-34. The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

For the due process claim, the threshold question is whether a plaintiff was deprived of any of these interests, because "*no* process is due if one is not deprived of 'life, liberty, or property.'" *Kerry v. Din*, 135 S.Ct. 2128, 2132 (2015) (Scalia, J., plurality opinion) (quotation omitted, emphasis in original). Plaintiffs do not directly allege such a deprivation, so the question is whether they were deprived of "certain implied 'fundamental rights'" that are understood to be included under the "liberty" prong. *Id.* at 2133. This is also lacking. Plaintiffs have not alleged any constitutionally protected fundamental rights for either the Family Member Class or the Visa

16

Applicant Class. They refer to a "right" to the "integrity of the family unit," but even assuming such a right can be found in the Fifth Amendment, which is not at all clear, plaintiffs concede that it would "not amount to a right of entry for foreign nationals, nor to an unfettered right to reside in the United States with family members who are foreign nationals." Dkt. No. 57 at 13. Indeed, the Supreme Court has held in a plurality opinion that "[e]ven if we might 'imply' a liberty interest in marriage generally speaking, that must give way when there is a tradition denying the specific application of that general interest . . . . Although immigration was effectively unregulated prior to 1875, as soon as Congress began legislating in this area it enacted a complicated web of regulations that erected serious impediments to a person's ability to bring a spouse into the United States." *Din*, 135 S.Ct. at 2135. Plaintiffs' inability to allege a deprivation of an interest protected by the Due Process Clause means their claim must be dismissed in both its procedural and substantive iterations. The dismissal is without prejudice and plaintiffs may amend, if they so choose.

Plaintiffs' equal protection claim under the Fifth Amendment is also dismissed. Although the Fifth Amendment does not contain an express equal protection clause, its Due Process Clause has been interpreted to include an equal protection component. *See Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). Even so, there are problems with plaintiffs' equal protection claim. Their claim is that the "waiver guidance that has issued has been arbitrary and capricious and designed to result in almost-uniform denials. Taken as true, and given the background against which the waiver scheme arose, this supports an inference that the agency has a policy of denying waivers on discriminatory grounds, including nationality or religion." Dkt. No. 57 at 14. This inference is not nearly as obvious as plaintiffs suggest, and demands assumptions unsupported by non-conclusory allegations of fact. That will not do under *Twombly* and *Iqbal*. *See Iqbal*, 556 U.S. at 768. In addition, the logic that "almost-uniform denials" of waivers is tantamount to denial of "waivers on discriminatory grounds" holds together only if it is assumed that the Proclamation unconstitutionally excludes Muslims or illegally discriminates on the basis of nationality, a proposition that the Supreme Court turned aside in *Hawaii*. 138 S.Ct. at 2413-23.

The Court also notes, without firmly deciding the question at this time, that the equal protection claim would likely be subject to rational basis review. *See Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017). The Supreme Court has already concluded in reviewing the Proclamation that "the Government has set forth a sufficient national security justification to survive rational basis review." *Hawaii*, 138 S.Ct. at 2423. This is another sizeable roadblock to the equal protection claim as currently alleged. But plaintiffs will have an opportunity to amend this claim too.

## IV. MANDAMUS CLAIM

Plaintiffs' final claim, for a writ of mandamus, is also dismissed without prejudice. The writ of mandamus is "intended to provide a remedy for a plaintiff only if he [or she] has exhausted all other avenues of relief and only if the defendant owes him [or her] a clear nondiscretionary duty." *Heckler v. Ringer*, 466 U.S. 602, 616-17 (1984).

Plaintiffs themselves have acknowledged the duplicative nature of their mandamus claim and that it may not be necessary. *See*, *e.g.*, Dkt. No. 57 at 15 ("Should this Court find that plaintiffs are not entitled to relief under the APA or the Due Process Clause, mandamus relief would still be available."); Dkt. No. 68 at 21:3-5 ("I would say the core of our claim is the APA and the constitutional claims.").

Because the APA claim will go forward, the Court dismisses plaintiffs' mandamus claim on the basis of plaintiffs' representations that the mandamus claim is redundant. The dismissal is without prejudice to renewing at a later time, should that become appropriate. Plaintiffs' mandamus claim may also become relevant to a discussion of the proper relief in this case.

On that note, the prayer for relief in the complaint asks the Court to order the retraction of all visa denials and to order defendants to "fulfill their duties under the Proclamation." Dkt. No. 34 at 67. The former may infringe impermissibly on individual consular officers' decision-making, and the latter, as noted previously in this order, sounds like an impermissible attempt to enforce the Proclamation. These issues are not squarely before the Court at this time, but plaintiffs may want to consider them if they amend the complaint.

**CONCLUSION**

Defendants' motion to dismiss is denied for plaintiffs' APA claim.  The Fifth Amendment claim is dismissed with leave to file an amended complaint by February 25, 2019, if plaintiffs so choose.  The mandamus claim is dismissed without prejudice to potential remedies if appropriate at a later stage.

**IT IS SO ORDERED.**

Dated: February 4, 2019

JAMES DONATO
United States District Judge