# Exhibit D

## DECLARATION OF JAY GAIRSON

Pursuant to 28 U.S.C. § 1746, I declare the following to be true and correct under penalty of perjury:

1. I am the founder and managing member of Gairson Law, LLC. I practice immigration law with a focus on fraud and national security issues. My practice consists of both normal family and business cases that do not have any problems and cases that involve complicated fraud and national security issues. I have been an attorney practicing in this area of immigration law since January 5, 2011. Prior to becoming an attorney, I had worked since August 2006 at an immigration law firm as a paralegal.

2. Due to the focus of my practice, my clients are predominantly from Somalia, Ethiopia, Eritrea, Iran, Yemen, Pakistan, Syria, Libya, with the remainder mostly coming from or having visited countries with significant Muslim populations in the Middle East, South Asia, and Africa.

3. I am a frequent presenter at conferences, know your rights presentations, and podcasts and have spoken on issues ranging from Terrorism Related Inadmissibility Grounds (TRIG) under INA § 212(a)(3)(B), the Controlled Application Review and Resolution Program (CARRP), the Freedom of Information Act and Privacy Act, consular processing, administrative processing, the travel ban under INA § 212(f) including Presidential Proclamation 9645, law enforcement agencies and investigations, and other issues including immigration fraud and national security hot topics. My most recent presentation was a podcast for the American Immigration Lawyers Association titled "Advising Clients Impacted by Travel Ban 3.0".

4. I am a regular participant on multiple immigration lawyer listservs that regularly discuss consular processing, the travel ban, and numerous other immigration issues. Using these listservs I am able to monitor larger trends in immigration processing based on the questions asked and discussions held by other lawyers, beyond the data available through my own immigration cases.

5. I have directly, by entering an appearance and communicating directly with U.S. embassies and consulates, and indirectly, by advising clients and reviewing the materials that they intended to send the embassy, represented over a hundred immigrants and non-immigrants impacted by the current implementation of the travel ban under Presidential Proclamation 9645 since December 4, 2017.

6. Based on my experience, review of the materials, and observation of trends, I advise other attorneys and my clients on how to request Presidential Proclamation 9645 § 3(c) waivers or to argue that the Proclamation does not apply to an individual case.

7. It is my considered opinion that P.P. 9645 has been haphazardly implemented by the Department of State and its consulates and embassies. Based on the inconsistent trends in P.P. 9645's implementation, it is clear that DOS has not issued consistent guidance to its consular officers or visa units and it has not provided sufficient resources for its officers and visa units to handle the additional work created. Furthermore, insufficient guidance with regards to P.P. 9645 has been made available to the public, resulting in a hodgepodge of conflicting techniques and conflicting opinions and an increase in scams guaranteeing travel ban waivers for exorbitant and unnecessary fees.

8. DOS has not publicly adopted, as required by P.P. 9645 § 3(c) substantive "guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants."

9. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

10. DOS has not publicly promulgated procedures for requesting or applying for a waiver to P.P. 9645.  As a result the majority of U.S. embassies and consulates refuse to accept documentation from visa applicants supporting and requesting a P.P. 9645 § 3(c) waiver.  In order to compensate for the lack of guidance, immigration lawyers have had to resort to a variety of techniques to ensure that documents supporting their client's case are entered into the record.  These techniques include submitting waiver packets with the initial petition, submitting waiver documents to the National Visa Center, emailing waiver documents to the U.S. embassies and consulates, encouraging clients to attempt to submit documents in person, and mailing unsolicited documents to U.S. embassies and consulates requesting that a waiver be considered.

11. Despite the lack of a formal method to apply for or request a waiver, according to DOS in its letter to Senator Hollen, "Consular officers may grant waivers on a case-by-case basis *when the applicant demonstrates* to the officer's satisfaction that he or she meets the three criteria [for a waiver]."  However, without being able to submit documents and legal analysis supporting a demonstration that the applicant meets the three criteria for a waiver, there is no way that an individual applicant could demonstrate to an officer's satisfaction that he or she qualifies for a waiver in a three to five minute visa interview.

12. To complicate matters further, since the Supreme Court decision on June 26, 2018, the consular officers at the U.S. Embassies in Abu Dhabi and Djibouti have been explicitly informing visa applicants that they will not accept packets requesting a waiver as it is their job to put together the waiver application and they do not need supporting documents to make their determination.  For example, on July 19 the U.S. Embassy in Abu Dhabi wrote the following to a colleague of mine, "There is no role or requirement for legal services to facilitate the waiver process, which the Embassy initiated as soon as the applicant was interviewed.  Please note – and inform your client – that only U.S. government officials can author waiver requests."

