JOSEPH H. HUNT
Assistant Attorney General
Civil Division
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
GISELA A. WESTWATER
Assistant Director, Office of Immigration Litigation
District Court Section
STACEY I. YOUNG
Senior Litigation Counsel, Office of Immigration Litigation
District Court Section
P. ANGEL MARTINEZ
Trial Attorney, Office of Immigration Litigation
DAVID KIM
Trial Attorney, Office of Immigration Litigation

Ben Franklin Station, P.O. Box 878
Washington, DC 20044
Telephone:  (202) 532-4094
Email:  david.kim4@usdoj.gov

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FARANGIS EMAMI, et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>KEVIN K. MCALEENAN, In His Official Capacity As Acting Director of the Department of Homeland Security, [1] et al.,<br><br>                Defendants. | Case No. 3:18-cv-01587-JD<br><br>**DEFENDANTS' NOTICE OF MOTION; MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT; AND MEMORANDUM IN SUPPORT**<br><br>Judge: Hon. James Donato<br>Hearing: July 25, 2019, 10 a.m.<br>Place: San Francisco U.S. Courthouse,<br>        Courtroom 11, 19th Floor |

---

[1] Under Fed. R. Civ. P. 25(d), Acting Director Kevin K. McAleenan, in his official capacity, is substituted for his predecessor, Kirstjen M. Nielsen.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION AND MOTION TO DISMISS .................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 1

I.     INTRODUCTION ............................................................................................................ 1

II.    BACKGROUND ............................................................................................................... 3

    A.  The Proclamation's Waiver Process ..................................................................... 3

    B.  Individuals Plaintiffs' Claims ............................................................................... 5

III.   STANDARD OF REVIEW .............................................................................................. 6

IV.   ARGUMENT .................................................................................................................... 7

    A.  Motion to Dismiss ................................................................................................ 7

       1.  Plaintiffs fail to state a claim under the *Accardi* doctrine ....................... 7

       2.  Plaintiffs fail to state due process and equal protection claims .............. 8

       3.  Plaintiffs fail to state a mandamus claim ................................................. 9

    B.  Motion for Summary Judgment .......................................................................... 11

       1.  The administrative record emphatically demonstrates that the waiver process is not a sham. ......................................................................................................... 11

          a.  Internal guidance. .......................................................................... 12

          b.  National security vetting. ............................................................... 15

          c.  Consular officers' function in adjudicating waivers ..................... 17

          d.  Application process. ....................................................................... 20

          e.  Waiver-related statistics ................................................................ 21

V.    CONCLUSION .............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Alharbi v. Miller,*
 -- F. Supp. 3d --, 2019 WL 1367758 (E.D.N.Y. Mar. 26, 2019) ........................................ 9, 19

4

*Camp v. Pitts,*
 411 U.S. 138 (1973).......................................................................................................... 6

5

6

*City & Cnty. of San Francisco v. United States,*
 130 F.3d 873 (9th Cir. 1997) .......................................................................................... 6

7

*Hawaii v. Trump,*
 138 S. Ct. 2392 (2018) ............................................................................................. passim

8

9

*Hussein v. Beecroft,* No.-17-cv-12356,
 2018 WL 3574717 (E.D. Mich. July 25, 2018) .......................................................... 11

10

*I.N.S. v. Miranda,*
 459 U.S. 14 (1982)........................................................................................................ 23

11

12

*Kleindienst v.Mandel,*
 408 U.S.762 (1972)........................................................................................................ 9

13

*Luo v. Coultice,*
 178 F. Supp. 2d 1135 (C.D. Cal. 2001) ................................................................. 10, 11

14

15

*Mada-Luna v. Fitzpatrick,*
 813 F.2d 1006 (9th Cir. 1987) ....................................................................................... 7

16

*Montilla v. I.N.S.,*
 926 F.2d 162 (2d Cir. 1991)........................................................................................... 8

17

18

*Nw. Motorcycle Ass'n v. U.S. Dep't Agric.,*
 18 F.3d 1468 (9th Cir. 1994) ......................................................................................... 6

19

*Occidental Engineering Co. v. Immigration & Naturalization Service,*
 753 F.2d 766 (9th Cir. 1985) ......................................................................................... 6

20

21

*Sayyadinejead v. Chertoff,*
 No. 07-cv-0631-JAH, 2007 WL 4410356 (S.D. Cal. Dec. 14, 2007).......................... 23

22

*Singh v. Still,*
 470 F. Supp. 2d 1064 (N.D. Cal. 2007) ...................................................................... 23

23

24

*U.S. ex rel. Knauff v. Shaughnessy,*
 338 U.S. 537 (1950)........................................................................................................ 9

25

*United States ex rel. Accardi v. Shaughnessy,*
 347 U.S. 260 (1954)................................................................................................... 1, 7

26

27

28

**STATUTES**

5 U.S.C. § 555(b) .............................................................................................................. 11

5 U.S.C. § 706 .................................................................................................................... 6

5 U.S.C. § 706(2)(A) .......................................................................................................... 6

5 U.S.C. §§ 702 .................................................................................................................. 6

8 U.S.C. § 1182(f) ................................................................................................... 5, 13, 21

8 U.S.C. § 1185(b) ............................................................................................................ 19

8 U.S.C. § 1201(a)(1) ....................................................................................................... 14

**REGULATIONS**

22 C.F.R. § 42.81(e) ......................................................................................................... 21

22 C.F.R. §§ 41.111 .......................................................................................................... 14

22 C.F.R. §§ 41.121 & 42.81 ............................................................................................. 8

**RULES**

Fed. R. Civ. P. 25(d) .......................................................................................................... 0

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on July 25, 2019, at 10:00 a.m., before the Honorable James Donato of the United States District Court for the Northern District of California, in Courtroom 11 of the 19th Floor of the Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California, Defendants will move this Court to dismiss all claims in this case or, alternatively, for summary judgment in Defendants' favor.

Defendants' motion is being made pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. The bases for this are set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This is an unusual action—Plaintiffs bring what they plead as an APA claim to challenge the implementation of the waiver provision in Presidential Proclamation 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017), which the Supreme Court recently upheld in *Hawaii v. Trump*, 138 S. Ct. 2392 (2018). But Plaintiffs identify no agency policy that they claim is invalid or improper, and they challenge individual waiver denials despite the doctrine of consular nonreviewabilty. Plaintiffs assert that the waiver process is "a sham"—essentially a process that is not being implemented at all. This Court recognized the unusual nature of this APA claim in its motion to dismiss ruling. *See* Dkt. No. 74. This Court explained that the only viable inquiry was into whether the State Department was in fact implementing the waiver provision pursuant to guidance issued to implement the Proclamation. The government's record answers this question definitively and in the affirmative: the State Department has issued detailed guidance to its consular officers and continues to update that guidance to assist them in processing waiver requests. And those officers are carrying out their duties in good faith, authorizing thousands of waivers and conducting burdensome and time-consuming national security vetting on many thousands more. The status of the individual Plaintiff cases shows this process is ongoing. Because the process is not a sham, and guidance has been issued, this Court should grant summary judgment to Defendants.

