Exhibit 1

1
2

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

3
4
5
6
7

Farangis Emami, et al.,
             Plaintiffs,

    v.

Kirstjen Nielsen, et al.,
             Defendants.

Case No. 3:18-cv-01587-JD

8
9
10
11
12

Pars Equality Center, et al.,
             Plaintiffs,

    v.

Mike Pompeo, et al.,
             Defendants.

Case No. 3:18-cv-07818-JD

**DECLARATION OF IMMIGRATION
ATTORNEY MAHSA KHANBABAI
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS OR,
ALTERNATIVELY, FOR SUMMARY
JUDGMENT**

13
14

**DECLARATION OF MAHSA KHANBABAI**

15

I, Mahsa Khanbabai, hereby declare as follows:

16
17
18
19
20
21

1.    I am a practicing immigration attorney barred in Massachusetts with extensive experience representing clients in their requests for waivers under Presidential Proclamation 9645. I make this declaration in support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Second Amended Complaint or in the Alternative for Summary Judgment. I have personal knowledge of the matters set forth herein and can and will testify thereto if called upon to do so.

22
23
24

2.    I am the founder and sole attorney of Khanbabai Immigration Law. I practice immigration law with a focus on physician immigration and business specialty occupation visas, and I have a large practice assisting clients from the Middle East. My practice consists of both

25

DECLARATION OF MAHSA
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

      1      Case No. 3:18-cv-01587-JD

family and business cases across a wide range of circumstances. I have been a practicing attorney since 1999.

3.     Due to my Iranian heritage and ability to speak Farsi (a.k.a. Persian), the national language of Iran, my office has attracted business from many Iranians and Iranian-American, Iranian-Canadian, and Iranian-British clients. When the Supreme Court allowed the implementation of Presidential Proclamation 9645, my office began to attract Iranian clients who are subject to the Proclamation and seek waivers as described in P.P. 9645(3)(c). After I developed a measure of experience in applying for waivers and found success in a couple of cases, other practitioners began referring clients from Iran and other affected countries to my office to assist them with obtaining waivers.

4.     As a result of my experience navigating the waiver process, I frequently present at conferences and lead workshops. I have authored nationally distributed practice pointers for other immigration lawyers regarding travel ban waiver application best practices. I also authored an article in a nationally recognized journal using data from Defendant Department of State ("DOS") to demonstrate the decrease in visa grants to nationals from the banned countries.

5.     I am a regular participant on multiple immigration lawyer listservs that regularly discuss consular processing, the travel ban, and numerous other immigration issues. Using these listservs, I am able to compare my own experiences with larger trends in immigration processing based on the questions asked by, discussions held by, and case outcomes obtained by other lawyers.

6.     I have directly, by entering an appearance and communicating with U.S. embassies and consulates, and indirectly, by advising clients and reviewing the materials that they intended to send the embassy, represented over a dozen immigrants and nonimmigrants impacted by the current implementation of the travel ban under Presidential Proclamation 9645 since December 4, 2017, and counseled many more.

7.     Based on my experience, review of the materials, and observation of trends, I advise

DECLARATION OF MAHSA                2                Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

other attorneys and my clients on how to request Presidential Proclamation 9645 § 3(c) waivers or to argue that the Proclamation does not apply to an individual case.

8.     It is my considered opinion that the Proclamation has been at best haphazardly implemented by Defendant DOS and its consulates and embassies and at worst, intentionally designed to confuse and result in denials. My office's experiences applying for waivers has varied drastically from my fellow practitioners' experiences regarding even basic aspects such as the proper means to submit evidence of section (3)(c)'s criteria for a waiver. Further, my own experiences in seeking a travel ban waiver for my clients have varied by embassy, by immigrant vs. non-immigrant applicant, by nationality, and by type of hardship (i.e. family reasons, medical reasons, financial reasons, etc.).

9.     Based on my experiences and my knowledge of other practitioners' experiences, consular officers and visa units do not appear to be processing waivers in a consistent manner, either because DOS has not issued consistent guidance to consular officers and visa units, or because the guidance is so vague that it is effectively meaningless. Even waiver grants are made in a haphazard and inconsistent manner and serve only to highlight the deficiencies of the process overall.

