**MUSLIM ADVOCATES**
NIMRA AZMI (*pro hac vice*)†
P.O. Box 34440
Washington, DC  20043
Telephone:    (202) 897-2622
Facsimile:    (202) 508-1007
nimra@muslimadvocates.org

†*Not admitted to practice in DC; practice
limited to federal courts and agencies*

[additional counsel listed on signature page]

*Attorneys For EMAMI Plaintiffs*

**NATIONAL IMMIGRATION LAW CENTER**
ESTHER H. SUNG (SBN 255962)
JOSHUA T. STEHLIK (SBN 220241)
3450 Wilshire Blvd. #108-62
Los Angeles, CA  90010
Telephone:    (213) 639-3900
sung@nilc.org
stehlik@nilc.org

[additional counsel listed on signature page]

*Attorneys For PARS Plaintiffs*

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
AUGUST E. FLENTJE
Special Counsel, Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
NICOLE GRANT
DAVID KIM
P. ANGEL MARTINEZ
Trial Attorneys, Office of Immigration Litigation

  Ben Franklin Station, P.O. Box 878
  Washington, DC  20044
  Telephone:    (202) 598-8085
  Facsimile:    (202) 532-4094
  Email:    Angel.Martinez2@doj.gov
          David.Kim4@doj.gov

*Attorneys For Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FARANGIS EMAMI, et al., | Case No. 3:18-cv-01587-JD |
| Plaintiffs, | Judge:  Hon. James Donato |
| v. | |
| KEVIN K. McALEENAN,* et al., | **JOINT DISCOVERY REPORT** |
| Defendants. | |
| PARS EQUALITY CENTER, et al., | Case No. 3:18-cv-07818-JD |
| Plaintiffs, | |
| v. | |
| MIKE POMPEO, et al., | |
| Defendants. | |

*Pursuant to Fed. R. Civ. P. 25(d), Kevin K. McAleenan, Acting Secretary of the Department of Homeland Security, should be automatically substituted as a Defendant in place of his predecessor in office, Kirstjen Nielsen.

JOINT DISCOVERY REPORT                                      No. 3:18-cv-01587-JD
                                                            No. 3:18-cv-07818-JD

1     Pursuant to this Court's July 25, 2019 minute order, the Parties respectfully submit this joint

2 report addressing the two tranches of discovery identified by this Court: (1) "[w]hat has been

3 produced, what plaintiffs believe is missing, and for any additional discovery plaintiffs seek, why

4 they believe they are entitled to such discovery;" and (2) "[f]or the State Department's 6/6/2019

5 statistical report to Congress, what discovery plaintiffs wish to have to test the report." *Emami* ECF

6 113; *Pars* ECF 133.

7     **Plaintiffs' Summary**

8     These cases have been pending for over a year, and Plaintiffs believe that the Court should

9 proceed with the hearing on the date that it set nearly six weeks ago, and should decline the latest

10 iteration of the Government's request to postpone proceedings.  Plaintiffs have prior letter motions to

11 compel pending before the Court (*Emami* Dkt. 90 & 101; *Pars* Dkt. 111 & 122), which concern

12 threshold issues regarding the completeness of the Administrative Record, and assert additional

13 entitlements to discovery below.

14     The parties have agreed that we are at an impasse as to the entirety of "tranche one" materials

15 that the Court, aware of the briefing on Defendants' dispositive motions, identified in its prior order

16 to the parties.  Plaintiffs believe rulings on those "tranche one" issues are ripe now and that nothing

17 about the prospect of "tranche two" report-related discovery agreements hinders the susceptibility of

18 those issues for review.  No efficiency will be gained from further postponement on an issue where

19 the court allotted six weeks of discussion without yielding agreement.  Relatedly, despite Defendants'

20 continued attempts to cast this case as only having one pending (*Accardi*) claim, Plaintiffs' complaints

21 include multiple statutory claims not present before the Court in its prior order on Defendants' first

22 motion to dismiss the since-amended *Emami* complaint (including notice and comment claims,

23 arbitrary and capricious claims, and *ultra vires* claims), as well as re-pled versions of the *Accardi*,

24 mandamus, and constitutional claims arguments not present before the Court in its prior order on

25 Defendants' first motion to dismiss (including notice and comment claims, and arbitrary and

26 capricious claims) as well as re-pled versions of the *Accardi*, mandamus, and constitutional

27 claims.  Consistent with this Court's prior orders to produce the Administrative Record before ruling

28 on the Government's Rule 12 motion, the complete Administrative Record should have been

produced months ago.

**Defendants' Summary**

Defendants believe it makes sense to briefly postpone the hearing scheduled for September 12, 2019 for two separate reasons. *First*, the parties are at an impasse with respect to Plaintiffs' request to expand the administrative record and seek discovery into the development of the waiver guidance, but that impasse rests almost entirely on the scope of the single APA claim that this Court has allowed to proceed: in Defendants' view, the record is responsive to the *Accardi* claim which is the only claim this Court allowed to proceed; but Plaintiffs seek extra-record discovery and record expansion in order to pursue additional APA claims that this Court did not permit to proceed. Until this Court provides guidance by addressing the motion to dismiss or for summary judgment, *Emami* Dkt. 98; *Pars*, Dkt. 120, Defendants do not think the parties can narrow the issues. But action on that motion may allow the issues to be narrowed. *Second*, with respect to the preparation of the State Department report to Congress, we believe the parties have made and continue to make progress in narrowing the issues and that there is further progress to be made. Defendants will very soon produce to Plaintiffs a declaration explaining the preparation of the Report and addressing questions recently posed by Plaintiffs regarding the report. Defendants are also willing to discuss providing a Rule 30(b)(6) deposition regarding the production of the report and the possibility of creating new datasets in order to resolve the outstanding discovery issues.

## FACTUAL AND PROCEDURAL BACKGROUND

1.       The *Emami* plaintiffs, in their July 29, 2018 First Amended Complaint "asserted three legal claims: violation of the Administrative Procedure Act, 5 U.S.C. § 706; violation of the Due Process Clause of the Fifth Amendment to the United States Constitution; and for a writ of mandamus." *See, e.g.* February 4, 2019 Order, Dkt. No. 74 at 10. In September 2018, the government moved to dismiss all claims in the first amended complaint. On February 4, 2019, this Court granted the motion in part and denied it in part. The Court allowed *Emami* plaintiffs' APA challenge to proceed based on its finding that *Emami* Plaintiffs stated a claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), explaining that "the heart of the APA claim is that the State Department has acted arbitrarily and unlawfully by disregarding its own procedures and rules in

administering the waiver program." *See* Dkt. No. 74 at 13-16. The Court dismissed *Emami* plaintiffs' constitutional claims and dismissed the mandamus claim as redundant, given the *Accardi* claim. *Id. a*t 16-18. The Court permitted the *Emami* plaintiffs to amend.

2. The *Pars* plaintiffs initially filed suit in the Western District of Washington in July 2018. The Pars complaint asserts that Defendants' implementation of the waiver provision of Presidential Proclamation No. 9645 (the "Proclamation") was arbitrary and capricious under 5 U.S.C. § 706(2)(A), violated the Administrative Procedure Act ("APA") by engaging in *ultra vires* conduct under 5 U.S.C. § 706(2)(C), and failing to comply with notice and comment procedures as required under 5 U.S.C. § 706(2)(D) failed to comply with their own rules and regulations in contravention of *Accardi*, and violated the Due Process Clause.

3. The *Pars* parties fully briefed motions to dismiss before the Western District of Washington; however, the matter was transferred to this Court on December 12, 2018 before that court rendered a decision. The parties did not refile that briefing.

4. Following this Court's decision on the *Emami* motion to dismiss, the *Emami* plaintiffs filed a second amended complaint. The second amended complaint included similar allegations to the *Pars* complaint. Each complaint, however, contains claims for relief that are unique. Specifically, the *Emami* complaint asserts unique equal protection and mandamus claims; while the *ultra vires* and notice-and-comment claims are unique to *Pars*.

5. At a hearing on April 11, 2019, this Court ordered that Defendants produce the Administrative Record by May 13. *Pars* ECF 103; *Emami* ECF 82. In addition, as directed by the Court, on April 12, Plaintiffs served a request for production on Defendants requiring production of the Administrative Record and all related material. *See* Declaration of Esther H. Sung ("Sung Decl."), Ex. A.