13. Due to the DOS policy of not accepting waiver requests and supporting documents from the visa applicant or attorney, it is virtually impossible for a consular officer to adequately

evaluate the waiver factors for each case.  For visa applications based upon petitions filed with USCIS, the primary focus of evidence submitted throughout the case is to prove that a bona fide employment opportunity exists or a bona fide family relationship exists.  For visa applications without a petition, the primary focus is of evidence submitted is to prove that the individual is not inadmissible to the United States and satisfies the basic criteria for the visa classification sought.  Furthermore, the waiver processes defined in regulation for the various inadmissibility grounds are largely based upon hardship to a U.S. person and not on the visa applicant.  The P.P. 9645 § 3(c) factors turn the existing waiver guidelines around and look at evidentiary factors beyond those in a standard visa petition or application.  While the bona fide nature of a relationship or employment opportunity may be a part of the waiver factor evaluation, it is unlikely to adequately describe the full extent of the undue hardship or national interest.  Furthermore, the only document most immigrant visa applicants, and few non-immigrant visa applicants, submit in support of satisfying national security and public safety review are a standard police certificate from any country they have lived in for more than six months.  Fundamentally the documents necessary for normal visa processing are insufficient to always and consistently show whether a visa applicant satisfies the waiver criteria.

14. Consular officers are able to quickly find that a visa applicant does not qualify for a P.P. 9645 waiver, because the necessary documentation to support a waiver has not historically been a required portion of the visa application.  As a result, by not accepting documents and legal analysis relevant to the P.P. 9645 waiver factors, the consular officer has an excuse to not carry out the excessively burdensome security screening process.  Alternatively, consular officers are tacitly acknowledging that the waiver process is a fraud and documentary evidence is not necessary to satisfy the undue hardship and national interest factors or they are avoiding busy work because virtually no applicant can pass the national security and public safety screening.

15. In addition to the lack of publicly available procedures to acquire a waiver to Proclamation 9645, DOS does not appear to have adequately trained its consular officers as to its scope or

exceptions. As a result, visa applicants that are stateless or dual nationals consistently find themselves being considered for a waiver and individuals in the U.S. fear leaving in the event a consular officer may fail to apply a valid exception or an overbroad definition of the scope to the individual and thereby constructively deny them a visa to return.

16. The P.P. 9645 § 3(c) terms of art "undue hardship", "national interest", and "national security or public safety" are not defined within the proclamation and have not been adequately defined by DOS. As a result, there is little guidance on how a visa applicant could satisfy these requirements in order to obtain a waiver. The only guidance that has been made available was not to the public, but instead to Congress in the DOS letter sent to Senator Hollen, where the terms of art were given more slightly more definition.

17. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

18. In its letter to Senator Hollen, DOS described "undue hardship" as "an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel". However, this definition of undue hardship is higher than and inconsistent with the standard defined in *In re E-L-H*, as it requires an element of novelty in the hardship being "an unusual situation". DOS has not provided any other guidance on how "undue hardship" is defined or what it may look like.

19. The "undue hardship" standard as defined by DOS to Senator Hollen is inconsistent with the examples provided in P.P. 9645 § 3(c)(iv). The examples do not require the existence of "an unusual situation", but instead describe multiple scenarios that are relatively common but distinctly fit within the legal definition of undue hardship. For example, (A) covers visa applicants with long-term or continuous presence in the U.S. dedicated to an activity that would be impaired should a visa not be granted, (B) covers all categories of significant contacts within the U.S. (e.g., family, business, investment, and other possibilities), (C) includes individuals pursuing significant professional or business obligations that would be impaired if a visa was not granted, (D) includes situations where failure to grant a visa would

cause undue hardship to a close family relationship, which inherently includes bona fide relationships classically necessary for a family-based petition, (E) covers the young, those with medical need, adoptees, and the elderly, and the remainder cover government related situations. None of these necessarily meets the novelty inherent in describing something as an "unusual situation". Nonetheless, DOS has set the "undue hardship" standard higher than that described in the Proclamation itself and within the existing body of law for that term.

20. As a result of DOS's overly burdensome definition for "undue hardship" and based on my experience, U.S. Embassies and Consulates are inconsistently applying the term:

   a. Until March 2018, the U.S. Embassy in Djibouti systematically informed visa applicants and their lawyers that a travel ban waiver would only be considered when there was a showing of "extreme hardship". Recently the Embassy has started reconsidering cases it had previously denied, but it has not provided any guidance as to how it is defining "undue hardship".

   b. The U.S. Embassy in Abu Dhabi, U.A.E., systematically refuses to respond to immigration attorneys and visa applicants unless it initiates the conversation. Based upon its issuance of questions similar to those on DOS Form DS-5535, it appears that the Embassy is utilizing the more familiar "extreme hardship" standard for its hardship analysis.