This Court partially dismissed this matter in February. The Court allowed Plaintiffs' Administrative Procedure Act (APA) challenge to proceed in a limited way, based on its finding that Plaintiffs stated a claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), finding that "the heart of the APA claim is that the State Department has acted arbitrarily and unlawfully by disregarding its own procedures and rules in administering the waiver program." *See* Dkt. No. 74 at 13-16. The Court dismissed Plaintiffs' constitutional claims, holding that Plaintiffs failed to allege any constitutionally protected fundamental right, Dkt. No. 74 at 16-17, and that *Hawaii* precludes their argument that a high proportion of waiver denials could constitute inherently unconstitutional discrimination. *Id.* at 17. The Court also dismissed Plaintiffs' mandamus claim as redundant.

Plaintiffs new complaint should be dismissed for largely the same reasons. First, Plaintiffs'

*Accardi* claim, unless very narrowly focused on whether the waiver process is being implemented at all, is too amorphous and does not specifically allege that any particular aspect of the process violates the Proclamation or State Department guidance. Further, the Proclamation and its implementing guidance are neither regulations nor internal documents that create procedural rights. Second, Plaintiffs' due process, equal protection, and mandamus claims have already been resolved by this Court and have not substantively changed in the new complaint.

Should the Court deny the instant motion to dismiss, Defendants, in the alternative, move for summary judgment based on the administrative record submitted to the Court, which includes the various types of guidance provided to consular officers to assist them in resolving waiver requests, the factual material showing the progress made in each of the Plaintiffs' individual cases, and statistics recently provided to Congress showing the active and ongoing implementation of the waiver provision. As this Court has noted, the "gravamen of the complaint" here is that the government has disregarded its own guidance about visa and waiver adjudications under the Proclamation "in favor of a policy of blanket denials." *See* Dkt. No. 74, at 12:6-8. As this Court explained, the government's *Accardi* defense "puts substantial emphasis on a number of factual matters" such as "waiver reviews and approval figures" and is "properly addressed in a summary judgment motion (if truly undisputed)." *Id*. at 16. As the accompanying certified administrative record and congressional reporting shows there is no such policy of blanket denials; instead, since the Proclamation went into effect, relevant agencies have issued guidance to consular officers to assist them in adjudicating visa waiver requests.

Consular officers, moreover, have been processing and reviewing a vast number of visa applications on an individualized basis: over 3,000 waiver requests granted as of the end of March. An additional 12,000—over 26 percent of those considered for waivers—are undergoing security vetting, which is a rigorous, time-consuming process that is fully consistent with the Proclamation's direction that waivers be granted only to those who pose no national security or public safety risk given fundamental flaws in the identification infrastructure or cooperativeness of the countries subject to the Proclamation, a concern the Supreme Court expressly validated. There can be no real factual dispute over these processing statistics or the existence of the guidance to consular officers. Indeed, Plaintiffs are unable to demonstrate any violation of law even as to

their own cases, where the record reveals that they—or their family members—have been issued visas, are still undergoing consideration for waivers, or have been refused after having been found ineligible for a waiver.

In sum, Defendants are implementing the waiver provision in an ordered and deliberate way, giving due consideration not only to the demonstrated interests of individual applicants but also to the abiding concerns of national security and public safety that gave rise to the Proclamation in the first place. Simply put, there is no viable allegation that Defendants have not implemented the Proclamation's waiver process in good faith, or that the waiver process is a "sham."

## II.    BACKGROUND

### A.  The Proclamation's Waiver Process

At issue is the implementation of the Proclamation's waiver provision. Subject to exceptions not relevant here, the Proclamation suspends entry into the United States of nationals of several identified countries of concern. *See* 82 Fed. Reg. 45161 § 2(g). A consular officer may nonetheless, as a matter of discretion, "grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended." *Id.* § 3(c). Notably, visa applicants are not refused pursuant to the Proclamation if they are ineligible to obtain visas on other grounds or if their applications are rejected for reasons other than the Proclamation's entry restrictions. An applicant is refused under the Proclamation only if it constitutes the sole basis for visa refusal. By extension, only an applicant refused based solely on the Proclamation may be considered for a waiver under it. *See id.* § 3(a), (c).

As the State Department's publicly accessible guidance explains, there is no separate application for a waiver: "An individual who seeks to travel to the United States should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver." U.S. Department of State – Bureau of Consular Affairs, June 26 Supreme Court Decision on Presidential Proclamation 9645 ("State Dep't Website"), *available at* https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/presidential-proclamation-archive/june_26_supreme_court_decision_on_presidential_proclamation9645.html (last visited June 11, 2019); A.R. 296, 299, 306, 309, 317, 319. This is consistent with other visa-application procedures, such as nonimmigrant visa waivers, which do not have a separate

application. *See* Foreign Affairs Manual ("FAM") 305.4-3, *available at* https://fam.state.gov/fam/09FAM/09FAM030504.html. The Proclamation sets out a non-exhaustive list of examples elucidating when a waiver "may be appropriate," while emphasizing that "[c]ase-by-case waivers may not be granted categorically." 82 Fed. Reg. at 45168-69, § 3(c)(iv). The Proclamation mandates that "[t]he Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate." *Id.* at 45168, § 3(c). Such guidance is not required to be made public, and the State Department often provides internal guidance to consular officers to avoid the risk that visa applicants will misuse it. A.R. 288, 297, 308, 318.

Since the promulgation of the Proclamation, the State Department has provided answers on its public website to a number of common questions regarding the mechanics of the waiver process. *See* State Dep't Website. It has also released hundreds of pages of guidance, both general and in specific cases. *See, e.g.*, A.R. 13-155; U.S. Department of State, Virtual Reading Room Documents Search Results.[2] This Court has previously noted that such online postings constitute the State Department's outward-facing guidance on the waiver process. Dkt. No. 74, at 14:18-19.

The internal waiver guidance that has been promulgated, and submitted in the administrative record for this Court's review, consists of several types of material. First, updates to the Foreign Affairs Manual have provided visa adjudication guidance to consular officers by the State Department. A.R. 3-11. Second, detailed operational Q&As have addressed specific issues that might arise in applying the Proclamation and its waiver provisions, and are updated on a rolling basis. A.R. 13-155. Third, cables have regularly been issued to consular posts, as the State Department has endeavored to ensure that its personnel are in full compliance with the Proclamation. A.R. 157-98. Fourth, various training materials have been produced for the benefit of consular officers, including presentations, flowcharts, and reference guides. A.R. 200-84, 327-45. Fifth, press guidance has laid out waiver-related issues suitable for explanation to the public. A.R. 286-325.

---

[2] *Available at* https://foia.state.gov/Search/results.aspx?searchText=Presidential+Proclamation+9645&beginDate=20170901&endDate=20190612&publishedBeginDate=&publishedEndDate=&caseNumber=.