10.     There has been very limited information made available to the public. The information that has been made available typically consists of a single paragraph on DOS embassy websites describing the general nature of the travel ban. The information that has become available to immigration attorneys regarding waivers has only come through three venues: through Congressional inquiry (letters to Senator Van Hollen), through FOIA requests (Operational Q&As on the Proclamation), and through direct interactions with U.S. embassies.

11.     In each of these cases, Defendant DOS has resisted making operational and procedural information publicly available and has only provided information when required by Congress, by U.S. law regarding information availability, or by U.S. law regarding consular requirements for

DECLARATION OF MAHSA                    3                Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

providing explanations when instructing visa applications or denying visa applications.

12.   Each waiver case involves demonstrating that the applicant meets the three criteria set out in P.P. 9645(3)(c): (A) denying entry would cause the foreign national undue hardship, (B) entry would not pose a threat to the national security or public safety of the United States, and (C) entry would be in the national interest. The use of the phrases "…if such foreign nationals demonstrate" and "… if a foreign national demonstrates" at various points of the section indicates that the onus is on the applicant to provide evidence to the consular officer, as is standard for all immigration processes.

13.   In the absence of any guidance other than the Proclamation itself, other attorneys and I relied on standard definitions of terms like "undue hardship" that have been established by legal precedent and described in detail in numerous USCIS and DOS sources. The INA provides for several types of statutory waivers on the grounds of "undue hardship," such as a waiver from the two-year home residency requirement for J-1 visa holders (filed via Form I-612) and a waiver from inadmissibility on the grounds of unlawful presence (filed via Form I-601(A)). Having successfully filed many of these cases, I am aware of the standard agency definition of "undue hardship" and the evidentiary standard that is required to meet it.

14.   An I-601A waiver I filed for Mr. X, a Mexican man who crossed into the U.S. without authorization, typifies the existing standard of "undue hardship." Mr. X had a child with a U.S. citizen, then went on to marry a U.S. citizen. His household is two-income and he plays an active role as a father to both his biological child and his stepchild. In the I-601A submission, we argued that his U.S. citizen wife, child, and stepchild would face severe emotional and psychological hardship if they were separated from their father, as well as the financial hardship of losing his income. We also noted that his wife was diagnosed with an anxiety disorder, and that exacerbation of this disorder would likely have consequences for her physical health, but this was merely one argument amidst many types of hardships.

DECLARATION OF MAHSA                4          Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

15.    In support of our arguments, we submitted a substantial amount of supporting evidence, including affidavits, financial statements, reports regarding conditions in Mexico, etc. The waiver was ultimately approved as a result of demonstrating the sheer number and types of hardships that U.S. citizens would face of the waiver was not approved. Accordingly, in the absence of any initial guidance from the Department of State, I used this definition of "undue hardship" for travel ban waiver cases.

16.    However, in a letter to Senator Van Hollen, DOS described the "undue hardship" requirement as: (1) an unusual situation exists that compels immediate travel by the applicant and (2) delaying visa issuance and associated travel plans until after visa restrictions are lifted would defeat the purpose of travel. This definition of "undue hardship" is an entirely new legal creation that, on its face, is far stricter than the established definition and a reflection of the government's intent to deny as many waivers as possible. It does not appear anywhere else in the body of immigration law.

17.    Essentially, this definition asks applicants to prove that the reason for their travel cannot wait until after visa restrictions are lifted. This is an entirely different legal test than what the President ordered in the Proclamation and is inconsistent with the plain language of the Proclamation and the established meaning of "undue hardship."

18.    It is worth noting that this definition did not emerge until the February 2018 letter to Senator Van Hollen. The Supreme Court did not have access to this definition when it ruled on the constitutionality of the Proclamation, and all legal opinions related to the waiver process likely presumed that the Proclamation's standard of "undue hardship" was the same standard as the rest of immigration law.