6. Defendants received an extension of the May 13, 2019 deadline and, on May 15, Defendants produced a certified Administrative Record comprising 364 pages of materials and a signed certification from Jenny Cordell, a supervisor in the State Department's Visa Office, stating the production of the "attached non-classified, non-privileged documents are the full and complete administrative record," which "consist" of "internal guidance relating to visa adjudications under

- 3 -

Presidential Proclamation 9645 provided to consular officers responsible for those adjudications." *See Pars* ECF 120-1 (Administrative Record attached to *Pars* ECF 120, hereinafter referred to in citations as "AR")).

7.     Plaintiffs notified Defendants on May 17 by email that Plaintiffs believed there were significant gaps in the Administrative Record, which did not contain materials from agencies other than the State Department, did not include a privilege log, and did not contain sufficient or entirely accurate information about their individual clients.  Plaintiffs began a meet-and-confer process with Defendants regarding these gaps.

8.     On May 17, Plaintiffs jointly served a second set of written discovery requests, consisting of two requests for production and 15 interrogatories about data and statistics concerning implementation of the waiver process.  See Sung Decl., Exs B & C.

9.     After a telephonic meet and confer with Defendants on May 28, Plaintiffs filed a letter motion the same day (*Pars* ECF 111; *Emami* ECF 90) seeking to compel production of what Plaintiffs viewed as the whole Administrative Record, and for Defendants to respond to the request for production for the Administrative Record and related materials.  Defendants responded on June 11. *Emami* Dkt. 96; *Pars* Dkt. 119.  This matter was fully briefed.

10.     On June 6, 2019, the State Department transmitted to Congress a report, pursuant to a statutory requirement, that provided statistical information regarding the granting of waivers under the Proclamation.

11.     On June 13, 2019, the government moved to dismiss both the *Emami* second amended complaint and the *Pars* complaint, or in the alternative for summary judgment.  *Emami* Dkt. 98; *Pars* Dkt. 120.  These motions are fully briefed.

12.     During a June 17 telephonic meet and confer, Defendants indicated that they would not provide any information or materials responsive to Plaintiffs' second set of discovery requests, on the grounds that the Court's previous order on the motion to dismiss in the *Emami* case only allowed the *Emami* plaintiffs to proceed on their *Accardi* claim, subject to amendment.  Defendants contended that the Administrative Record was tailored to the *Accardi* issue as Defendants read it, and thus they had already produced the relevant administrative record.  Plaintiffs thereafter filed an

- 4 -

1   additional letter motion to compel on June 17 (*Pars* ECF 122; *Emami* ECF 101).  On the same day,

2   Defendants moved to stay discovery in these cases "until after the Court had resolved the pending

3   discovery disputes—particularly the question of whether review of Plaintiffs' APA claim should be

4   limited to the administrative record." (*Pars* ECF 121; *Emami* ECF 99).

5       13.    The Court subsequently indicated it would address the issues raised by the parties letter

6   motions at the already-calendared July 25 hearing on Defendants' Motions to Dismiss.

7       14.    At the July 25 hearing, the Court proposed a "discovery summit" on September 12,

8   during which the parties would address discovery in "two tranches:" (1) "what's been produced and

9   what do [Plaintiffs] think is missing, and why it is that that should be part of the administrative

10  record;" and (2) discovery that Plaintiffs "would like to ask with respect to the merits," especially

11  regarding the State Department report referenced in Defendants' Motions to Dismiss, which provides

12  statistics on waiver processing between December 2017 and March 2019. (*Pars* ECF 136 at 24). The

13  Court instructed the parties to meet and confer before September 12 and provide the Court with

14  advance briefing, due on September 5, on "anything you want to raise in terms of discovery," as the

15  Court made clear its intent to "make decisions in September." (*Pars* ECF 136 at 26-27).

16      15.    Following the July 25 hearing, on August 5, the parties had a meet-and-confer call.

17  During this call, Defendants offered Plaintiffs a declaration providing information on the processes

18  and data surrounding the Congressional Report, and invited Plaintiffs to provide questions and topics

19  to address in the declaration.  The government also indicated that following review of the declaration,

20  the parties could confer further regarding the possibility of a Rule 30(b)(6) deposition regarding the

21  report or relevant data that could be compiled from State Department databases in order to resolve

22  Plaintiffs' discovery requests.   During the call Defendants also stated that additional guidance

23  materials had been issued and would be included in a supplement to the Administrative Record.  The

24  parties agreed that they continued to be at an impasse regarding the contents of the Administrative

25  Record or discovery surrounding the formulation of the waiver guidance.

26      16.    Following that call, on August 6, 2019, Plaintiffs provided by email a list of topics for

27  the declaration.  Also on August 6, Defendants indicated that it would take around 30 days to produce

28  a comprehensive declaration addressing the report.  In an additional correspondence between the

parties on August 12 and 14, Plaintiffs asked about and Defendants provided preliminary information concerning the State Department database that was used to generate the Congressional Report and how that database could be queried or its information sorted.

17.     On September 3, 2019, the parties met and conferred in person to attempt to reach an agreement on the pending evidentiary issues.  During this meeting, the government advised Plaintiffs that updated guidance documents were being finalized for inclusion in a supplement to the Administrative Record and would be shared before the submission of this report and provided Plaintiffs an opportunity to view these documents during the meeting.  The parties remain at an impasse as to Tranche 1 – The Administrative Record.  As to Tranche 2, the government also informed Plaintiffs that the declaration addressing the second tranche (Congressional Report) and many of the questions Plaintiffs posed was in the final stages of preparation and would be forthcoming very shortly, but not before the submission of this report. Accordingly, Defendants suggested to Plaintiffs, that the parties seek the Court's permission to postpone the submission of the report and the September 12, 2019 hearing by 2-3 weeks to allow Plaintiffs to review the declaration and discuss the possibility of a rule 30(b)(6) deposition or relevant data that could be compiled from State Department databases in order to resolve Plaintiffs' discovery requests.  Plaintiffs noted that there are several, substantial ripe issues for this Court's review and, on that basis, contended that the September 12 hearing should not be postponed.  The parties did not reach an agreement on seeking the aforementioned postponement.

## TRANCHE ONE – THE ADMINISTRATIVE RECORD

## I.    DEFENDANTS' PRODUCTION TO DATE

As set forth above, Defendants have produced 364 pages of materials consisting of "internal guidance relating to visa adjudications under Presidential Proclamation 9645 provided to consular officers responsible for those adjudications." These materials (the "May 15 Record") comprised:

- A new section of the Foreign Affairs Manual ("FAM"), 302.14-10, which the Defendants promulgated to implement the waiver program.  The Foreign Affairs Manual comprises the internal rules and regulations that govern State Department operations.  These materials included redactions.

- 322 pages of guidance materials used to communicate the rules to consular officers – specifically, five iterations of questions and answers, nine cables, three PowerPoint presentations, press guidance, and other documents.  These materials also included redactions.

- A short description of  the status of the visa applications of each of the proposed class representative plaintiffs.

In addition, the State Department published to Congress a report on June 6, 2019 (the "Report"), providing detailed statistics on the processing of visa applications affected by the Proclamation, as well as waivers under the Proclamation between December 2017 and March 2019. The Report is publicly available and Defendants referenced the Report in their Motion to Dismiss (and as a basis for their alternative summary judgment motion).

## II.   WHAT PLAINTIFFS CONTEND IS MISSING FROM THE ADMINISTRATIVE RECORD

Plaintiffs have identified for Defendants on multiple occasions the categories of documents missing from the May 15 Record. These missing materials include:

1.   *Materials "directly or indirectly" considered in adopting the guidance mandated by Section 3(c) of the Proclamation, including FAM Section 302.14-10 and the additional guidance materials provided to consular officers responsible for visa adjudications under the Proclamation.* Such materials would include internal comments, draft reports, inter- or intra-agency emails, revisions, memoranda, and meeting notes considered by Defendants in adopting and revising FAM Section 302.14-10 and the relevant guidance materials, including how Defendants came up with the rules set forth in these materials, why they picked these rules over the other alternatives, how the rules have changed over time, and why the changes were made.