   c. The U.S. Embassy in Ankara, Turkey, appears to have implemented a slightly more lenient standard than "extreme hardship", but has trended toward only referring cases for waiver review when the hardship is family based rather than related to an individual's education, economic, or employment needs. However, its implementation of "undue hardship" still appears to be greater than the prevailing legal definition of the term based upon its existing use within immigration and administrative law.

   d. The U.S. Embassies in Addis Ababa, Ethiopia and Nairobi, Kenya, appear to have implemented a standard for "undue hardship" consistent with the legal definition of "preventing [the applicant] from maintaining ties to close family members." *In re E-L-H*, 23 I&N Dec. 700, 703-4 (B.I.A. 2004) (Opinion written by AG Janet Reno). However,

DECLARATION OF JAY GAIRSON      Page 6 of 11

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA 98108
(206) 357-4218

these embassies appear to largely disregard undue hardship based upon an adverse impact to an individual's education, economic livelihood, or employment. Furthermore, these embassies unnecessarily restrict the definition of "close family members" to unmarried children under 21 and spouses.

21. Prior to and after the letter to Senator Hollen, DOS has not provided any guidance on what it means for travel to the U.S. to be in the "national interest". In its letter to Senator Hollen, DOS write that "the applicant's travel may be considered in the national interest if the applicant demonstrates to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted."

22. The DOS letter to Senator Hollen sets out a national interest standard prefaced upon harm to U.S. persons, including entities. However, in application at U.S. embassies and consulates the national interest standard has largely been applied as equivalent to extreme hardship. For example, consular officers regularly find that there is no hardship suffered when siblings are not allowed to visit each other in the U.S., when refugees cannot bring their loved ones to the U.S., or when regional centers and EB-5 qualifying businesses cannot receive local input from their investors. As a result, the standard is being inconsistently implemented, with many embassies appearing to expect a showing that the U.S. person would imminently cease to exist without the visa applicant.

23. The final factor to obtain a waiver is to establish that the applicant is not a threat to national security or public safety. According to a DOS representative at the AILA Annual Conference 2018, this factor requires a consular officer to determine the undue hardship and national interest factors first and then to refer the case to the DOS Visa Office in the U.S. Once at the Visa Office an analysis via internal security officers of the U.S. government, as authorized by INA 105(a), is carried out. This process of coordination was opaquely described in the DOS to Senator Hollen as follows: "to establish that an applicant does not constitute a threat to national security or public safety, the consular officer considers the information-sharing and identity-management protocols and practices of the government of the applicant's

DECLARATION OF JAY GAIRSON    Page 7 of 11

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA 98108
(206) 357-4218

country of nationality as they relate to the applicant. If the consular officer determines, after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met, a visa may be issued with the concurrence of a consular manager." It is often indicated that a consular officer has found the previous two criteria satisfied by the issuance of Form DS-5535 or a list of questions taken from the form.

24. The DOS's description of the process to satisfy the national security or public safety threat analysis appears to be substantively similar to the review allegedly done to evaluate countries for inclusion in P.P. 9645. In particular, countries that are subject to P.P. 9645 allegedly failed to satisfy the "global requirements for information sharing in support of immigration screening and vetting" as set out in the Proclamation. Therefore, the national security or public safety threat analysis, as described to Senator Hollen, appears to be a sham as virtually nobody would be able to satisfy the information sharing requirements, if the country of their nationality truly failed to satisfy the requirements during the alleged analysis and consultation completed by the Secretary of State, Secretary of Homeland Security, and the Attorney General.

25. Based on the patterns and behaviors of cases undergoing additional review both before and after the issuance of the various travel bans, including P.P. 9645, it appears that DOS has implemented "extreme vetting" by merging its Visas Condor, Visas Donkey, and Visas Viper programs and removed the basic screening criteria for individuals from P.P. 9645 designated countries. Visas Condor is an additional screening and background check process for individuals from the T-7 list of State Sponsors of Terrorism (Cuba, Iran, Iraq, Libya, North Korea, Sudan, Syria) and the List of 26, countries with allegedly significant terrorist activity (Afghanistan, Bahrain, Djibouti, Egypt, Eritrea, Indonesia, Iran, Iraq, Jordan, Kuwait, Lebanon, Libya, Malaysia, Morocco, Oman, Pakistan, Qatar, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, UAE, Yemen). Visas Condor is a mandatory stop list that utilizes ICE's Pre-Adjudicated Threat Recognition and Intelligence Operations Team along with resources at the FBI, DOS, CIA, and other agencies in order to evaluate whether a mandatory stop should