A waiver may be granted only if an applicant shows the following: (1) denying entry would cause undue hardship, (2) entry would be in the national interest of the United States, and (3) entry would not pose a threat to the national security or public safety of the United States. 82 Fed. Reg. at 45168, § 3(c). As of March 31, 2019, 3,071 visa applicants have been given waivers and issued visas. *See* Dep't of State Report to Congress: Implementation of Presidential Proclamation 9645 – December 8, 2017, to March 31, 2019 ("State Dep't Report").[3] While the first two prongs of waiver eligibility may be readily resolved based on the materials submitted by the applicant, an analysis of the third prong can prove time-consuming because the applicant must be carefully vetted in light of the identity sharing problems identified as the basis for the Proclamation. As of March 31, 2019, more than 12,000 visa applicants had been found by consular officers to preliminarily meet the first two conditions for a waiver and are now under review to determine whether they meet the national security and public safety criterion. *See id.*

Visa applicants who are refused under the Proclamation are handed notices by consular officers indicating that they are ineligible for a visa under 8 U.S.C. § 1182(f) and a consular officer is reviewing their eligibility for a waiver under the Proclamation. *See* A.R. at 10, 11, 29-30, 57-58, 87-88, 119-20, 151-53, 340-41. The notices describe the three criteria that must be met for a waiver approval, and advise applicants that, during this potentially lengthy process, their applications will remain refused under § 1182(f) until the consular officer has made an individualized determination on those three factors. *See id.*

**B. Individual Plaintiffs' Claims**

Plaintiffs include U.S. citizens and lawful permanent residents who filed family-based visa petitions on behalf of one or more beneficiaries, or whose family members are visa applicants. SAC ¶¶ 11, 12, 16-45, 95-302, 304. Plaintiffs also include unadmitted and nonresident aliens who applied for and were denied visas under the Proclamation. *Id.*

In all, 26 Plaintiffs are seeking waivers in this action. One Plaintiff has been issued an immigrant visa based on a finding that she was eligible for a waiver. A.R. at 347-59 ¶ 12. One Plaintiff had a visa application refused for a reason unrelated to the Proclamation. *Id.* ¶ 21. Twelve

---

[3] *Available at* https://travel.state.gov/content/dam/visas/presidentialproclamation/Combined%20-%20Report%20on%20Implementation%20of%20PP%209645%20December%2007%202017%20to%20March%2031%202019.pdf.

Plaintiffs, whose visa applications were refused under the Proclamation, have been advised that they do not qualify for a waiver. *Id.* ¶¶ 5, 6, 18, 19, 20, 23, 24, 25, 26, 27, 28, 29. The remaining twelve Plaintiffs have been preliminarily found to meet the first two waiver prongs—undue hardship and national interest—and are among the group of more than 12,000 applicants who are undergoing national security vetting, but for whom a final decision has not been made. *Id.* ¶¶ 4, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 22. While national security vetting is ongoing, these Plaintiffs' visa applications remain properly refused under the Proclamation.

Plaintiffs claim that their visa applications and waivers were either inappropriately denied or have been pending too long, which they attribute to an alleged "blanket denial" policy, SAC ¶¶ 3, 5, 7; a failure to issue or follow internal policies and procedures, *id.* ¶ 1-2, 314; a failure to create a separate process for waiver applications, *id.* ¶ 315; and various constitutional theories, *id.* ¶¶ 122, 173, 319-32.

## III.   STANDARD OF REVIEW

The APA provides for judicial review of final agency action. *See* 5 U.S.C. §§ 702, 704. It authorizes courts to "hold unlawful and set aside" only those agency actions, findings, and conclusions it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The administrative record is the exclusive basis for the Court's review. *See id.* at 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("the focal point for judicial review should be the administrative record in existence, not some new record made initially in the reviewing court").

Summary judgment under Rule 56 is appropriate to resolve APA challenges. *See Nw. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Even if the parties dispute the facts before the administrative agency, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co. v. Immigration & Naturalization Service*, 753 F.2d 766, 769 (9th Cir. 1985); *see also City & Cnty. of San Francisco v. United States*, 130

F.3d 873, 877 (9th Cir. 1997).

IV.     **ARGUMENT**

    A. **Motion to Dismiss**

       1.       **Plaintiffs' fail to state a claim under the *Accardi* doctrine.**

In its February 4, 2019 Order, the Court found that Plaintiffs stated a claim under *Accardi*, 347 U.S. 260, and "the heart of the APA claim is that the State Department has acted arbitrarily and unlawfully by disregarding its own procedures and rules in administering the waiver program." *See* Dkt. No. 74 at 13-16. This Court, however, did not have the benefit of detailed briefing from the Government on *Accardi*. That claim should now be dismissed because such a claim is too amorphous when Plaintiffs do not challenge any specific agency action as violative of agency policy, and the Proclamation and its implementing internal guidance are neither regulations nor internal documents that create procedural rights.

As an initial matter, even if *Accardi*'s directive that an agency must follow its own regulations may make sense when analyzing a specific agency action, it makes little sense when there is no final agency action subject to review, which is the case here given consular non-reviewability. *Accardi*—even where it applies—is not a license to engage in roving oversight of an agency's implementation of a regulatory scheme, and there are no cases where it has been applied in the manner Plaintiffs seek to apply it here. *See* Order at 18 (recognizing a request to "order defendants to fulfill their duties under the Proclamation" may be "impermissible").

Further, *Accardi* is inapplicable here because the Proclamation is not a regulation. *Accardi*, 347 U.S. at 268. It is neither the nature nor the purpose of the Proclamation waiver provisions to confer a legally enforceable benefit or right in any person, as the Proclamation itself expressly acknowledges. Proclamation, § 9(c). Moreover, the implementing guidance, including the Foreign Affairs Manual, simply furnishes additional details regarding the waiver process, which ultimately consists of discretionary determinations made by consular officers as expressly provided by the Proclamation. A.R. 3-11. The Ninth Circuit has held that the *Accardi* doctrine is inapplicable in the context most similar to this one—with respect to internal operating guidelines that preserve the exercise of agency discretion as in this case. *See Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1009 (9th Cir. 1987) (Operating instructions are "general statements of policy" because the instructions

persevered the agency's flexibility and opportunity to make discretionary determinations.). As the Ninth Circuit explained, an *Accardi* claim is not viable where a directive "leave[s] agency officials free to consider the individual facts in the various cases that arise and to exercise discretion." *Id.* That is plainly true here given the express terms of the Proclamation and the discretion conferred on consular officials.

Plaintiffs briefly assert that the government is failing to follow two regulations, s*ee generally* SAC ¶ 314, but their own complaint shows this to be untrue. The two regulations, 22 C.F.R. §§ 41.121 & 42.81 mandate that a decision be made on a visa application and supported by a justification. Here, every Plaintiff has received exactly what the regulations require. *See, e.g.,* SAC Ex. L at 2, Dkt. No. 77-13 ("[A] consular officer found you ineligible for a visa under Section 212(f). . . Taking into account the provisions of the Proclamation, a waiver will not be granted in your case."); SAC ¶¶ 79, 97, 99-302; *see also* AR at 347-59.

Even assuming an *Accardi* claim could survive a motion to dismiss, the relief for any violation of such a "regulation" under an *Accardi* theory would be limited to a "remand" with instructions for the agency to comply with its regulations, irrespective of the outcome the agency reaches on remand. *Montilla v. I.N.S.*, 926 F.2d 162, 169 (2d Cir. 1991). But for those who were denied a visa based on the Proclamation, the agency is already considering qualification for a waiver under the applicable guidelines. A.R. 347-59. The relief Plaintiffs seek goes far beyond a remand and would not be appropriate on this claim. *See generally* SAC, Prayer for Relief at 66.