19.    My first waiver case concerned Iranian applicant Mr. Hashemi, an Iranian man seeking a non-immigrant visa to come to the U.S. and donate blood marrow to his brother, a U.S. citizen afflicted with a rare form of blood cancer. The applicant interviewed at the U.S. embassy in

DECLARATION OF MAHSA          5          Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

1    Yerevan on February 9, 2018. The donation surgery was scheduled by the U.S. citizen brother's

2    doctors for April, requiring the applicant's presence in the U.S. in advance of the surgery for

3    prerequisite testing and procedures.

4        20.    By mid-March 2018, the embassy still had not made any movement on the case, had

5    made no contact with the applicant, and had not requested any further evidence. Although the

6    applicant described the details of the situation at his visa interview, it was not clear that the

7    embassy was taking into consideration the time constraints and other factors of his case, and the

8    embassy did not process the waiver of PP 9645 despite the dire situation. Further, given the

9    embassy's inaction despite the urgent medical and humanitarian need he had to travel, it seems

10   clear that the embassy did not have clear instructions on how to prioritize cases of this nature or

11   on how to adjudicate the factors described in Section (3)(c).

12       21.    When the applicant retained our office in March, I acted quickly to ensure the applicant

     would make it to the U.S. in time for the donation surgery. I first emailed the Yerevan Embassy's

13   generic NIV email address on March 19, 2018 with a legal memo and supporting documentation.

14   We received a generic response that neither confirmed receipt of the materials nor stated that the

15   embassy could not accept such materials.

16       22.    On March 23, I emailed several individuals within the Department of State the same

17   materials, stressing the urgency of the case; the principal recipient was Carl Risch, Assistant

18   Secretary of State for Consular Affairs. It was only at this point that I received a response from the

19   "countries-of-concern-inquiries" email address, stating that the information I had provided was

20   forwarded to the mission in Yerevan.

21       23.    At this point, I determined that the case would not be timely processed and therefore

22   reached out to an international media outlet regarding the case. The critical circumstances of the

23   case attracted immediate national and international media attention, as it became clear that DOS

24   inaction on a travel ban waiver application might lead to the preventable death of a U.S. citizen.

25   DECLARATION OF MAHSA                6              Case No. 3:18-cv-01587-JD
     KHANBABAI
     KHANBABAI IMMIGRATION LAW
     115 MAIN ST. STE 1B
     NORTH EASTON, MA 02356

24.     On March 28, with time running out and no definitive response from Yerevan, I emailed Erin Eussen, U.S. Consul in Yerevan and cc'd Ed Ramotowski, Deputy Assistant Secretary for Visa Services. This email contained the key information about the urgency of the case I had been repeating and also included a link to the international news article that had just been published about the case which was framed as describing how Trump's travel ban was about to cause the death of a U.S. citizen.

25.     At this point, I received a response from Ms. Eussen affirming the urgency of the case and stating that she had requested expedited review. Additionally, Congressman Michael Capuano's office sent a letter directly to Secretary of State Tillerson on March 28. On March 29, I received a call stating that the waiver had been approved and Mr. Hashemi could acquire the visa stamp and come to the U.S.

26.     It is worth noting that it is standard practice for the U.S. government (USCIS, DOS, CBP, etc.) to require corroborating evidence of claims made during immigration cases. USCIS has recently increased these standards for a number of case types; for example, they often reject diplomas stating an applicant's name and degree type as sufficient evidence of educational attainment and instead request direct transcripts; any medical claims are met with requests for letters from physicians or other doctors; statements that companies employ less than 25 people are met with requests for payroll rosters; etc.

27.     DOS public guidance suggests that officers will collect all of the evidence they need regarding eligibility for a travel ban waiver during the verbal interview with the applicant. It is unclear how consular officers would collect such corroborating evidence through verbal questioning, which is why we emailed the evidence from multiple authoritative sources. This evidence was apparently accepted and considered post-interview.

28.     It is also worth noting that at no point did I take any actions based on guidance issued by the Department of State of relayed by the embassy. I pursued these actions on my own initiative

DECLARATION OF MAHSA              7              Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

based on my own hunches regarding pressure points within the Department of State and the consular chain of command.