2.   *Materials from other Defendant agencies besides the Department of State and from contractors involved in implementing the Proclamation.*  Although the Proclamation tasks both DOS and DHS with implementing the Proclamation, the May 15 Record contains no material from DHS. Further, materials produced in response to FOIA requests show that other contractors and consultants, such as Deloitte and Quality Support, Inc., were involved in implementing the Proclamation, but the May 15 Record contains no documents produced by or sent to or from such contractors.  Documents in the possession of all these entities would constitute documents and materials "directly or indirectly

- 7 -

considered" by agency decision-makers.

3.      *Materials representing the work and recommendations of subordinates involved in drafting, revising, or implementing FAM Section 302.14-10 and the relevant guidance documents.* To the extent that agency decision-makers rely on the work and recommendations of subordinates, such materials should be included in the Administrative Record.  The May 15 Record, as well as FOIA responses, indicate that at least two dozen individuals worked on developing and revising the rules found in FAM Section 302.14-10 and the guidance materials provided to consular officers. None of these individual materials is included in the May 15 Record.

4.      *Materials referenced by Record documents but not included in the Record.*  These include historical versions of the FAM in effect during the time the Proclamation has been in effect, other cables, and additional presentations and training materials.

5.      *Privilege log.*  Defendants have not provided a privilege log for any materials withheld in full or in part.

6.      *Accardi-Related Discovery*:  Plaintiffs believe Administrative Record and extra-record materials should be produced as relevant to Plaintiffs' *Accardi* claim.  In particular, Plaintiffs have alleged failure to abide by State Department policies and regulations requiring notification of visa applicants of the availability of a waiver process and vesting final decision making discretion with consular officers, as well as the portions of the Proclamation providing exemplars of when a waiver "may be appropriate."  The May 15 Record contains no discussion of the first two points, and minimal discussion of the exemplars; whether such materials are technically part of the Administrative Record or are extra-record materials, they have not been produced.

## III.   WHY PLAINTIFFS ARE ENTITLED TO THESE MISSING MATERIALS

### PLAINTIFFS' POSITION

A Court's judicial review of alleged APA violations is based on "the whole record."  5 U.S.C. § 706.  The "whole record" means the "full administrative record" that is before the agency at the time of decision – meaning the whole record before the State Department when it adopted FAM Section 302-14.10 and guidance materials provided to consular officers in implementing the Proclamation's waiver provision.  *Citizens to Protect Overton Park v. Volpe*, 401 US 402, 419-20

(1971).  The "whole" record, moreover, "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. US Dep't of Labor*, 885 F. 2d 551, 555 (9th Cir. 1989).  "When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate." *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F. 2d 1534, 1548 (9th Cir. 1993). Without having the complete Administrative Record, it is difficult, if not impossible, for a reviewing court to conduct an APA review.  *See, e.g.*, *DC Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1237 (D.C. Cir. 1972) (without a complete Administrative Record, "judicial review of the [agency's] action can be little more than a formality"); *accord Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

### A.    Plaintiffs Are Entitled To A Complete Administrative Record.

As the Ninth Circuit has recognized, "the whole administrative record . . . is not necessarily those documents that the *agency* has compiled and submitted as the administrative record." *Thompson*,  885 F.2d at 555.  While the government is entitled to a  presumption of completeness, that presumption "may be rebutted by clear evidence to the contrary."  *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 443 (2017).  Here, as noted above in Section II, there are gaps in the May 15 Record, clearly indicating that it does not include "everything that was before the agency pertaining to the merits of its decision," and Plaintiffs are entitled to these missing materials.  *Portland Audubon Soc'y*, 984 F. 2d at 1548.

1.    *Materials "directly or indirectly" considered in adopting the guidance mandated by Section 3(c) of the Proclamation*.  Defendants have produced a section of the FAM reflecting the waiver program rules as of May 15, 2019, the date the Administrative Record was produced. Defendants, however, have not produced any earlier versions of the FAM in effect during the time the Proclamation has been enforced, or the materials that were "directly or indirectly" considered in adopting this section – e.g., how the State Department came up with these rules, what alternatives did they consider, why they picked these rules over the other alternatives, how the rules have changed over time, and why changes were made.  Likewise, Defendants produced multiple versions of Q&As and other training materials intended to guide consular officers' decisions on waiver eligibility, but

- 9 -

1   the May 15 Record does not include any of the materials "directly or indirectly considered" in

2   adopting and revising these training materials – e.g., how these materials were developed, how and

3   why they were revised and expanded, and why certain rules or guiding principles were adopted.  As

4   Judge Chabria has noted: "It is obvious that in many cases internal comments, draft reports, inter- or

5   intra-agency emails, revisions, memoranda, or meeting notes will inform an agency's final decision."

6   *Inst. for Fisheries Res. v. Burwell*, No. 16-cv-01574-VC, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10,

7   2017).  None of these materials has been produced.

8        Indeed, FOIA responses reflect there were extensive internal communications about the rules

9   promulgated in FAM Section 302.14-10, both preceding the initial iteration of the decision in

10   December 2017 and as the decision was repeatedly revised and expanded.[1]  None of the historical

11   versions of FAM Section 302.14-10, nor most of these FOIA materials, were produced as part of the

12   May 15 Record – these, and the failure to collect materials from the dozens of individual State

13   Department employees and contractors whom the FOIA responses indicate were involved,

14   demonstrates the May 15 Record is incomplete.  *See, e.g.*, *San Miguel v. Kempthorne*, 587 F. Supp.

15   2d 64 (D.D.C. 2008) (citing 28 documents produced in response to FOIA that were not produced as

16   part of the record); *Sierra Club v. Zinke*, No. Civ. 17-7187-WHO, 2018 WL 3126401, at *4 (N.D.

17   Cal. June 26, 2018) (plaintiffs may establish incompleteness of the record through materials received

18   from FOIA)..

19        Tellingly, Ms. Cordell's declaration does not state that the proffered Record represents "all

20   documents and materials directly or indirectly considered."  Rather, she says that the record has been

21   limited to "non-privileged" materials consisting of the "internal guidance relating to agency

22   adjudications under Presidential Proclamation 9645 provided to consular officers responsible for

23   those adjudications."  The "applicat[ion] of the wrong standard in compiling the record" – as reflected

24

25   [1] In their Opposition to the Motion to Dismiss (Emami ECF No. 104), Emami plaintiffs attached as
    exhibits a representative sample of FOIA documents that counsel Muslim Advocates received through
26   FOIA requests, including cables, guidance e-mails sent to consular officers, and a Deloitte report that
    were not produced in the May 15 Record. See also Sung Decl., ¶¶ 5, 6 (providing links to FOIA
27   responses made available online by Departments of State and Homeland Security). Information
    redacted from the May 15 Record under the Law Enforcement Privilege, moreover, was often
28   disclosed in these FOIA responses, including essential high-level information about the Security
    Advisory Opinion process in waiver adjudications.

in the agency certification here – is evidence that the "whole" record has not been gathered and must be supplemented.  *People of State of Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture*, Nos. Civ. 05-3508-EDL & 05-4038, 2006 WL 708914, at *2 (N.D. Cal. Mar. 16, 2006).

        2.    *Materials from other Defendant agencies besides the Department of State.*  Under the Proclamation, the President mandated that the "Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances under which waivers may be appropriate."  This is the process that led to the adoption of FAM Section 302.14-10 and the guidance materials provided to consular officers. The May 15 Record, however, is limited exclusively to materials from the State Department, with nothing from DHS or any of its relevant components (Customs and Border Control and US Citizenship and Immigration Services); nor any materials comprising the "coordination" that is expressly mandated under the Proclamation, notwithstanding the fact that the Q&A training materials clearly reflect coordination with DHS and CBP.[2] FOIA responses also include numerous documents from Defendants DHS, CBP, and USCIS related to those agencies' roles in putting together and implementing a process for waivers under Proclamation 9645. *See Emami* ECF 104 at 13-15. None of these were part of the May 15 Record. Courts are clear that interagency consultations should be included in the Administrative Record because they are materials "directly or indirectly" considered. *Thompson*, 885 F.2d at 555.