be ordered for a visa applicant. Visas Condor, except for "extreme vetting", is largely automated for the majority of applicants and often takes less than a week to complete an evaluation. Visas Donkey is a namecheck and biometric information evaluation for potential IDENT or HIT matches that then cause additional review in 2% to 3% of all cases. Visas Donkey often takes between 4 and 6 months to complete review. Visas Viper is used to review biometric details of visa applicants for matches with known or suspected terrorists and can often take upwards of a year to complete review. Prior to the implementation of P.P. 9645, cases went through a preliminary screening process to identify the probability of a Visas Condor, Donkey, or Viper match requiring further review. After the implementation of P.P. 9645, it appears that all cases for individuals from the designated countries go through complete Visas Condor, Donkey, and Viper evaluations and less than 2% of cases appear to pass through the evaluations quickly. Prior to the proclamation, when a visa applicant had a Visas Donkey or Visas Viper hit, it was normal for DOS to request additional information similar to that included on the new Form DS-5535.

26. Consular officers regularly issue a Form DS-5535 or questions similar to it once the officer is satisfied that the undue hardship and national interest factors are satisfied. It is my opinion that the Form DS-5535 is being used to carry out the full evaluations necessary to complete in-depth Visas Condor, Donkey, and Viper evaluations. It is possible that other Visas programs are being used as well or have been created to satisfy this requirement, but these are the systems that I am aware of due to my research on the causes of administrative processing and national security review. It now appears that DOS has made full review with each of these Visas systems mandatory for all cases for visa applicants from the designated countries under P.P. 9645. As a result, Visas programs that were originally designed to quickly screen cases and then refer only a small percentage for in-depth scrutiny, are now being used to carry out extensive investigations on all applicants from the designated countries.

27. Based upon the lengthy delays in evaluating the national security and public safety factor for visa applicants from P.P. 9645 designated countries, it is my opinion that DOS and its partner

agencies fundamentally lack the resources to carry out the vast increase in background checks necessary to utilize a full Visas Condor, Viper, and Donkey investigation on every case from the P.P. 9645 designated countries. In part this lack of resources was emphasized by former Secretary of State Rex Tillerson when he issued new interview guidelines last year: "In order to ensure that proper focus is given to each application, posts should generally not schedule more than 120 visa interviews per consular adjudicator/per day. Please [note] that limiting scheduling may cause interview appointment backlogs to rise." DOS Cable SUPERSEDING 17 STATE 24324: IMPLEMENTING IMMEDIATE HEIGHTENED SCREENING AND VETTING OF VISA APPLICATIONS, 17 STATE 25814 (Mar. 17, 2017). As anticipated by former Secretary Tillerson, tremendous backlogs have resulted internationally due to the heightened screening and vetting processes. Even with the small reduction in the number of visa interviews per consular adjudicator per day, it appears that consular officers cannot keep up with the workload necessary to evaluate each case (even when disallowing the submission of supporting documents) for satisfaction of the criteria for a P.P 9645 § 3(c) waiver. Furthermore, the backlogs caused by the unnecessary elimination of the basic screening criteria for Visas Condor, Donkey, and Viper when applied to visa applicants from the P.P. 9645 designated countries, has adversely impacted the U.S. immigration system as a whole. As a result, the review of cases that legitimately have hits in Visas Donkey, Condor, and Viper screening process are slowed and the effectiveness of these programs has been diminished. For example, a professor from Europe had a name hit with a known terrorist, which resulted in review under Visas Viper. The professor had never traveled to any of the designated countries or any of the Visas Condor countries. Nevertheless, he was required to complete a DS-5535 and his case was held in administrative processing for over a year. Ultimately the professor's only choice to resolve the case was to either lose his job or seek a writ of mandamus against the Department of State for failing to adjudicate his case in a reasonable amount of time. Within days of the filing of the writ of mandamus, his visa was approved. Fundamentally the professor's case is one illustration of how the enormous backlogs caused by the elimination of basic screening principles in order

1  to implement extreme vetting through the P.P. 9645 waiver process has adversely impacted
2  visa applications worldwide for no apparent tangible benefit.

3  28.  In conclusion, it is my opinion that the haphazardly implemented provisions of P.P. 9645
4  result in an unnecessary burden on the Department of State, excessive and unnecessary
5  denials for individuals with legitimate cases from the designated countries, and
6  fundamentally appears to be little more than a sham due to the recursive requirements of its
7  apparent implementation.

9  I declare under penalty of perjury on this 26th day of July 2018 that the foregoing is true and
10 correct to the best of my knowledge, experience, and understanding.

_____
Jay Gairson, WSBA # 43365
Gairson Law, LLC
4606 Martin Luther King Jr Way S
Seattle, Washington  98108
(206) 357-4218 / jay@gairson.com