### 2.      Plaintiffs fail to state due process and equal protection claims.

Plaintiffs' constitutional claims are virtually identical to those this Court already rejected. *See* Dkt. No. 74 at 16-18. Because they continue to lack merit, the Court should dismiss them.

First, Plaintiffs do not allege a deprivation of an interest protected by the Due Process Clause, as this Court held. *See* Dkt. No. 74 at 16-17 ("[Plaintiffs have not alleged any constitutionally protected fundamental rights" and there is no "unfettered right to reside in the United States with family members who are foreign nationals"); Plaintiffs' complaint has not substantively changed on this claim. *Compare* SAC ¶¶ 319-21 *with* FAC ¶¶ 322-27 (consisting of almost identical allegations). In a purported procedural due process claim, Plaintiffs now set forth alleged "reliance interests" and procedural rights based on "statutory benefits" and "an opportunity

for meaningful consideration for a waiver." SAC ¶¶ 322, 324. But these allegations amount to the same insufficient, cursory claim this Court already rejected. Dkt. No. 74 at 17 (dismissing Plaintiffs' procedural due process claim because of "Plaintiffs' inability to allege a deprivation of an interest protected by the Due Process Clause"); *compare* SAC ¶¶ 322-26 *with* FAC ¶¶ 328, 333-34. The visa applicant Plaintiffs do not have a protected liberty or property interest because they are "unadmitted and nonresident alien[s]" who have "no constitutional right of entry into the country," *Kleindienst v. Mandel*, 408 U.S. 753. 762 (1972), and "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950). Thus, even assuming that a U.S. citizen spouse has a protected interest, Defendants afforded them the process due by providing a statutory citation justifying the visa denials (SAC Ex. L at 2, Dkt. No. 77-13). *Hawaii*, 138 S. Ct. at 2419. ("the Government need provide only a statutory citation to explain a visa denial"). Thus, all Plaintiffs' procedural due process claims fail.

Plaintiffs' equal protection claim is also substantively identical to the one rejected by this Court given that *Hawaii* had already resolved the relevant issues. *See* Dkt. No. 74 at 17 (claim "demands assumptions unsupported by non-conclusory allegations of fact" and Supreme Court has already rejected "the logic that almost-uniform denials of waivers is tantamount to denial [based on] discriminatory grounds) (citing *Hawaii*, 138 S. Ct. at 2413-23). This Court noted that "the equal protection claim would likely be subject to rational basis review" and "[t]he Supreme Court . . . concluded . . . that the Government has set forth a sufficient national security justification to survive rational basis review." *Id.* at 18 (internal citation and quotation marks omitted); *accord Alharbi v. Miller*, -- F. Supp. 3d --, 2019 WL 1367758 (E.D.N.Y. Mar. 26, 2019) (dismissing Establishment Clause and Due Process challenges to waiver process).

In sum, these constitutional claims have not changed and must be dismissed. Letting these claims proceed would amount to an end run around the dispositive *Hawaii* decision.

### 3.      Plaintiffs fail to state a mandamus claim.

Plaintiffs set forth an asserted mandamus claim that is substantively identical to their prior claim. *See* SAC ¶¶ 333-39. This Court has already found that a mandamus claim in this context is redundant, and granted leave to amend it only as appropriate "at a later stage." *See* Dkt. No. 74 at

18 ("Because the APA claim will go forward, the Court dismisses plaintiffs' mandamus claim . . . . The dismissal is without prejudice to renewing at a later time, should that become appropriate [including when] relevant to a discussion of the proper relief in this case."); *compare* SAC ¶¶ 333-39 *with* FAC ¶¶ 335-41. Therefore, the Court should likewise dismiss Plaintiffs' mandamus claim in the SAC. As we explained in our first motion to dismiss, Dkt. No. 42 at 9-11, Plaintiffs have no clear right to the relief they seek, nor do Defendants have a nondiscretionary, ministerial duty to perform the acts requested given that Proclamation waivers are discretionary.

Even putting those fundamental flaws in the mandamus claim to the side, the relief requested under mandamus is not warranted. Plaintiffs ask this Court to order Defendants to: (i) "develop guidance on the waiver process," SAC at ¶¶ 335-36, Prayer for Relief ¶ 3; (ii) "evaluate whether . . . applicants previously denied waivers under an unlawful process should be reconsidered," SAC at ¶ 338; (iii) and "adjudicate applicants' requests for waivers" and "immediately issue visas," SAC at ¶ 335, 338. With respect to guidance, it has been promulgated, and is included in the administrative record, as Plaintiffs acknowledge. *See* State Dep't Website; *see*, *e.g.*, SAC at ¶ 86; Dkt. No. 77-4, 77-7. With respect to readjudicating all waiver requests, this Court has already found that a request for "the retraction of all visa denials" would be "impermissible." Dkt. No. 74 at 18. And as State Department statistics show, thousands of waivers have been granted and many thousands more are under active consideration. With respect to the demand that Plaintiff's individual waiver request be immediately adjudicated, this relief is inapprorpiate. The language of the Proclamation emphasizes that no applicant has a "clear right" to a waiver, and that it is up to consular officers, following guidance from the Secretaries of State and Homeland Security, and using the time necessary to ensure themselves that each of the three waiver factors are met to their satisfaction, to decide "in their discretion" if a waiver "would be appropriate" in any given case. Proclamation, § 3(c). Even if the Proclamation were enforceable, it does not impose any timeline by which waivers must be adjudicated. Proclamation, § 3(c); *see Luo v. Coultice*, 178 F. Supp. 2d 1135, 1140 (C.D. Cal. 2001). But even if Plaintiffs' claims were subject to APA review under a "reasonable time" standard, which they are not, Plaintiffs fail to

state a claim that Defendants have not acted "within a reasonable time[ ]," given Defendants' need to review thousands of applications individually to assess the national-security and public-safety requirements for a waiver. 5 U.S.C. § 555(b); *see Hussein v. Beecroft*, No.-17-cv-12356, 2018 WL 3574717, at \*7 (E.D. Mich. July 25, 2018); *Luo*, 178 F. Supp. 2d at 1140. The waiver process also offers the ability to expedite processing in appropriate cases. *See Moody v. Pompeo*, No. 19-1151, Order at 5 (D.D.C. May 13, 2019) (explaining availability of expedited processing when warranted); A.R. 145 ( "[i]n urgent cases, a response from the Visa Office [to a waiver-related question] can be provided within one business day, provided that the Visa Office has all the information needed"). And any relief in favor of Plaintiffs will work to delay the adjudication of others seeking waivers. *See* State Dep't Report (12,000 waiver requests undergoing security vetting). For these reasons, the Court should dismiss Plaintiffs' mandamus claim.