29.    This case did not succeed because DOS has established a clear and efficient process of evidence submission, prioritization, and adjudication. It succeeded because I poured significant resources into warning every DOS employee I could think of that delay carried grave consequences. It succeeded because under pressure from myself, a member of Congress, and the international media, I managed to convince someone that they should pay special attention to this case. Had it simply proceeded through the ordinary waiver "process," Mr. Hashemi's brother would likely have died an avoidable death.

30.    Despite being a plainly meritorious application, and despite DOS possessing the capacity to process emergency cases rapidly, this case only succeeded once I abandoned the proscribed process and resorted to extraordinary measures. This case succeeded despite DOS established process, not because of it; I can only imagine how it might have played out if Mr. Hashemi did not have access to legal counsel to advocate on his behalf.

31.    Our next successful waiver case was concerning Iranian applicant Mr. Namazifard, who suffered a paralyzing spinal cord injury five years ago and was invited to participate in a research study in the United States using a robotic exoskeleton. The hospital offering the opportunity sought to determine his eligibility for the study, in which case they would cover the cost of his treatment. If he were not eligible for the study, he would still be eligible for the treatment, which he would pay for. His U.S. citizen brother would host the applicant at his house and cover his cost of living, and also contribute to his treatment costs.

32.    The applicant suffered severe physical and mental health consequences from his injury and lower body paralysis, and this treatment offered a unique opportunity to alleviate these symptoms. He first had an interview in Abu Dhabi where a consular officer accused him of "faking it" and not really needing a wheelchair, before denying his visa. He next applied for a visitor visa

DECLARATION OF MAHSA
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

8                    Case No. 3:18-cv-01587-JD

1   at the embassy in Ankara and the waiver was denied after pending for 6 months.

2       33. · Based on our experience with Mr. Hashemi's case, we advised Mr. Namazifard to

3   apply for his visa at the US embassy in Yerevan. His interview was scheduled for June 22, 2018

4   and we submitted documentation directly to the embassy on June 20 detailing his condition and

5   the consequences of a visa denial to both him and his U.S. citizen brother. We included a letter of

6   support from Congressman Paul Tonko.

7       34. We received an email response from the embassy acknowledging receipt of the

8   materials. We also sent the materials to Mr. Namazifard himself to bring with him to the interview.

9   After the interview, Mr. Namazifard and his brother reported to us that the interviewing officer

10  took the materials and told Mr. Namazifard that he believed he was eligible for a waiver but that

11  someone above him had to make the final decision, concluding that it might take up to a month for

    his higher-ups to review.

12      35. In our multiple follow-up correspondences we stressed that the applicant has young

13  children who would have a break from school over the summer but would go back in the fall, and

14  requested that the embassy consider the additional hardship to the applicant and his family if he

15  had to leave his children during the school year. On July 22, 2018, we again followed up with the

16  embassy, stressing this point. We received an email response stating that our concerns had been

17  forwarded to the attention of the responsible consular officers. We followed up again on August

18  2, receiving a similar response. Finally, on August 21, Mr. Namazifard was notified that his waiver

19  had been approved.

20      36. Our third successful waiver case concerned applicant Mr. Varnakesh, whose U.S.

21  citizen wife was sponsoring him for a green card. At the time of the applicant's interview at the

22  U.S. embassy in Yerevan on November 20, 2018, his U.S. citizen wife was pregnant with what

23  was determined by her physician to be a high-risk pregnancy. The applicant's wife was in Iran

24  with the applicant at the time and sought to return to the U.S., where she would have access to a

25  DECLARATION OF MAHSA                9            Case No. 3:18-cv-01587-JD
    KHANBABAI
    KHANBABAI IMMIGRATION LAW
    115 MAIN ST. STE 1B
    NORTH EASTON, MA 02356

1

higher quality of medical care in case she ran into complications with her pregnancy. However,

2

she did not wish to travel alone and potentially give birth to her first child without her husband

3

present.