        3.    *Materials representing the work and recommendations of subordinates involved in drafting, revising, or implementing FAM Section 302.14-10 and the relevant guidance documents.* When an agency relies "on the work and recommendations of subordinates, those materials should be included [in the Administrative Record] as well." *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *accord Lockyer*, 2006 WL 708914, at *2.  Materials from the May 15 Record and FOIA responses indicate that approximately two dozen individuals worked on developing and revising the rules found at FAM Section 302-14.10.  None of their individual materials

---

[2] *See, e.g.*, AR 122 (instructing consular officers that consideration of protections under the Convention Against Torture "would not be a part of the visa application and is more intended for DHS consideration of the P[residential] P[roclamation]"); AR 119 & 152 (indicating coordination with DHS as to the "refusal code" consular officers should enter for applicants who are not excepted from the Proclamation); AR 20 (reporting confirmation from CBP "that it intends to honor waivers approved by consular officer during the adjudication of the visa application"); AR 31, 39, 60, 68, 90, 99, 122, 131, 155 (same or similar).

        

1    has been produced.

2         4.     *Materials referenced by Record documents but not included in the Record.*  Though

3    Ms. Cordell's declaration purports to provide all "internal guidance…provided to consular officers,"

4    additional guidance materials referenced in the May 15 Record have not been produced. PowerPoint

5    presentations in the Record, for example, reflect there are recordings of those same presentations,

6    along with additional updates and resources, "posted on CAWeb."  *See, e.g.*, AR 201, 218, 220, 251.

7    FOIA responses further indicate that there were several presentations, in late 2017 and early 2018,

8    which were not included in the May 15 Record.  *See* Sung Decl. Exs. D, E, F. Similarly, the guidance

9    materials produced include references to ten other cables which have not been produced.  These were

10   certainly materials that were "directly or indirectly considered" in providing the guidance.

11        At the hearing on July 25, and in their letter-brief, the Government contended that they have

12   tailored the May 15 Record to exclusively focus on Plaintiffs' *Accardi* claim, and that any missing

13   materials were deliberately omitted due to irrelevance.  That is wrong both on the law and facts.

14        For purposes of the APA (including the *Accardi* doctrine), there is one Administrative Record,

15   and the standard for compiling it is "all documents and materials directly or indirectly considered by

16   agency decision-makers, and includes evidence contrary to the agency's position."  *Thompson*, 885

17   F. 2d at 555.  For this reason, courts have specifically rejected the idea that the Government can tailor

18   the Administrative Record based on purported claims of "relevance."  *Gill v. Dep't of Justice*, No.

19   14-cv-03120, 2015 WL 9258075 (N.D. Cal. Dec. 18, 2015) (where Defendants purported to limit the

20   record to "materials relevant to the specific agency actions that are at issue," they applied the wrong

21   standard and were ordered "to revisit the administrative record to ensure its completeness");

22   *Winnemem Wintu Tribe v. Forest Service*, No. 2:09-cv-01072, 2014 WL 3689699, at *11 (E.D. Cal.

23   July 24, 2014) (limiting the record to "documents and materials relevant to the specific agency action"

24   did not apply correct standard and the government had to include "all documents directly or indirectly

25   considered by the agency decision-makers.").  Defendants' purported record is thus admittedly,

26   definitionally incomplete and must therefore "must be viewed as a fictional account of the actual

27   decisionmaking process." *See Portland Audubon Soc'y*, 984 F.2d at 1548.

28        In addition, the May 15 Record does not include materials relevant to all claims. There is

- 12 -

certainly nothing in the Administrative Record that addresses Plaintiffs' Section 706 claims that Defendants have engaged in arbitrary and capricious, or *ultra vires*, decision making, or that such decision making should have been subject to notice-and-comment procedures.  Nor is there anything in the Administrative Record addressing aspects of Plaintiffs' *Accardi*  claim, as discussed above.

5.  *Privilege log.*  Defendants appear to have withheld extensive materials from the Administrative Record on various grounds of privilege.  Ms. Cordell's certification makes clear that the Administrative Record has been limited to "non-privileged" documents, and Defendants' FOIA responses contain extensive redactions ostensibly for "deliberative process privilege."

Under Federal Rule of Civil Procedure 26(b)(5), when a party withholds information on the basis of privilege, the party must expressly make that claim and provide sufficient information to "enable other parties to assess the claim."  Defendants have failed to do so here: they have not furnished a privilege log or anything else that complies with their obligations.

Providing this information is essential to allowing the other party to evaluate a claim of privilege, both to determine whether (1) all elements needed to invoke a privilege are met, and (2) there are applicable exceptions or other reasons to compel production.  Of particular note, certain privileges routinely invoked by governmental entities – such as the deliberative process privilege – are "qualified," meaning "a litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC v. Warner Comm., Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (identifying standard for assessing a claim of deliberative process privilege).

Courts in this District (and in many other jurisdictions) have held that when the Government withholds documents from the Administrative Record on the basis of a privilege, it must identify such documents on a privilege log.  *See, e.g., Regents of Univ. of Calif. v. DHS*, No. 17-5211-WHA, 2017 WL 4642324 at *7 (N.D. Cal. Oct. 17, 2017) ("If a privilege applies, the proper strategy isn't pretending the protected material wasn't considered, but withholding or redacting the protected material and then logging the privilege."); *Gill*, 2015 WL 9258075 at *7 ("[C]ourts in this district have required parties withholding documents on the basis of the deliberative process privilege to, at a minimum, substantiate those claims in a privilege log"); *Lockyer*, 2006 WL 708914 *4

- 13 -

1    ("... documents such as purely internal deliberative materials may be protected from inclusion in

2    the administrative record, but Defendants must make a specific showing establishing the application

3    of a privilege for each document that it contends that it may withhold"); *see also Desert Survivors v.*

4    *U.S. Dep't of Interior*,16-cv-1165-JCS (N.D. Cal. May 1, 2017) (discussing deliberative process

5    claims after court compelled production of a privilege log); *Indigenous Env'tl Network v. U.S. Dep't.*

6    *of State*, CV-17-29, 2018 WL 1796217, at *1 (D. Mont. Aug. 16, 2018) (ordering production of a

7    log); *Wagafe v. Trump*, C17-94-RAJ, 2018 WL 1731939 (W.D. Wash. Apr. 11, 2018) (noting prior

8    order to create privilege log, with which government complied).

9        While the Defendants contend (*Pars* ECF 118) that "the Ninth Circuit has never held" that a

10   privilege log must be prepared, cases concerning deliberative process privilege assertions frequently

11   note that the governmental entity produced a privilege log setting forth its basis for claiming privilege.

12   *See, e.g.*, *Hongsermeier v. CIR*, 621 F.3d 890, 903-04 (9th Cir. 2010); *see also generally First Resort*

13   *v. Herrera*, No. Civ. 11-5534 SBA(KAW), 2014 WL 988773 (N.D. Cal. Mar. 10, 2014).[3]  More

14   importantly, there is a reason why the Defendants' position has been squarely rejected by Courts in

15   this District: if a governmental defendant is not required to log such materials or disclose materials

16   withheld in their entirety on a log, the opposing party has no ability to assess the basis for the privilege

17   assertion.  As Judge Chabria held, "If a privilege applies, the proper strategy isn't pretending the

18   protected material wasn't considered, but withholding or redacting the protected material and the

19   logging the privilege."  *Inst. for Fisheries Res.*, 2017 WL 89003 at *1.

20       6.    *Accardi-Related Discovery*: As discussed in Tranche Two, Part III, Plaintiffs are

21   entitled to discovery relevant to their *Accardi* claims.

22

23

24   [3] The Defendants also cite a line of cases — following cases from the D.C. Circuit — to suggest that
     no privilege log was required to cover materials solely covered by the deliberative process privilege,
     reasoning that such materials "are not part of the record."  ECF 118 at 3.  The Defendants'
25   discussion of relevant D.C. Circuit precedent notably failed to discuss the D.C. Circuit's latest decision on this
     question – *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019), which while affirming the
26   principle that there is no basis to compel a log for materials "deemed immaterial or irrelevant," but
     recognized a log may be required where a "substantial showing was made that the record was
27   incomplete" — precisely the situation here.  Indeed, the *Oceana* decision reflects that the Defendants
     in that case voluntarily produced two rounds of "index[es] of withheld privileged documents." 920
28   F.3d at 860.

- 14 -

1

### DEFENDANTS' POSITION

2       Defendants submit the following statement regarding the outstanding discovery issues on

3   Tranche 1 and, should the Court find it useful, respectfully also refer the Court to Defendants' detailed

4   discovery letters.  *See Emami*, Dkt. 96, 99; *Pars*, Dkt. 119, 121.