**B. Motion for Summary Judgment**

    **1.    The administrative record emphatically demonstrates that the waiver process is not a sham.**

Contrary to Plaintiffs' depiction of the waiver process as "arbitrary and ad hoc," SAC ¶ 94, the administrative record shows that Defendants have applied the waiver provision in an orderly way, taking deliberate measures to adhere to the Proclamation and any related guidance. The waiver process is operating properly and is not a sham. This is established by the administrative record, which shows that (1) the State Department has regularly issued detailed internal guidance to inform consular officers' application of the Proclamation's waiver criteria, (2) each applicant who meets the first two prongs for a waiver is properly vetted for national security or public safety concerns, (3) consular officers are afforded discretion to make case-by-case waiver determinations, which are not reviewable and are in any event entitled to a presumption of regularity, (4) the application process is legitimate, as applicants are automatically considered for waivers as part of a unitary visa application process consistent with other types of waiver requests, and (5) numerous applicants, including most Plaintiffs, either have been found eligible for waivers and issued visas or continue to receive administrative processing after the consular officer made a preliminary finding regarding the undue hardship and national interest criteria. The record

confirms, moreover, that the *Accardi* doctrine does not apply in this case, as consular officers do in fact enjoy discretion to make waiver determinations on a case-by-case basis.

### a.  Internal guidance

Summary judgment is appropriate because the record shows that the waiver process is being regularly implemented and is not a sham. Proof of that robust administration can first be found in the guidance that the State Department has methodically prepared, and periodically updated, to ensure that waiver adjudications conform to the Proclamation's terms. *See* 82 Fed. Reg. at 45168, § 3(c) (requiring relevant agencies to "coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals" under the Proclamation). The Department periodically circulated "Operational Q&As," which include a detailed discussion for day-to-day application of the waiver standards by consular officers, and cover specific topics such as how consular officers should construe the phrase "close family member" when considering an applicant's hardship, or what might constitute "significant business or professional obligations" in a consular officer's judgment. A.R. 19-24, 38-52, 67-81, 98-113, 130-46. The Q&As and other guidance documents expound how the Proclamation's general waiver criteria should be applied by consular officers in light of the specific facts presented in each case; thus, they delve into a number of illustrative scenarios and hardship categories to elucidate when a consular officer might reasonably find that an applicant has shown undue hardship, national interest, or the absence of any threat to national security or public safety. A.R. 20-22, 43-48, 72-77, 102-08, 135-40. The specificity and depth with which the Q&As treat the waiver prongs—addressing, for instance, whether the spouse of "an unconsummated proxy marriage" could qualify as a close family member to establish undue hardship—undercuts any claim that the government is perfunctorily issuing "mass waiver denials" or purposely flouting the Proclamation's waiver provision. A.R. 45, 74, 105, 137; *see* Dkt. No. 1 ¶ 102.

The same is true for internal State Department cables, many of which meticulously lay out how the waiver provision should be applied. One cable, from September 25, 2017, recites discrete "steps" that consular officers should follow in adjudicating visa applications, reminding them that

an applicant can qualify for a waiver even if he did not "fit[] in any of the categories of exceptions" to the Proclamation. A.R. 164-65. That cable also contains examples drawn from the Proclamation to illustrate particular instances when a waiver may be warranted—for example, when an officer makes the fact-specific determination that the applicant is "an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case." A.R. 171; *see* Proclamation § 3(c)(ii)(D) (directing State Department to issue guidance addressing this example of when a waiver would be appropriate). These internal cables, in addition to consistently noting the availability of waivers, have been responsive to the various legal developments surrounding the Proclamation. *E.g.*, A.R. 163-64, 172, 185-86. Even after the Supreme Court upheld the Proclamation as a lawful exercise of the President's broad authority under 8 U.S.C. § 1182(f), agencies have continued to refine the procedures by which their personnel, including consular officers, process visa applications and regulate entry into the United States. *See* A.R. 193-98 (Feb. 24, 2019 cable alerting consular officers of "the need to delve deeper into particular applications that warrant additional scrutiny"). Indeed, the very sequence of these internal cables, issued over time to ensure that consular officers are aware of and promptly account for evolving extrinsic circumstances, attests to the celerity and rigor with which the Department of State applied the Proclamation and its waiver provision.

The State Department has also periodically organized trainings, such as interactive webinars, to ensure that consular officers are acquainted with the scope and purpose of waiver adjudications under the Proclamation. Consistent with the individualized nature of those assessments, presenters have referred to the Proclamation to clarify the parameters of the waiver analysis—emphasizing, for example, that undue hardship cannot be found unless "an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel." A.R. 212, 235. These internal presentations are consistent with the Proclamation and have provided examples and guidelines to inform the factual evaluations done by consular officers prior to rendering any judgment on a waiver application. Such examples and guidelines have promoted consistent, competent, and

assured decision-making by consular officers, who must weigh whether an applicant has made a sufficient showing of the three waiver criteria. *See* A.R. 236-45 (discussing types of hardship to consider as part of the first prong and factual scenarios that might give rise to a finding of "undue" hardship).

The presentations have been consistent with other internal guidance in requiring that consular officers provide case notes explaining the specific bases for any waiver issued, including "the category of waiver for which the applicant is eligible," "the undue hardship caused by denying entry during the suspension," the national interest advanced by virtue of the waiver, and "the reasons the applicant does not pose a threat to U.S. national security or public safety." *Compare* A.R. 227-28, *with* A.R. 9, 22, 23, 50, 65, 79, 110-12, 143-44, 169. The repeated emphasis on the need to articulate the reasoning behind a waiver grant further confirms the robustness of the process carried out by consular officers. *See* 8 U.S.C. § 1201(a)(1) (recognizing that the decision to grant or deny a visa application, with limited exception, rests solely with the consular officer); 22 C.F.R. §§ 41.111, 41.121, 42.71, 42.81 (same). Additionally, the presentation materials, like the Q&As and cables, have been updated over time to incorporate any issues that might be relevant to consular officers and to further improve efforts to consistently analyze waivers in accordance with the Proclamation's broad mandates. *See generally* A.R. 200-84; *see also* A.R. 286 (indicating that "[t]he Proclamation provides a timeframe which will allow the relevant agencies to make operational adjustments and implement its provisions"). That focus on refining the ability of adjudicators to assess diverse waiver claims is evident even in the interactive nature of the webinars, which allow officers to ask questions through a chat box as the presentations are ongoing. A.R. 201, 220 (noting that any unanswered questions would be addressed through updates to the Q&As). Such ongoing refinements to the procedure of deciding waivers and instructing consular officers across the world show that the process is not a sham.

In addition to the body of Q&As, cables, and presentations discussed above, the State Department has produced an array of miscellaneous guidance documents—e.g., flowcharts, sample letters, and reference guides—specific to the waiver process. A.R. 327-45. These too

demonstrate the agency's efforts to ensure rational, consistent decision-making by consular officers. Of particular note are the flowcharts, which map out the analytical steps through which a consular officer must proceed before granting or denying a waiver, and serve as useful visual aids for consular officers who must consider a large number of visa applicants day in and day out. A.R. 327-37. Especially relevant here is the flowchart for waiver eligibility determinations. A.R. 337. While that flowchart contains redacted information that, if disclosed, would provide a roadmap for applicants to potentially defeat screening protocols using fraud, it is revealing in its depiction of the various considerations that bear on a consular officer's assessment of a waiver claim. *Id.* Plaintiffs surmise that the government has administered the waiver provision without a definite plan or purpose, Dkt. No. 1 ¶ 7, but documents such as the flowchart show that the process has been anything but haphazard. Contrary to their claim of an "ad hoc" approach, the waiver provision has benefited from orderly administration by consular officers, who make a series of detailed factual assessments before arriving at any finding of no waiver. A.R. 237.