4

37.    In our waiver submission, sent to the embassy on November 19, 2018 we stressed the

5

medical risks the U.S. citizen wife faced and the lack of appropriate medical care in Iran. We

6

received a response from the embassy acknowledging receipt of the waiver package and stating

7

that it had been forwarded to a consular officer for review. We also sent the materials to Mr.

8

Varankesh to bring with him to the interview.

9

38.    Given the applicant's wife's due date in February, we asked Senator Markey's office

10

to inquire about the status of the case, which they did on December 6. They received a generic

11

response. On December 12, our office sent another follow up, as the no-travel date prescribed by

12

the wife's physician (Dec. 10) had now passed. The embassy requested DS-5535 information on

13

January 11, 2019, which was submitted on January 17. The embassy then approved the waiver on

May 24, 2019, well after the baby was born in Iran.

14

39.    We have a current case involving a Syrian minor who has been resettled as a refugee

15

in Germany. The U.S. embassy in Berlin has indicated they intend to grant a waiver to the minor

16

but not her father, who intended to travel with her to the U.S. The minor suffered severe burns

17

over 50% of her body during an explosion in Syria and had reached the peak of care she could

18

obtain outside the U.S. She was invited by a U.S. hospital to undergo plastic surgery at their world-

19

renowned surgery unit to repair damage done in the explosion. The applicant interviewed on April

20

29 and we submitted a detailed memo and supporting materials both prior to the interview and at

21

the interview. The case is still pending despite the urgent need for medical attention.

22

40.    We have several waiver application cases that have been pending for various lengths

23

of time. The case of Mrs. Razavi, spouse of a diversity visa lottery winner from Iran, has been

24

pending since the interview at the U.S. embassy in Montreal on January 3, 2019 (her husband was

25

DECLARATION OF MAHSA                    10                    Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

1
2

actually excepted due to being issued a visitor visa after the Proclamation's effective date and then entering the U.S. using that visa).

3
4
5
6
7
8
9

41.     In our submissions, we stressed to the embassy that if the waiver is not approved and the visa is not issued before October 1, the applicant would lose the chance to use her lottery selection and would have to instead be sponsored by a U.S. citizen or LPR, which would add many years wait before she can apply again. This would result in separating her from her now LPR husband and son. We intend to continue to follow up with the embassy regarding this case, but are extremely concerned given the embassy's inability or unwillingness to take action on the case thus far.

10
11
12
13
14
15

42.     The case of Ms. Malek, an Iranian woman being sponsored by her U.S. citizen fiancé has been pending since her interview in Yerevan on May 29, 2018 for which we submitted materials on December 13, 2018. The case of Mr. Vafadar and Mrs. Khozravi, an Iranian couple who are Canada Landed Immigrants who sought visitor visas to attend the wedding of Mr. Vafadar's brother in the U.S., has been pending since the couple interviewed in Montreal on October 25 and November 1, 2018 and we submitted waiver materials at the time of the interview. These are but a few examples of our currently pending cases.

16
17
18
19

43.     Each of these cases involves severe emotional and often financial hardships to the applicants and fits well within the examples provided in the Proclamation of instances in which a waiver grant would be appropriate. Precedent in U.S. immigration law defines "hardship" as any aspect of hardship, including emotional, physical, financial, psychological, etc.

20
21
22
23
24

44.     In any standard U.S. immigration case, the severe emotional hardships of prolonged separation from a spouse or fiancée, or from missing a significant family event such as a wedding, would represent strong evidence in favor of the applicant. However, it appears that embassies have been instructed to disregard this evidence and instead prioritize evidence of immediate medical hardship, in clear violation of immigration law precedent and standard government practice.

25

DECLARATION OF MAHSA              11              Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

45.   The case of Mr. Vafadar and Mrs. Khozravi, Canadian Landed Immigrants, represents the clearest example of this divide. The applicants' visa application was time-sensitive because the wedding was scheduled for May 4, 2019 (the case has not been adjudicated; they have missed the wedding). We presented strong evidence of hardships that would be inflicted upon both the applicants (fulfilling criterion 1 of section (3)(c)) and U.S. citizens (fulfilling criterion 3) if the waiver was not issued. We argued that, pursuant to the government's interpretation of criterion 1, delay in visa issuance would nullify the purpose of the travel.