5       *First*, as the government has stated during this discovery dispute, the scope of discovery must

6   be limited to the APA claim this Court allowed to proceed, and we understood this to be the guidance

7   this Court provided.  At this Court's April 2019 hearing, the Court directed the parties to "consider

8   the *Emami* order to be the baseline for both the complaint[s], what can and can't go forward

9   in *Pars*, and then also what issues you can argue on the defendants' side."  *See* April 11, 2019

10  Tr., Dkt. 84 at 9.  The Court also stated that it would not be "revisiting [*Accardi*] issues or the APA

11  issues [it] sustained."  *Id.* at 15.  We took these directions to heart in compiling the Administrative

12  Record and this discovery dispute should not turn into a relitigation of the scope of the APA claim,

13  and this Court's framing of the APA issue formed the backbone of the government's motion to

14  dismiss or for summary judgment.  In turn, Plaintiffs are not entitled to the multiple categories of

15  information they list in Tranche 1 because the requests pertain to APA claims this Court did not allow

16  to proceed rather than the *Accardi* claim.

17      *Second*, while Defendants believe the issue regarding the scope of the APA claim has been

18  resolved and should not be litigated, we respectfully note that it has been extremely difficult—if not

19  impossible—for the parties to meaningfully negotiate the scope of discovery while Defendants'

20  motions to dismiss and/or for summary judgment are pending.  This is particularly insurmountable

21  here as Plaintiffs rely on this Court having not ruled on the pending motions as a basis to seek

22  discovery on all claims alleged in their complaints, including the claims this Court has previously

23  dismissed and stated would not revisit.

24      *Third*, the administrative record's contents and Defendants' views of its scope respond to the

25  claim that this Court allowed to go forward: the *Accardi* claim, which alleged that the State

26  Department, having put out guidance about how it would administer the waiver program, has

27  nevertheless failed to comply with that guidance.  *See Emami*, Dkt. No. 74, Order Re Motion to

28  Dismiss ("Order"), at 14 ("The heart of the APA claim is that the State Department has acted

- 15 -

arbitrarily and unlawfully by disregarding its own procedures and rules in administering the waiver program."). Specifically, the allegations that the Court found sufficient to support this claim (taken as true, at this stage) were that Plaintiffs were denied a genuine opportunity to be considered for a waiver, including by issuing denials when the interview took place before the Proclamation was signed, *see* Order at 15; and that former consular officers have alleged that the State Department has replaced individualized waivers with a system of blanket denials, *see id.* at 15-16. At that time the Court noted that "factual matters" identified by the government would bear on a future motion for summary judgment. *See id.* at 16.

The government has put forward the Administrative Record designed to address this *Accardi* claim. Notably, the *Accardi* claim is based on allegations that the government has failed to comply with the waiver process. In order to address that claim, the government has put forward a two-part administrative record consisting of: (a) the guidance and other documents that are in effect and being applied by consular officials to consider waivers, including Plaintiffs' waivers; and (b) a declaration describing the history of each Plaintiff's visa application and current waiver status. That declaration shows that many Plaintiffs have preliminarily been found by a consular officer to meet the first two prongs of waiver consideration, and are awaiting a national-security assessment. It does not reveal anything to suggest that the waiver process is not being implemented in good faith by consular officials, and in responding to our motion, Plaintiffs provided no recent evidence suggesting the waiver process is not being implemented in good faith. Notably, some Plaintiffs have been granted waivers and issued visas. The government also referred to a publicly-available, detailed report to Congress on the number of waivers that have been issued. And while the report is not directly relevant to the Defendants' legal arguments nor have Plaintiffs presented any reason to doubt the accuracy of the statistics in the report to Congress, that Report is the subject of a separate discovery request on which the parties are continuing to seek to reach agreement, as described below ("Tranche 2").

With these principles in mind, it is evident that, none of Plaintiffs' requested categories of discovery bear on the *Accardi* claim:

**Categories 1 & 3** concern the creation of the waiver process, not an *Accardi* theory that, having provided a waiver process and waiver guidance, the State Department has failed to implement

- 16 -

that process or follow its guidance.  This Court made clear that "plaintiffs [do not] seek to enforce the terms of the Proclamation" but are "pursuing an APA claim based on the allegation that the State Department is not following its own waiver guidance." Order at 12.  How the guidance was developed will not tell Plaintiffs or the Court whether the "'agenc[y is] follow[ing] [its] own procedures." *Id.* at 14 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

**Category 2** is also widely off target in addressing an *Accardi* claim.  Plaintiffs claim that materials from DHS and contractors are needed because they "were involved in implementing the Proclamation."  But Plaintiffs have never alleged that the Department of Homeland Security (DHS) or "contractors" have any role in whether the government is complying with its waiver guidance. Contractors do not implement the waiver provision, the Proclamation specifically directs DHS to give effect to waivers granted by consular officers, and Plaintiffs do not claim that DHS is reviewing their waiver requests.  *See* Proclamation § 3(c)(iii) ("Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa").  DHS's only role involving those seeking visas, as with other intelligence partners, might be to assist with the screening and vetting of individuals on national security grounds, but none of that has anything to do with an *Accardi* claim.

**Category 4** refers to documents cited by Plaintiffs in their letter brief that are not part of the Administrative Record because they predate the Proclamation or are not documents relied upon by consular officers in making waiver decisions.  Thus, they are not relevant to the issue of whether the process is being followed properly under *Accardi*.  For example, several requested cables predate the Proclamation, such as 17 State 21026 (dated March 6, 2017) and 17 State 25814 (dated March 17, 2017).  Other requested cables that predate the Proclamation and are irrelevant include: 17 State 52856 (predating Proclamation); 17 State 60239 (predating Proclamation); 17 State 72000 (predating Proclamation and concerning Section 2 reports of a prior iteration of the Proclamation, not visa adjudications); 18 State 5468 (requesting post reporting on host country information sharing practices, thus not relating to visa adjudications); 18 State 19874 (relating to a March 2017 Presidential Memorandum on screening, not the Proclamation); 18 State 118790 (same); 19 State

8106 (referencing only vetting in accordance with the March 2017 Presidential Memorandum on screening and a prior order and notably indicating that "[t]hese instructions … do not affect other requirements, such as P.P. 9645…."). Plaintiffs have not alleged, much less shown, that the universe of documents requested relates to adjudications of waiver requests under the Proclamation, to support their *Accardi* claim.

**Category 5** seeks a privilege log for the Administrative Record, which includes marked, redacted portions to protect sensitive law enforcement and national-security privileged information. Defendants respectfully submit that submission of a privilege log is not required. The Ninth Circuit has never held that a privilege log is required for an administrative record. While some unpublished decisions have required that a privilege log accompany an administrative record other courts have expressly rejected this approach. *See San Luis & Delta-Mendota Water Authority v. Jewell*, No. 15-cv-1290-LJO-GSA, 2016 WL 3543203, at *19 (E.D. Cal. Jun. 23, 2016) (holding that requiring privilege logs in all APA cases "would undermine the presumption of correctness" and "shift the record compilation process too closely toward mechanisms employed in cases subject to regular civil discovery."); *ASSE Int'l, Inc. v. Kerry*, No. 14-534-CJC-JPRx, 2018 WL 3326687, at *3 (C.D. Cal. Jan. 3, 2018). Admittedly, there have been cases in this District where privilege logs were ordered to be produced after the courts in those cases found that documents directly considered by the agency were omitted from the administrative record. *See, e.g., Regents of Univ. of Cal. v. DHS*, Nos. 17-5211-WHA, 17-5235-WHA, 17-5329-WHA, 17-5380-WHA, 2017 WL 4642324, at *7 (N.D. Cal. 2018). In stark contrast, that is not the case here as Plaintiffs have failed to sufficiently rebut the presumption of completeness of the record that has been produced. Further, the national security and foreign policy sensitivity of these materials is self-evident, and little would be gained by requiring a privilege log at this time.