### b. National security vetting

The most time-consuming part of the waiver process is the security vetting, whereby every applicant must undergo thorough vetting to ensure they do not present a national security or public safety risk. That vetting—which is similar to many other vetting processes in the visa adjudication system where consular officers consult law enforcement partners to help evaluate applicants—is critical to achieve a fundamental purpose of the Proclamation given the identity management and cooperation problems with the subject countries. 82 Fed. Reg. at 45168, § 3(c)(i)(B) (waiver may be granted only if the applicant demonstrates to the consular officer's satisfaction that "entry would not pose a threat to the national security or public safety of the United States"). Vetting aliens to ensure that there is no threat to national security or public safety is not a sham, and Plaintiffs' complaint *raises no colorable allegation* that the national security vetting is illegitimate or improper in any way. Thus, the part of the waiver process that causes the most delay is not in any way being challenged in the operative complaint.

The Proclamation, from the outset, explains that the purpose of its entry restrictions is to

remedy threats to the safety of the United States posed by the inadequate identity-management and information-sharing protocols of certain identified countries. 82 Fed. Reg. at 45163, § 1(a)-(b) (such "protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States," which in turn "play a critical role" in protecting U.S. "citizens from terrorist attacks and other public-safety threats"); A.R. 3. The restrictions are intended to "encourage the countries to work with the United States to address those inadequacies and risks so that the restrictions and limitations . . . may be relaxed or removed as soon as possible," 82 Fed. Reg. at 45164, § 1(h), as happened with Chad. A.R. 185-87, 320. Short of that, however, the Proclamation contemplates that the restrictions must stay in place, "both to protect national security and public safety, and to induce improvements by [the identified] countries." *See Hawaii*, 138 S. Ct. at 2409. The Supreme Court expressly upheld the Proclamation based on this rationale. *Id.* at 2410.

A substantial portion of the guidance to consular officers concerns this security vetting— and most of that is classified or law enforcement sensitive because, if disclosed, just as with security vetting in other visa contexts, it would create the highest risk of providing a roadmap for malign actors intent on defrauding the government to skirt the national security and public safety checks. *See*, *e.g.*, A.R. 9-10 (9 F.A.M. 302.14-10(E)(2) (redacted material detailing steps for consular officer to take in conducting security vetting)); A.R. 39, 41-42, 50, 70-71, 79-80, 159-62 (same); A.R. 183 (referencing classified guidance); *see also* Dkt. No. ¶ 77 n.7 (discussing analogous administrative processing procedures). The primary public-facing cable addressing this vetting is 17 STATE 56801, with unclassified excerpts appearing at A.R. 157-162. This cable shows that a substantial manual investigation by the consular officer is needed in each case, who considers an exceedingly broad swath of information from interagency partners before rendering a judgment as to whether the applicant poses a security threat. *See* A.R. 157. In doing this, "consular officers must understand the specific circumstances that led to each [identified] country's designation as inadequate," including information relating to the likelihood a passport could be fraudulent, and whether the country shares information regarding identity, criminal

history, or suspected terrorists. A.R. 157-58. Given these concerns about identity management that gave rise to the Proclamation, this requires "a case by case determination to verify that an applicant's identity as recorded in a passport is bona fide and that there is no indication that he or she has engaged in terrorist or criminal activities." A.R. 157. This individual investigation is "resource intensive for posts and interagency partners." *Id.* The guidance makes it clear that consular officials are to provide case notes assessing this factor based on their investigation and consultation with partners and foreign governments. A.R. 79-80, 169. While this process is "resource intensive," it is not a "sham," and it is one that ultimately results in a judgment made by the consular officer. A.R. 157.

Given that the entry restrictions were introduced specifically to redress the "significant gaps" in the identity-management and information-sharing practices of several countries, *see* 82 Fed. Reg. at 45164, § 1(h)(ii), it would run counter to the very purpose and design of the Proclamation not to consider those gaps when adjudicating visa applications from affected foreign nationals. Further, while the first two prongs can be assessed relatively quickly on the materials and statements submitted by the applicant, the third component of the waiver analysis may take considerably more time—challenging consular officers not only to probe the applicant's background for fraud, criminal, or terrorist concerns, but also to scrutinize the gathered evidence in light of the conditions that led the applicant's country to be "deemed 'inadequate' on information sharing" in the first place. *See* A.R. 157. The patient and thorough approach adopted by consular officers to investigate applicants for security concerns reflects the good faith implementation of a Proclamation designed to eliminate national security risks in cases where information sharing or cooperation is inadequate, and that extensive effort is not what one would expect if the process were in fact a "sham."

### c. Consular officers' function in adjudicating waivers

The central role afforded to consular officers, and the presumption of regularity that their decisions enjoy, also shows that the waiver process is not a sham. Throughout the record, there is a clear recognition that consular officers are authorized to make, and in fact are the ones actually

making, waiver decisions with respect to visa applicants on a case-by-case basis. The Proclamation's direction that consular officers have discretion to adjudicate waivers is reiterated throughout various internal guidance—perhaps most prominently in the Foreign Affairs Manual ("FAM"), which punctuates that no waiver can be granted until the consular officer is satisfied that the applicant has met all three waiver conditions.[4] *See* A.R. 7-11. More than once, the FAM makes sure to directly address consular officers while setting out waiver-related guidance, leaving no uncertainty as to who is responsible for assessing waiver eligibility and adjudicating visas in individual cases. *See, e.g.*, A.R. 7 ("*You* must determine whether the applicant may qualify for a waiver" (emphasis added)); A.R. 9 ("If the applicant qualifies for a waiver, *you* may issue the visa." (emphasis added)).

Similarly, the Q&As make plain that "Consular officers may grant waivers on a case-by-case basis *when the applicant demonstrates to the officer's satisfaction* that the [waiver] criteria apply." A.R. 19 (emphasis added). Some of the Q&As provide for consultation with supervisors such as the visa chief or the consular section chief at the consular post, *see* A.R. 131—but those supervisory personnel are generally also consular officers at the post who themselves adjudicate visas and waivers.[5] A.R. 19, 39, 68, 99, 131. And while consular officers may find themselves consulting with interagency partners at certain points in the process—especially during the process of national security vetting, where information from interagency partners is critical—they do not relinquish any of their discretion in applying the waiver criteria to the applicant's case, including in relation to the third prong. A.R. 157-59. As the guidance makes clear, an applicant must "demonstrate[] to the [consular] officer's satisfaction" that her entry would pose no threat to national security or public safety before a waiver can be granted. A.R. 19, 38, 67, 130-31.

Plaintiffs rely heavily on the uncorroborated statements of a former State Department

---

[4] The FAM constitutes a "single, comprehensive, and authoritative source" for the State Department's governing policies and "convey[s] codified information" for agency personnel to "carry out their responsibilities in accordance with statutory, executive and Department mandates." *See* U.S. Department of State, Foreign Affairs Manual and Handbook, *available at* https://fam.state.gov/.