46.   The embassy ignored the time constraints of the case and has still not adjudicated the waiver application. We followed up with the embassy twice, on March 9 and April 13, 2019, stressing the time constraint and the US family members did as well. In each case, the embassy responded that there is no way to expedite the process. This directly conflicts with our experience in Mr. Hashemi's case, which was approved within two weeks of our initial contact regarding the case and two months of the interview out of respect for the urgent time constraints, and in which the U.S. Consul in Yerevan notified us that she had requested that the case be expedited.

47.   The long delay in Mr. Vafadar's and Mrs. Khozravi's case is also in spite of their Canadian residency and application from a location within Canada. The Proclamation explicitly lists this as an example of when a waiver may be appropriate, and internal DOS guidance obtained through FOIA indicates that there is an excellent information-sharing relationship with Canada and that the U.S. has full faith in their identifying information, meaning it should have been possible for the embassy to evaluate their waiver application expeditiously. This discrepancy leads us to believe that there is no coherent policy for the prioritization of cases or the compliance with deadlines, and that this is haphazardly determined by each consulate, resulting in different outcomes based on location of application.

48.   The aforementioned internal guidance provides clear instructions that it is possible for consular officers to respond within one business day, or within a matter of weeks when the case

DECLARATION OF MAHSA                 12              Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

1
2
must be vetted for security reasons. This seemingly acknowledges that embassies do have the capacity to address cases rapidly, even when there is administrative processing.

3
4
5
6
49.     Therefore, we are left to conclude that embassies arbitrarily use this ability based on either pressure from an attorney or other outside influential, and that getting them to consider deadlines and time urgency requires repeated follow ups, Congressional inquiries, media pressure, and sometimes direct contact with high-level DOS employees.

7
8
9
10
11
12
50.     Ever since I started representing clients throughout the waiver process, I have observed how arbitrary the process is for my clients to get waivers. Every single successful waiver case involved the intervention of at least one U.S. Senator or Representative, who submitted letters of inquiry and support that urged action on the case. I have also used media outlets, which have published articles about one of my client's dire situation, to push the embassy to consider my client's waiver.

13
14
15
16
17
51.     It appears that embassies will prioritize cases where there is pressure from government officials or media, but nothing in the Proclamation or public guidance tells applicants to seek legislator or media help. There is no clear guidance indicating why this is the case; in fact, this reality suggests that the lack of guidance regarding prioritization and adjudication is so profound that consular units have arbitrary patterns for organizing case priorities and can be easily influenced to reorder their cases by external pressure.

18
19
20
21
22
23
52.     Similarly, there is no guidance issued by DOS indicating that medical hardships count for more than other types of hardship, and current precedent in immigration law states that it should not. However, a clear pattern has emerged where DOS has favored medical hardship over other types of hardship, without any public guidance saying this is appropriate and contrary to immigration law precedent. This appears to be particularly true for Iranian applicant's compared to other nationalities.

24
25
53.     Internal guidance in the form of an operational Q&A obtained through a FOIA request

DECLARATION OF MAHSA                    13                Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

1
2
3
4
5
6
7

repeatedly indicates that it expects consular officers to obtain the concurrence of a visa or consular section chief to issue a waiver. Further, the Q&A reveals that if a waiver application does not fit neatly into one of the example categories provided in P.P. 9645, consular officers should email the case to countries-of-concern-inquiries@state.gov to receive a decision from them. It is unclear who maintains this email, and there is nothing to suggest that consular officers may disagree with the conclusions provided by this email, instead suggesting that officers must do what they are instructed by the authorities that man the email inbox.

8
9
10
11
12
13

54.     Both of these directives directly contradict the plain text of P.P. 9645, which states that to obtain a waiver, one must demonstrate "to the consular officer's or CBP official's satisfaction" that they qualify. The language of P.P. 9645 gives discretionary authority to consular officers to grant waivers, but internal guidance shows that consular officers are expected to instead seek the approval of superiors and unknown other entities within DOS before granting waivers. This also contravenes the INA, which states that consular officials have sole discretion over whether to grant or deny visas. *See* 8 U.S.C. § 1104(a).