**Category 6.** This is the only area where Plaintiffs purport to seek discovery into the claim this Court allowed to proceed – the *Accardi* claim. Plaintiffs are not entitled to any further discovery on the *Accardi* claim. As mentioned above, the Administrative Record is complete; it is tailored to and fully addresses the *Accardi* claim. The Administrative Records' declaration describes Plaintiffs' cases and fatally undermines Plaintiffs' allegation that they were denied a genuine opportunity to be

- 18 -

considered for a waiver.  Indeed, it shows that some Plaintiffs have actually been found eligible for waivers and been issued visas.  For other Plaintiffs–the majority–a consular officer has preliminarily found them to meet the first two prongs for a waiver (undue hardship and national interest), which are the two prongs for which information submitted primarily by an applicant, either in the application or during the interview, is most relevant.  Those Plaintiffs are waiting on a national-security and public safety determination, which depends primarily on responses by U.S. intelligence and security partners, using well established vetting processes that have existed for many years. The records declaration included with the administrative record also shows that, while some Plaintiffs initially had their waiver denied after the Proclamation issued, some had their waiver reconsidered, including after submission of additional information by the visa applicant.  Therefore, this declaration is a clear indication that the process exists and is proceeding, as it should, for all Plaintiffs.

Altogether, the applicable, comprehensive guidance documents regarding waivers, the declaration showing that Plaintiffs' cases are proceeding in an orderly way through the waiver system, and the statistics showing thousands of granted waivers fatally undermine Plaintiffs' claim that the State Department is actually using a process of blanket denials.  That allegation cannot be reconciled with the evidence, none of which Plaintiffs have provided a basis to dispute.

Moreover, there is no further discovery that could be relevant to Plaintiffs' *Accardi* claim based on the specific requests they identify in Category 6.  First, Plaintiffs say that the State Department has failed to abide by policies "requiring notification of visa applicants of the availability of a waiver process."  But as the Government has repeatedly explained and the guidance makes plain, there is no separate waiver application; visa applicants are considered automatically and are not required to do anything else to be considered for a waiver. The records declaration confirms this is what occurred in Plaintiffs' cases.  It also shows that the consular officers considered waiver requests in circumstances of concern that this Court identified – where interviews were conducted prior to the Proclamation going into effect.  *See* Order at 15.  There was, in short, nothing for Plaintiffs to be misled about.

Plaintiffs also allege that the Government has failed to abide by regulations providing that final decision-making discretion for waivers belongs to consular officers.  As the Government has

explained, however, this claim fails both legally and factually.  Legally, this is not an *Accardi* theory alleging that State failed to follow its own rules; instead, it is a theory that the State Department failed to correctly implement the President's directive in the Proclamation, but this Court did not allow such a claim to proceed.  *See, e.g.,* Order, *Emami*, Dkt. 74 at 12, 18 ("plaintiffs [do not] seek to enforce the terms of the Proclamation" and a request to "order defendants to fulfill their duties under the Proclamation" may be "impermissible").

Even putting to the side this Court's ruling, this claim fails legally because it is based on the suggestion that the Proclamation created an obligation for waivers to be assessed by consular officers, but that the State Department in fact has put that discretion somewhere else.  *See, e.g.,* Plaintiffs' Opposition to Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment ("Plaintiff's Opposition"), *Emami*, Dkt. 104 at 3-5, 11; *Pars*, Dkt. 125 at 1-3, 7.  Even if that were the correct reading of the Proclamation, as Defendants have repeatedly maintained in the motions to dismiss and/or for summary judgment, the Proclamation is expressly not privately enforceable, and Plaintiffs have no cause of action to enforce the terms of the Proclamation.  Moreover, there is no cause of action that would allow Plaintiffs to challenge the State Department's decisions about what procedures will best assess national security for entry of foreign nationals.  Such cause of action cannot rest under the APA.  *See Allen v. Milas*, 896 F.3d 1094, 1097, 1106-09 (9th Cir. 2018).

This claim also fails as a factual matter, and instead it is perfectly appropriate for consular officers to seek guidance in making their consular decisions, as happens in all aspects of visa adjudication.  *See, e.g.*, 9 Foreign Affairs Manual ("FAM") 304.1. ("Certain visa cases will require you to obtain an opinion from the Department before final adjudication").  Plaintiffs are therefore factually mistaken about what is required for proper visa adjudications and waiver considerations.  Their supposition that consular officers must have no support or resources to evaluate visa ineligibility grounds or waivers based on national security and public safety concerns is completely illogical.  No sensible proclamation–especially one aimed at promotion of information sharing to safeguard national security–would require that individual consular officers stationed all across the world to *not* have access to or coordinate with the full range of U.S. intelligence and national-security information resources to determine whether any particular visa applicant poses a threat to the country's security

- 20 -

1   and safety.

2       Plaintiffs also say that further discovery is warranted because the Proclamation's "exemplars"

3   in Section 3(c)(iii) are not being followed.  The Administrative Record provides the relevant guidance

4   on how the "exemplars" are applied by consular officers, and makes plain that when an alien fits

5   within the exemplar, there need be no further consultation regarding of whether an applicant meets

6   the national interest or hardship prongs.  *See, e.g.,* Administrative Record at DOS-005-07.   And

7   Plaintiffs' individual cases do not suggest any departure from the exemplars.  Plaintiffs do not explain

8   how discovery will further address this issue.  Moreover, for the reasons set forth above, this is an

9   improper effort to relitigate the Court's framing of the *Accardi* claim.  Plaintiffs are attempting to

10  shift the inquiry this Court allowed to proceed – whether "the State Department has acted arbitrarily

11  and unlawfully by disregarding its own procedures and rules in administering the waiver program"

12  (Order at 14) – to an inquiry this Court did not allow to proceed, whether the State Department failed

13  to correctly implement the President's directive in the Proclamation.   Order at 12.   Additionally, this

14  effort to evaluate the consular officers' application of the exemplars would amount to a direct

15  circumvention of consular nonreviewability.   This is why there are not cases evaluating the

16  implementation of various grounds of inadmissibility by consular officials, and instead only very

17  limited review under *Din* to confirm that a statutory basis of refusal was provided.

18      Our motion to dismiss or for summary judgment included additional reasons why discovery

19  is not appropriate here.  To emphasize two points directly related to the discovery requests here:  *First,*

20  no cause of action exists that allows Plaintiffs to challenge the State Department's design of the

21  waiver process, based on a failure to implement the Proclamation, because the Proclamation is the

22  only source of law that governs the waiver process and it is not privately enforceable.  Supreme Court

23  held in *Hawaii* that Section 1182(f) permitted the President to suspend entirely the ability of the

24  certain applicants like Plaintiffs to obtain a visa.  Having put that suspension into effect, the President

25  was entitled to create discretionary waivers, but did not afford judicial review to such waiver

26  considerations.   Additionally, the APA does not apply here, because the issuance of waivers is

27  expressly committed to agency discretion by law.  *See* 5 U.S.C. § 701(a).

28      *Second*, the "waiver guidance" is not final agency action under the APA.  Plaintiffs cannot

- 21 -

challenge a whole set of guidance documents and label it final agency action because there is no "decision" that the guidance itself supports.  Further, Plaintiffs are legally prohibited from arguing that a series of actions and decisions in individual cases constitutes a "decision" that is justified by an 'administrative record." *See, e.g.,* Defendants' Reply in Support of Motion to Dismiss or, in the Alternative, for Summary Judgement, *Emami,* Dkt. 107 at 3-5.  Notably, it would be almost impossible to put together such a record that comprised everything the government has ever considered, talked about, or done while implementing the waiver process.  And it would take months or years and impose a crushing burden on national security agencies in protecting sensitive material.  Thus, the only potential final agency action that Plaintiffs could identify are the individual decisions regarding Plaintiffs' applications.  But Plaintiffs do not – and cannot – challenge those decisions because they are precluded from judicial review under consular nonreviewability.

## TRANCHE TWO – THE STATE DEPARTMENT REPORT

## I.   THE PARTIES' PROGRESS TO DATE REGARDING THE STATE DEPARTMENT REPORT

During the parties' initial telephonic meet-and-confer on August 5, Defendants proposed providing a declaration from the State Department explaining the methodology and type of data used to prepare the Report, after which point Defendants would be willing to discuss a Rule 30(b)(6) deposition concerning the creation of the report and the types of information that are captured in State Department databases.  The parties subsequently met and conferred on August 5 and agreed that Plaintiffs would provide an initial list of questions and issues concerning the Report, which Plaintiffs would like to know more about, while Defendants would confer with their clients and provide an estimate of when the State Department could produce an initial declaration.  During this same meet-and-confer, the parties expressed a common understanding that discovery into the data underlying the Report, should it be necessary and appropriate, would be an iterative process, as Plaintiffs learn more about how the Report was produced and what kind of data the State Department collects on waivers and visas issued under the Proclamation.