[5] According to the Q&As, "[s]ole consular officers do not need concurrence from their supervisor for waivers or exceptions, but should seek [visa office] concurrence on their decisions to grant waivers." A.R. 23, 50, 80, 111, 143.

employee, Christopher Richardson, who alleged many months ago, in a different case, without being subject to adversarial, that consular officers are shut out from the decision-making process to grant or deny waivers. *See generally* SAC ¶¶ 3, 67, 72, 75, 90-93. According to Richardson, "it is understood that there really is no waiver [process]" and consular officers are forced "to determine at all possible cost" that all applicants are ineligible "to even apply for a waiver." *See, e.g.,* Dkt. No. 77-3; SAC ¶ 91. But Richardson's qualifications to opine on the waiver process are dubious at best. Before he retired from the Department in March of 2018—just a few months after the Proclamation went into effect—he served as the American Citizens Services Chief at the U.S. Embassy in Madrid. *Id.* ¶ 155. Spain is not one of the countries of concern identified in the Proclamation, nor do American citizens apply for visas as they must travel with passports. *See* 8 U.S.C. § 1185(b) (providing that "it shall be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid United states passport"). Richardson also does not claim that he adjudicated visa applications, applied the Proclamation, or ever played any part in carrying out the Proclamation's waiver provision, and his credentials suggest that he did not. In short, other than Richardson's vague conjecture that the waiver process somehow is a sham, Plaintiffs point to nothing that would allow this Court to reasonably conclude that consular officers—despite all the record evidence to the contrary—have been directed to deny all waiver applications and disregard the hundreds of pages of guidance that are included in the administrative record.[6] Richardson's declaration was before the court in *Alharbi v. Miller*, No. 17-cv-2435-BMC (E.D.N.Y. Apr. 25, 2018), Dkt. No. 42-2, but the court dismissed that case after finding that the plaintiffs there had made no plausible or particular allegations of bad faith by agency actors. *Id.*, Dkt. No. 82, at 26.

Thus, while consular officers may at times have to confer with supervisors or agency partners, especially with respect to the resource-intensive national security assessment, that collaborative element does not alter the fact that the consular officer oversees all steps of the waiver

---

[6] Plaintiffs refer to statements from other former consular officers as evidence of a fraudulent waiver process. *See, e.g.,* SAC ¶ 89. But because Plaintiffs never identify these individuals, their alleged statements should hold no weight.

adjudication and ultimately decides in her discretion to grant or deny a waiver under the Proclamation. A.R. 157.

### d.  Application process

The application process further confirms that implementation of the waiver provision is not a sham by ensuring that all individuals subject to the Proclamation receive full consideration for a waiver as a matter of course. While the waiver provision places the burden on the applicant to demonstrate to the satisfaction of the consular officer that a waiver is warranted, "[t]here is no separate application for a waiver. An individual who seeks to travel to the United States should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver." State Dep't Website. This unitary process, whereby applicants refused visas under the Proclamation are still considered for a waiver with an opportunity to provide relevant information but without any further action on their end, is consistent with the terms of the Proclamation, which does not dictate any particular method by which consular officers must consider waiver eligibility, but mandates only that waiver eligibility be considered. *See* 82 Fed. Reg. at 45168, § 3(c). Indeed, requiring applicants to file a separate application for a waiver, with largely duplicative evidence, would burden both the applicant and the consular officer, who in any case would have to interview the applicant on his larger request for a visa. An automatic process, on the other hand, streamlines application processing and prevents applicants from being penalized for being unfamiliar with the general framework of the Proclamation and the ways in which its various parts intersect.

As to the argument that a separate waiver form, however onerous, could enable applicants to provide more evidence in support of their claim than through a unitary visa application, the State Department has made sure to give public notice that applicants, during the visa interview, should disclose "any information that might demonstrate that he or she is eligible for a waiver." State Dep't Website. Further, as amply shown above, consular officers are reminded regularly that the Proclamation itself mandates that refused visa applicants be considered for waivers, and there is no evidence that they have ever attempted to disobey that express directive. The first two waiver

prongs, in any case, can be evaluated through relatively straightforward inquiries of the applicant—and the visa applicant is provided the information needed to substantiate a claim of severe hardship or other compelling reason for wanting to travel to the United States.[7] And should the applicant still, for some reason, believe that she had been deprived of a full opportunity to establish her case for a visa, the regulations allow her to present further evidence regarding her eligibility to the consular officer who adjudicated his case for up to one year from the date of her refusal. *See* 22 C.F.R. § 42.81(e).

Some of the named Plaintiffs allege that they submitted visa applications and were interviewed on those applications before the Proclamation went into effect and thus were never properly considered for waivers. Dkt. No. 81, ¶¶ 22, 77, 196, 251, 260, 278, 314. That allegation is unfounded and, in any case, confuted by the record. As their individual declarations show, those Plaintiffs had their applications readjudicated after the Proclamation took effect. They were refused visas under 8 U.S.C. § 1182(f) pursuant to the Proclamation and automatically considered for waivers. A.R. 347 60, ¶¶ 5, 6, 7, 9, 11-13, 20, 22 24, 26, 28. Some of those Plaintiffs were denied waivers after failing to meet the mandatory criteria, while others are still undergoing consideration for a waiver of the Proclamation's entry restrictions. If anything, the orderly way in which all Plaintiffs' cases have been handled—irrespective of when they arose—plainly demonstrates that Defendants are implementing the waiver process.

### e.   Waiver-related statistics

Statistics relating to the implementation of the Proclamation unmistakably demonstrate that the waiver process is not a sham. According to data recently released in the quarterly State Department report on the waiver process, consular officers, between December 8, 2017, and March

---

[7] Because the first two waiver prongs demand an inquiry into individual facts and can best be assessed by the consular officer, who is directly presented with the applicant's evidence, it is unsurprising that much of the State Department's publicly available guidance pertain to undue hardship and national interest. *See* A.R. 19, 38, 67, 98, 131 (each explaining that "[t]he requirement for issuance to be in the **national interest** may be met *if a U.S. person or entity* would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted" (emphasis in original)). Those prongs intersect where "[t]he required level of hardship to an applicant may vary with the level of U.S. national interest in facilitating the applicant's travel to the United States." A.R. 140. Thus, "[w]hen assessing national interest, consular officers should consider hardship suffered by a U.S. person or entity . . . . If an applicant's travel is related to a program or policy objective of the U.S. government, then the national interest can be considered higher, and the hardship to the applicant would not need to be as severe." *Id.*

21

31, 2019, received 178,681 visa applications from nationals of the affected countries. State Dep't Report, at 7-16. Of those, only 60,275 applications—or about a third of all applications—were affected by the Proclamation. *Id.* And of those 60,275 affected applicants, 10,734 were refused visas for reasons unrelated to the Proclamation, whereas 6,893 were issued visas under the Proclamation, including 3,071 applicants as a result of a waiver. *Id.* at 16-20, 26-36. Those 3,071 individuals were granted waivers after having been found to meet all three waiver criteria—a figure that represents approximately 6.7 percent of all applications considered for a waiver under the Proclamation. *Id.* at 3. Notably, more than 12,000 applicants—or over 26 percent of those considered for waivers—have been found to meet the first two waiver prongs and are currently undergoing a manual "interagency security review to resolve whether their entry would not pose a threat to the national security or public safety." *Id.* As we have explained, it is that vetting that is most time-consuming and that has led to frustration by applicants. Thus, contrary to Plaintiffs' suggestion of a blanket waiver denial policy, the evidence demonstrates that there are applicants currently occupying every stage of the multi-step waiver process, and proceeding through that process in a structured way.