14
15
16
17
18
19

55.     The legal distortion and mutilation that is necessary to argue that DOS' current system legally fits within the Proclamation's plain text—that officers who must seek the concurrence of superiors and the managers of the countries-of-interest-inquiries emails before issuing waivers do in fact have "discretion" to issue waivers because their judgement is the preliminary step—is akin to Cinderella's step-sisters cutting off the heels and toes of their feet to try to squeeze them into the glass slipper.

20
21
22
23
24

56.     My own and my colleagues' experiences with waiver applications, combined with the limited internal guidance that has been pried from the Department of State, indicates that the travel ban waiver process is chaotic, disorganized, and unregulated. The success of an application seems to depend on meeting an undefined standard that is contradictory to the body of U.S. immigration law and on Congressional pressure to adjudicate individual cases in a timely manner. It also seems

25

DECLARATION OF MAHSA                    14                  Case No. 3:18-cv-01587-JD
KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

1  to depend heavily on which embassy the applicant applies through.

2      57.   Further, the process itself of "applying" for a waiver has no clear procedures. Many

3  embassies have informed lawyers that they cannot accept materials in advance of the interview,

4  although we have often received responses indicating that Yerevan and Montreal embassies have

5  accepted the materials and forwarded them to the appropriate officers. We send applicants to their

6  interview with a physical copy of the materials and officers appear reluctant to accept them but

7  sometimes do so. The packets are oftentimes voluminous and detailed, which means that it would

8  be impossible for the consular official to consider them fully in the course of a short interview, but

9  there is no publicly defined process for advance submission of such materials, the way there is for

10  other visa application materials.

11      58.   It is unclear if there is now a standard procedure across all embassies or if it varies

12  from embassy to embassy. Whereas our colleagues have been met with emails stating there is no

13  role for legal counsel in the waiver process, we have received acknowledgements of receipt of

14  evidence submitted both before and after interview. It appears that this is a viable means of

15  submitting evidence, but the Department of State has not issued guidance saying so and instead

16  maintains its assertion that consular officers collect everything they need during the verbal

    interview.

17      59.   If it is the case that it varies from embassy to embassy, then this is further evidence of

18  a lack of sufficient guidance by DOS for waiver consideration and/or a lack of consistency in the

19  manner in which the guidance is being applied. In order to get waivers approved, we have had to

20  follow up repeatedly with embassies, have congressional offices follow up, submit requests

21  directly to D.C.-based DOS staff, and speak directly to consular officers over the phone. The sheer

22  volume of work that must be performed simply to get a timely adjudication is unlike any other

23  immigration process and is unprecedented in my time as a lawyer.

24      60.   The entire travel ban waiver process appears to be based on invented legal definitions

25  DECLARATION OF MAHSA                  15              Case No. 3:18-cv-01587-JD
    KHANBABAI
    KHANBABAI IMMIGRATION LAW
    115 MAIN ST. STE 1B
    NORTH EASTON, MA 02356

that contradict established precedent, arbitrary prioritization of cases, and an overall lack of guidance and procedural definition by DOS in violation of the clear language of P.P. 9645.

61.  That we have managed to find success in applying for waivers is not, as the government may suggest, evidence that there is an effective process in place. Instead, it is evidence that in order to simply obtain an adjudication, many applicants have to work with legal counsel outside of whatever shambolic process there is. The "process" and "procedures" that DOS has established clearly serve to hinder applications, to the extent that successfully obtaining waivers has consistently required us to abandon DOS' publicly advised process.

I declare under penalty of perjury the foregoing to be true and correct.

DATED: June 26, 2019

Mahsa Khanbabai

DECLARATION OF MAHSA KHANBABAI
KHANBABAI IMMIGRATION LAW
115 MAIN ST. STE 1B
NORTH EASTON, MA 02356

16

Case No. 3:18-cv-01587-JD