On August 6, Defendants informed Plaintiffs that it would take approximately 30 days for the State Department to generate a declaration explaining its databases and production of the report.  In

- 22 -

1    response to inquiries from Plaintiffs, Defendants also indicated that the State Department is exploring

2    whether the data created for the Congressional report can be disaggregated by nationality and

3    consulate/embassy involved.   Defendants indicated that those issues would be addressed in the

4    declaration.

5        During a subsequent, in-person meet-and-confer on September 3, Defendants reported that

6    the State Department declaration would likely be produced between the September 5 due date for this

7    joint report and the September 12 hearing date, and proposed postponing the filing and hearing two

8    to three weeks so Plaintiffs can review the declaration, and the parties can potentially meet and confer

9    further on what Defendants are willing to produce.   Plaintiffs are unwilling to delay the filing and

10   hearing dates already set by this Court, but are willing to continue meeting and conferring with

11   Defendants and will update the Court on any progress during the September 12 hearing.

12   **II.    DISCOVERY THAT PLAINTIFFS SEEK CONCERNING THE REPORT**

13       Plaintiffs requested the following information about the Report from Defendants during the

14   parties' meet-and-confer process:

15   - Overall architecture of State Department databases collecting information about visas and

16     waivers for individuals subject to the Proclamation, including what data fields the State

17     Department tracks and what information those fields represent.

18   - Whether the State Department's data can be stratified and/or disaggregated.

19   - Whether the data can be stratified to get visa and nationality information broken down by

20     consulate/embassy.

21   - Whether the data can be broken down over time, and if so, by what time period (week,

22     month, quarter, or year).

23   - What data was considered in generating the Report.

24   - What data was considered but not included in the Report.

25   - Who prepared the Report; who reviewed the Report before it was published; and who

26     approved the Report for publication.

27       In addition, in the discussions regarding the databases that the State Department maintained,

28   Plaintiffs have requested the following statistics based on the data underlying the Report, for all visa

JOINT DISCOVERY REPORT

No. 3:18-cv-01587-JD
No. 3:18-cv-07818-JD

applicants subject to the Proclamation, disaggregated by month, visa class, nationality, or embassy/consulate, since the Proclamation's effective date:

- The number of people considered for a visa.
- The number of people who received a visa under an exception under the Proclamation.
- The number of people considered for a waiver.
- The number of visas issued pursuant to a waiver and, if applicable, the relevant exemplar circumstance (if any, as set out in Section 3(c)(iv)(A-J) of the Proclamation).
- The number of visa applicants refused under each of the three criteria enumerated in the Proclamation.
- The number of visa applicants for whom the adjudicating consular officer sought consultation or approval from a consular manager, the reason why, and the outcome.
- The number of visa applicants referred to the Visa Office for waiver consideration, the reason why, and the outcome.
- The number of visa applicants referred to the "countries-of-concern" e-mail address, the reason why, and the outcome.
- The number of visa applicants given expedited processing, the reason why, and the outcome.
- The number of visa applicants placed in administrative processing, the reason why, and the outcome.
- The number of visa applicants pending in administrative processing.
- The number of visa applicants moved out of administrative processing, the reason why, and the outcome.

In addition to these requests made during the parties' meet-and-confer process, Plaintiffs previously propounded a set of written discovery requests on Defendants on May 17, seeking similar data. *See* Sung Decl., Exs. B, C.  In that request, Plaintiffs also sought the following:

- The average time that elapses between when a consular officer first considers a visa applicant for a waiver and when that individual receives a final decision on waiver eligibility.

III.   **WHY PLAINTIFFS SUBMIT THAT THEY ARE ENTITLED TO DISCOVERY INTO THE REPORT**

**PLAINTIFFS' POSITION**

As the Court noted during the July 25 hearing, even a complete Administrative Record cannot prove a negative, or "what an agency did not do." *Pars* ECF 136 at 8.  The discovery detailed above is therefore relevant to both Plaintiffs' *Accardi* claim and Plaintiffs' allegations that "the State Department has acted arbitrarily and unlawfully by disregarding its own procedures and rules in administering the waiver program." *Emami*, 365 F. Supp. 3d at 1020.  Data about, among other things, how many applicants receive waivers and whether they fit an exemplar enumerated by the Proclamation; how many applicants are denied waivers and under which of the three criteria; how many applicants are referred to consular managers or the "countries-of-concern" e-mail and the outcome; and how many people receive expedited processing and why, are all relevant to whether Defendants have departed from applicable regulations and their own guidance in a such a manner that capriciously results in a disproportionate number of waiver denials.  Despite its extra-record nature, discovery of such information is both permissible and proper.

While judicial review in most actions brought under the APA is limited to the Administrative Record, extra-record discovery can be available in APA cases where "the bare record may not disclose the factors that were considered" in the agency's decision. *Overton Park*, 401 U.S. at 420.  Consistent with this holding, the Ninth Circuit has allowed discovery of extra-record evidence in a number of instances, including when "the agency has relied on documents not in the record;" when supplementation is "necessary to explain technical terms or complex subject matter;" and when such extra-record evidence is necessary to determine "whether the agency has considered all relevant factors and has explained its decision." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).  Each of these situations applies here.

A.   **Extra-Record Discovery Is Warranted Because Defendants Have Relied on the Report.**

This Court's analysis can begin and end with the fact that Defendants have relied heavily on extra-record materials in their arguments.  Indeed, Defendants have filed a summary judgment motion

- 25 -

1  relying entirely upon an extra-record State Department report.  Simply put, if Defendants are going

2  to use the report as a defense to Plaintiffs' allegations, Plaintiffs must have the opportunity to conduct

3  discovery on the report, including not only the opportunity to test what is in it but also to discover

4  evidence that counters it.  *Accord* Pars ECF 136 at 7 ("Plaintiffs "are entitled to do targeted discovery

5  on the report that the government's effectively taking a stand on for the case.")

### B.  Extra-Record Discovery Is Necessary to Explain Complex Subject Matter.

6

7  The discovery Plaintiffs seek, moreover, is related to a complex issue.  Plaintiffs' claims

8  pertain, in part, to the manner in which Defendants have implemented the Proclamation's waiver

9  provision, a process that affects tens of thousands of individuals.  Although Plaintiffs do not challenge

10  any particular individual waiver determination, discovery into how Defendants have handled the

11  process, including how they continue to handle thousands of applicants seeking waivers, is necessary

12  to determine whether Defendants' actual practice contravenes the plain text of the Proclamation or

13  their own regulations and internal guidance.  Further, Plaintiffs' case is brought as a class action—a

14  complex litigation vehicle with concerns of typicality and numerosity which Plaintiffs cannot assess

15  without information beyond the Record.  Both complexities support extra-record discovery.

16

### C.  Extra-Record Discovery is Necessary to Determine Whether the Defendant Agencies Considered All Relevant Factors.

17

18  Finally, Plaintiffs contend that Defendants have failed to follow relevant statutes, their own

19  rules, and their regulations when implementing the Proclamation's waiver provision.  Plaintiffs also

20  allege that the process (or lack thereof) ultimately established led to arbitrary and capricious denials

21  (including disproportionate numbers of denials) of waivers.  Discovery into the Report is necessary

22  to determine whether the agency considered all relevant factors – including its own statutory

23  constraints, internal rules and regulations, and the guidance in the Proclamation – when doing so.

24  For example, Plaintiffs have alleged that Defendants have implemented the Proclamation's

25  waiver provision in such a manner that "visa applicants have been denied waivers without ever having

26  received notice of a waiver process, and/or have been denied waivers without ever having had a

27  consular interview or other opportunity to provide evidence of their eligibility for a waiver."  *Pars*

28  ECF 1 at ¶ 289; *see also Emami* ECF 81 at ¶ 314. Such a process violates 22 C.F.R. §§ 41.121 and

- 26 -

42.81 (which require, when refusing the issuance of a visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal"). Further, it violates the FAM, which incorporates the Proclamation and places the burden of proving waiver eligibility on the visa applicant, *see* AR 7 (FAM 302.14-10(D)). Extra-record evidence exploring disparities and inadequacies in notice to applicants is essential to this claim. Plaintiffs have therefore asked Defendants, both in formal propounded discovery and during the parties' meet-and-confer process, to provide data on the number of waiver denials broken down by month and consulate, including when an applicant's interview occurred.