Plaintiffs also refer to some statistical data—from early 2018, just a few months after the Proclamation went into effect—to allege that Defendants have adopted a blanket denial policy. Dkt. No. 1 ¶¶ 136-54. Plaintiffs, in fact, rest much of their case on those expired statistics, arguing that because "only an exceedingly small number of visa applicants are actually granted waivers," the figures "confirm that [the waiver process] is, indeed, window dressing." *Id.* ¶ 138. Although the referenced data in fact reveals that, even in the Proclamation's incipiency, applicants were being processed and cleared for waivers, Plaintiffs insinuate that the number of waiver grants during that period was either too low or contrived. *Id.* ¶¶ 139-41, 145 (claiming that the government "appeared to start granting waivers at a relatively faster rate" in light of developments in *Hawaii*), 148-50. In doing so, however, Plaintiffs divorce the waiver statistics from the only context in which those numbers can be properly viewed. Statistics from the very beginning of the waiver process, just as the program was being developed and implemented after the Supreme Court

granted a stay that permitted the Proclamation to take effect in December 2017, are not representative and should be given little weight by this Court. Indeed, the numerical cherry-picking in which Plaintiffs engage—suggesting, for example, that the waiver process is irregular simply because "less than 2% of visa applicants . . . had been granted waivers as of April 30, 2018"— is based on information that the Supreme Court had before it and represents the kind of statistical manipulation that the Supreme Court expressly disfavored in *Hawaii*. *See id.* at 2423 n.7. If Plaintiffs had their way, this Court would be put in the untenable position of determining whether the number of waiver grants, which naturally changes over time, is somehow too low—an impossible task that the Court should decline to take on.

In citing waiver statistics to challenge the waiver process, Plaintiffs also misapprehend the basic framework in which waiver adjudications take place. As discussed above, no waiver can be granted until a consular officer has made an individualized determination that the applicant has met the three criteria set out in the Proclamation—to wit, undue burden, national interest, and national security/public safety. *See* 82 Fed. Reg. at 45168, § 3(c). It is a wide and exhaustive undertaking—so much so that the refusal letters provided to visa applicants who remain eligible for waivers forewarn that the waiver assessment "can be a lengthy process." A.R. 10, 11, 152, 340, 341; *see Singh v. Still*, 470 F. Supp. 2d 1064, 1068 (N.D. Cal. 2007) (holding that in determining whether an agency has unreasonably delayed in processing an immigration application, courts typically look to "the source of the delay—e.g., the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding"). Even before the Proclamation's promulgation, case-by-case adjudications of visa petitions frequently took months, in part, because of required background checks. *See I.N.S. v. Miranda*, 459 U.S. 14, 15, 18 (1982) (finding that INS's failure to act on immigrant visa petition for eighteen months did not constitute unreasonable delay because of "the number of the applications received by the INS and the need to investigate their validity"); *Sayyadinejead v. Chertoff*, No. 07-cv-0631-JAH, 2007 WL 4410356, at *6 (S.D. Cal. Dec. 14, 2007) (finding that, despite a delay of three years on account of FBI background checks, USCIS and the FBI were "taking reasonable precautions as public

safety require[d] them to do, and [were] also doing everything possible to ensure that the [p]laintiff wait[ed] no longer than necessary to receive permanent status"). Thus, while Plaintiffs complain about what they deem to be excessively low numbers of waiver grants, they fail to consider that those statistics are entwined with the time it takes to thoroughly complete each individual waiver adjudication. And it is not unreasonable that the waiver statistics, thus far, have not been any higher, where consular officers must adjudicate a daunting volume of waiver applications and endeavor "to mitigate the risks" to national security and public safety that might attend any one of those determinations. A.R. 169, 180.

Plaintiffs, in short, proffer only "selective statistics" and "anecdotal evidence" to protest that "not enough individuals are receiving waivers." *See Hawaii*, 138 S. Ct. at 2423 n.7. Their complaint, at bottom, is rooted simply in their dissatisfaction with the rate at which consular officers have adjudicated waiver applications and the number of waivers that those officers have granted. Courts have declined to step in in individual cases where adjudications of similar requests have taken years—this Court should likewise decline to oversee a challenging and multi-faceted waiver process where many cases are delayed due to essential national security vetting. Plaintiffs' claims relating to delay are far too meager to go forward, especially where they have not proffered any evidence or viable claim that the government has failed to comply with its own waiver guidance and procedures.

***

Incidentally, the sound implementation of the waiver provision can also be seen in the case histories of Plaintiffs themselves. Notably, one Plaintiff has been granted an immigrant visa based on her qualification for a waiver. A.R. at 347-59 ¶ 12. Of the 26 plaintiffs for whom the State Department compiled information regarding their visa applications, consular officers determined that 12 of them met the first two waiver prongs of hardship and national interest. *Id.* ¶¶ 4, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 22. Although further vetting with respect to the third prong remains for these Plaintiffs, should the consular officers adjudicating their applications find that they would not pose a threat to national security or public safety, they would likely be granted waivers, absent any other eligibility concerns. Aside from one plaintiff who was refused a visa for a reason

unrelated to the Proclamation, *id.* ¶ 21, the remaining Plaintiffs were denied waivers after having failed to meet one or both of the first two waiver prongs, *id.* ¶¶ 5, 6, 18, 19, 20, 23, 24, 25, 26, 27, 28, 29. The different positions that Plaintiffs—and all other applicants covered by the Proclamation—currently occupy in relation to their visa proceedings illustrate that the waiver process, far from being aimless or stagnant, has been moving deliberately apace, through the combined efforts of the agencies.

In short, the administrative record and publicly available information showing thousands of granted waivers decisively refute Plaintiffs' allegations that the State Department has not followed its own guidance, or has instituted a "sham" waiver process. Defendants are entitled to summary judgment on the *Accardi* claim—the only claim that this Court permitted to go forward in its prior order.

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' SAC with prejudice or grant summary judgment to Defendants.

Dated: June 13, 2019                      JOSEPH H. HUNT
                                          Assistant Attorney General
                                          United States Department of Justice, Civil Division

                                          AUGUST E. FLENTJE
                                          Special Counsel

                                          WILLIAM C. PEACHEY
                                          Director, Office of Immigration Litigation
                                          District Court Section

                                          By: GISELA A. WESTWATER
                                          Assistant Director, Office of Immigration Litigation
                                          District Court Section

                                          By: STACEY I. YOUNG
                                          Senior Litigation Counsel, Office of Immigration Litigation
                                          District Court Section

                                          By: */s/ David Kim*
                                          DAVID KIM
                                          P. ANGEL MARTINEZ
                                          Trial Attorneys, Office of Immigration Litigation