*Pars* Plaintiffs have also alleged Defendants have implemented a waiver process in which "the eligibility criteria for a waiver and the exemplar situations in which a waiver may be appropriate," as set out in the Proclamation and FAM Section 302.14-10(D), "have been misinterpreted and misapplied to require a higher standard of proof of visa applicants" than the Proclamation and FAM require. *Pars* ECF 1 ¶ 291; *see also Pars* ECF 125 at 22-24 (discussing departures from the Proclamation and FAM, and from other statutes and case law, in defining key criteria for waiver eligibility). In other words, *Pars* Plaintiffs have alleged that – by adopting definitions of key eligibility criteria that are far more constrained than the Proclamation, FAM, or analogous statutes require, Defendants have implemented a process that results in the disproportionate and capricious denial of visa applicants who would otherwise be eligible for a waiver. Defendants responded to this allegation in their summary judgment motion by pointing to information in the Report reflecting that "over 26 percent of those considered for waivers" have "been found by consular officers to preliminarily meet the first two conditions for a waiver and are now under review to determine whether they meet the national security and public safety criterion." *Pars* ECF 120 at 5, 22. The Report also indicates, however, that two out of every three applicants are actually denied on the "undue hardship" or "national interest" criteria—the same criteria Plaintiffs allege Defendants have interpreted in an arbitrarily constrained fashion. For this reason, Plaintiffs have requested, both in formal propounded discovery and during the parties' meet-and-confer process, data on the number of visa applicants refused under each of the three criteria enumerated in the Proclamation; as well as the number of visa applicants placed in administrative processing or referred to the Visa Office for

waiver consideration, the reason why, and the outcome.

Plaintiffs have likewise alleged that the guidance Defendants have promulgated has "resulted in a waiver process in which, among other things, consular officers do not have discretion over whether and when to grant a waiver, and thus no discretion over whether they may grant a visa," which violates the Proclamation, FAM 302.14-10(D), and 8 U.S.C. § 1104(a). *Pars* ECF 1 ¶ 291; *see also Emami* ECF 81 ¶ 92. The May 15 Record contains numerous instances where a consular officers is instructed to issue a visa specifically *with* concurrence of a manager, Visa Unit Chief, or Consular Section chief, *see, e.g.*, AR 9, 131, 134, 180; or to refer a case to the "countries-of-concern-inquiries@state.gov" e-mail address in order to receive concurrence from the Visa Office on whether "a waiver may be justified or whether an A[dvisory] O[pinion] is needed," AR 8, 232. Despite this, Defendants insist that "[t]hroughout the record, there is clear recognition that consular officers are authorized to make, and in fact are the ones actually making, waiver decisions with respect to visa applicants on a case-by-case basis." *Pars* ECF 120 at 18. This dispute only highlights that discovery into the actual practice of consular officers, their managers, and the "countries-of-concern" referral system is necessary. Plaintiffs have, in fact, provided extra-record documents showing that consular officers seek approval from non-consular staff to grant waivers, which not only supports Plaintiffs' claim, but also proves that the claim requires discovery of extra-record materials. *See Pars* ECF 125 at 20 n.7. Plaintiffs have accordingly asked Defendants, both in formal propounded discovery and during the parties' meet-and-confer process, to provide information about the numbers of visa applicants for whom the adjudicating consular officer sought consultation or approval from a consular manager, the reason why, and the outcome, as well as the numbers of visa applicants referred to the Visa Office or to the "countries-of-concern" e-mail address, the reason why, and the outcome.

### DEFENDANTS' POSITION

Regarding Tranche 2, the Government at this time is not able to formulate a position on Plaintiffs' requests regarding the Congressional Report because Plaintiffs have not yet had an opportunity to assess and raise any issues with the detailed, imminent declaration that is intended to address Plaintiffs' requests regarding the report. Once this declaration is produced, Defendants propose discussing the possibility of providing a Rule 30(b)(6) deposition regarding the production

- 28 -

of the report and the possibility of creating and providing new datasets from the State department

database from which the Report was derived in order to resolve the outstanding discovery issues.


DATED: September 5, 2019.


*On Behalf of All Plaintiffs*

/s/ *John A. Freedman*
JOHN A. FREEDMAN

**MUSLIM ADVOCATES**
NIMRA AZMI (*pro hac vice*)†
P.O. Box 34440
Washington, DC  20043

**LOTFI LEGAL, LLC**
SHABNAM LOTFI (*pro hac vice*)
VERONICA SUSTIC (*pro hac vice*)
P.O. Box 64
Madison, WI  53701
Telephone:     (608) 259-6226
Facsimile:      (208) 977-9974
shabnam@lotfilegal.com
veronica@lotfilegal.com

†*Not admitted to practice in DC; practice
limited to federal courts and agencies*

*ATTORNEYS FOR EMAMI PLAINTIFFS*

**NATIONAL IMMIGRATION LAW
CENTER**
ESTHER H. SUNG (SBN 255962)
JOSHUA T. STEHLIK (SBN 220241)
3450 Wilshire Blvd. #108-62
Los Angeles, CA  90010
Telephone:     (213) 639-3900
Facsimile:      (213) 639-3911

MAX S. WOLSON (*pro hac vice*)
P.O. Box 34573
Washington, D.C.  20043
Telephone:     (202) 216-0261
Facsimile:      (202) 216-0266
sung@nilc.org
stehlk@nilc.org
wolson@nilc.org

/s/ *August E. Flentje*
AUGUST E. FLENTJE

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
AUGUST E. FLENTJE
Special Counsel, Civil Division
District Court Section
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
NICOLE GRANT
DAVID KIM
P. ANGEL MARTINEZ
Trial Attorneys, Office of Immigration
Litigation

Ben Franklin Station, P.O. Box 878
Washington, DC  20044
Telephone:     (202) 598-8085
Facsimile:      (202) 532-4094
Email:     Angel.Martinez2@doj.gov
               David.Kim4@doj.gov

*ATTORNEYS FOR DEFENDANTS*

JOINT DISCOVERY REPORT

**ARNOLD & PORTER KAYE SCHOLER LLP**
JOHN A. FREEDMAN (*pro hac vice*)
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Telephone:     (202) 942-5000
Facsimile:      (202) 942-5999
john.freedman@arnoldporter.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
DANIEL B. ASIMOW (SBN 165661)
Three Embarcadero Center, 10th Floor
San Francisco, CA  94111
Telephone:     (415) 471-3100
Facsimile:      (415) 471-3400
daniel.asimow@arnoldporter.com

**COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, CALIFORNIA**
ZAHRA A. BILLOO (SBN 267634)
BRITTNEY REZAEI (SBN 309567)
3160 De La Cruz Blvd., Suite 110
Santa Clara, CA  95054
Telephone:     (408) 986-9874
Facsimile:      (408) 986-9875
zbilloo@cair.com
brezaei@cair.com

**ASIAN AMERICANS ADVANCING
JUSTICE-ASIAN LAW CAUCUS**
JAVERIA JAMIL (SBN 301720)
55 Columbus Ave.
San Francisco, CA  94111
Telephone:     (415) 848-7733
javeriaj@advancingjustice-alc.org

**LANE POWELL, PC**
DARIN SANDS (CA SBN 257363)
JESSICA WALDER*
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA  98111-9402
Telephone:     (206) 223-7000
Facsimile:      (206) 223-7107
sandsd@lanepowell.com
walderj@lanepowell.com

NICHOLAS T. STONE*
601 S.W. Second Avenue, Suite 2100
Portland, OR  97204
Telephone:     503.778.2100
Facsimile:      503.778.2200
stonen@lanepowell.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IRANIAN AMERICAN BAR ASSOCIATION**
BABAK G. YOUSEFZADEH (CA SBN 235974)
5185 MacArthur Blvd. NW, Suite 624
Washington, DC  20016
Telephone:     (415) 774-3191
president@iaba.us

*Pro Hac Vice* motion forthcoming

*A*TTORNEYS *F*OR *PARS P*LAINTIFFS

## ATTESTATION OF CONCURRENCE IN THE FILING

Pursuant to Civil Local Rule 5-1(i)(3), I declare that concurrence has been obtained from all counsel to file this document with the Court.

/s/ *John A. Freedman*
JOHN A. FREEDMAN

JOINT DISCOVERY REPORT

No. 3:18-cv-01587-JD
No. 3:18-cv-07818-JD