**NATIONAL IMMIGRATION LAW CENTER**
MAX S. WOLSON (*pro hac vice*)
P.O. Box 34573
Washington, DC 20043
Telephone: (202) 216-0261
Facsimile: (202) 216-0266

**ARNOLD & PORTER KAYE SCHOLER LLP**
JOHN A. FREEDMAN (*pro hac vice*)
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**ARNOLD & PORTER KAYE SCHOLER LLP**
DANIEL B. ASIMOW (SBN 165661)
Three Embarcadero Center,10th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

*Attorneys for Pars Plaintiffs*

**MUSLIM ADVOCATES**
CHRISTOPHER GODSHALL (*pro hac vice*)
P.O. Box 34440
Washington, DC 20043
Telephone:     (202) 873-1550
Facsimile:     (202) 508-1007
christopher@muslimadvocates.org

**LOTFI LEGAL, LLC**
SHABNAM LOTFI (*pro hac vice*)
VERONICA SUSTIC (*pro hac vice*)
P.O. Box 64
Madison, WI 53701

**PERKINS COIE LLP**
ERIC EVANS (SBN 232476)
3150 Porter Drive
Palo Alto, CA 94304-1212
T. (650) 838-4334
F. (650) 838-4350
EEvans@perkinscoie.com

*ATTORNEYS FOR EMAMI PLAINTIFFS*

**ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS**
HAMMAD ALAM  (SBN 284186)
55 Columbus Ave.
San Francisco, CA  94111
Telephone:     (415) 848-7711

**IRANIAN AMERICAN BAR ASSOCIATION**
ELICA S. VAFAIE (CA SBN 284186)
BABAK G. YOUSEFZADEH (CA SBN 235974)
5185 MacArthur Blvd. NW, Suite 624
Washington, DC  20016
Telephone:     (415) 774-3191

**COUNSEL COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA**
ZAHRA A. BILLOO (SBN 267634)
BRITTNEY REZAEI (SBN 309567)
3160 De La Cruz Blvd., Suite 110
Santa Clara, CA  95054
Telephone:   (408) 986-9874
Facsimile:     (408) 986-9875

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| FARANGIS EMAMI, *et al.*, | Case Nos.   3:18-cv-1587-JD |
| Plaintiffs, | 3:18-cv-7818-JD |
| v. | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| ALEJANDRO MAYORKAS *et al.*, | |
| Defendants. | Judge:          Hon. James Donato |
| | Date:           June 9, 2022 |
| | Time:           10:00 a.m. |
| PARS EQUALITY CENTER, et al., | Courtroom:   11 |
| | Trial Date:    Not Set |
| Plaintiffs, | Actions filed:  March 13, 2018 (*Emami*) |
| v. | July 31, 2018 (*Pars*) |
| ANTONY BLINKEN, et al., | |
| Defendants. | |

**NOTICE OF MOTION FOR SUMMARY JUDGMENT TO THE DEFENDANTS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 9, 2022 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs in the above-captioned matters will and hereby do move under Federal Rule of Civil Procedure 56 for summary judgment.

Plaintiffs seek an order declaring Defendants' implementation of Proclamation 9645's waiver provision invalid as a matter of law, requiring that Defendants, within six months of being so ordered, reconsider the applications of individuals who were denied visas pursuant to the unlawful waiver implementation process without the requirement of repetition of applications, fees, or other costly travel and logistics.

1        This Motion is based on this Notice, the following Memorandum of Points and Authorities,

2    declarations and exhibits attached hereto, Request for Judicial Notice, the Administrative Record,

3    and such further papers and arguments of counsel that the Court may consider.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NATIONAL IMMIGRATION LAW CENTER**
MAX S. WOLSON (*pro hac vice*)
P.O. Box 34573
Washington, DC 20043
Telephone: (202) 216-0261
Facsimile: (202) 216-0266

**ARNOLD & PORTER KAYE SCHOLER LLP**
JOHN A. FREEDMAN (*pro hac vice*)
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

**ARNOLD & PORTER KAYE SCHOLER LLP**
DANIEL B. ASIMOW (SBN 165661)
Three Embarcadero Center,10th Floor
San Francisco, CA 94111
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

*Attorneys for Pars Plaintiffs*

**MUSLIM ADVOCATES**
CHRISTOPHER GODSHALL (*pro hac vice*)
P.O. Box 34440
Washington, DC 20043
Telephone:    (202) 873-1550
Facsimile:    (202) 508-1007
christopher@muslimadvocates.org

**LOTFI LEGAL, LLC**
SHABNAM LOTFI (*pro hac vice*)
VERONICA SUSTIC (*pro hac vice*)
P.O. Box 64
Madison, WI 53701

**PERKINS COIE LLP**
ERIC EVANS (SBN 232476)
3150 Porter Drive
Palo Alto, CA 94304-1212
T. (650) 838-4334
F. (650) 838-4350
EEvans@perkinscoie.com

*ATTORNEYS FOR EMAMI PLAINTIFFS*

**ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS**
HAMMAD ALAM  (SBN 284186)
55 Columbus Ave.
San Francisco, CA  94111
Telephone:    (415) 848-7711

**IRANIAN AMERICAN BAR ASSOCIATION**
ELICA S. VAFAIE (CA SBN 284186)
BABAK G. YOUSEFZADEH (CA SBN 235974)
5185 MacArthur Blvd. NW, Suite 624
Washington, DC  20016
Telephone:    (415) 774-3191

**COUNSEL COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA**
ZAHRA A. BILLOO (SBN 267634)
BRITTNEY REZAEI (SBN 309567)
3160 De La Cruz Blvd., Suite 110
Santa Clara, CA  95054
Telephone:   (408) 986-9874
Facsimile:      (408) 986-9875

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO

| | |
|---|---|
| FARANGIS EMAMI, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS *et al.*,<br><br>Defendants.<br><br><br>PARS EQUALITY CENTER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTONY BLINKEN, et al.,<br><br>Defendants. | Case Nos.      3:18-cv-1587-JD<br>                      3:18-cv-7818-JD<br><br><br>**MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:          Hon. James Donato<br>Date:           June 9, 2022<br>Time:           10:00 a.m.<br>Courtroom:    11<br>Trial Date:    Not Set<br>Actions filed:  March 13, 2018 (*Emami*)<br>                      July 31, 2018 (*Pars*) |

SMRH:4875-1594-8315.2

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

I.      INTRODUCTION...........................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ......................................................................2

III.    LEGAL STANDARD ..................................................................................................12

IV.    ARGUMENT ...............................................................................................................12

      A.     The Administrative Procedure Act Requires Holding Defendants' Actions Unlawful.............................................................................................................12

      B.     Defendants' Guidance Constituted Final Agency Action Subject to the Administrative Procedure Act ......................................................................13

      C.     Defendants Unlawfully Promulgated the Waiver Implementation Guidance Because Defendants Failed to Engage in Notice-and-Comment Rulemaking........16

      D.     Defendants' Waiver Implementation is Unlawful because it is Replete With Arbitrary and Capricious Decisionmaking, None of Which is Explained in the Administrative Record. .............................................................................20

      E.     Plaintiffs Continue to Face Harm from their Pre-Rescission Waiver and Visa Denials. ..................................................................................................23

V.     CONSULAR NON-REVIEWABILITY REMAINS IRRELEVANT TO THIS CASE............................................................................................................................24

VI.    CONCLUSION ...........................................................................................................25

Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

SMRH:4875-1594-8315.2

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Alcaraz v. Block*
    746 F.2d 593 (9th Cir. 1984) ................................................................................................ 17

*Am. Textile Mfrs. Inst., Inc. v. Donovan*
    452 U.S. 490 (1981) ............................................................................................................. 21

*American Mining Congress v. Mine Safety & Health Admin.*
    995 F.2d 1106 (D.C. Cir. 1993) ........................................................................................... 17

*American-Arab Anti-Discrimination Comm. v. Reno*
    70 F.3d 1045 (9th Cir. 1995) .................................................................................................. 2

*Arrington v. Daniels*
    516 F.3d 1106 (9th Cir. 2008) ....................................................................................... 20, 23

*Azar v. Allina Health Servs.*
    139 S. Ct. 1804 (2019) ......................................................................................................... 16

*Bennett v. Spear*
    520 U.S. 154 (1997) ............................................................................................................. 13

*Children's Hosp. of the King's Daughters, Inc. v. Azar*
    896 F.3d 615 (4th Cir. 2018) ............................................................................................... 17

*Crickon v. Thomas*
    579 F.3d 978 (9th Cir. 2009) ............................................................................................... 21

*DHS v. Regents of the Univ. of Calif.*
    140 S. Ct. 1891 (2020) ................................................................................................... 20, 21

*Dietary Supplemental Coal., Inc. v. Sullivan*
    978 F.2d 560 (9th Cir. 1992) ............................................................................................... 13

*Doe #1 v. Trump*
    423 F. Supp. 3d 1040 (D. Or. 2019) .................................................................................... 13

*Doe v. Trump*
    288 F. Supp. 3d 1045 (W.D. Wash. 2017) .......................................................................... 25

*Erringer v. Thompson*
    371 F.3d 625 (9th Cir. 2004) ............................................................................................... 16

*Gomez v. Biden*
    No. 20-cv-01419 (APM), 2021 WL 3663535 (D.D.C. Aug. 17, 2021) ................................ 23

-1-    Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Hawaii v. Trump*
   878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 ................................ 25

*Hemp Indus. Ass'n v. DEA*
   333 F.3d 1082 (9th Cir. 2003) ....................................................................................... 16, 17

*Int'l Refugee Assistance Project v. Trump*
   883 F.3d 233 (4th Cir. 2018) (*en banc*), *rev'd on other grounds*, 138 S. Ct. 2710 (2018) ..... 25

*J.L. v. Cissna*
   341 F. Supp. 3d 1048 (N.D. Cal. 2018) ............................................................................... 13

*Kiakombua v. Wolf*
   498 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................... 13, 14, 23

*King v. Cty. of Los Angeles*
   885 F.3d 548 (9th Cir. 2018) ................................................................................................. 8

*Lujan v. Nat'l Wildlife Fed'n*
   497 U.S. 871 (1990) ............................................................................................................. 12

*Make the Road N.Y. v. Pompeo*
   475 F. Supp. 3d 232 (S.D.N.Y. 2020) ............................................................................ 13, 18

*Make the Road New York v. Pompeo*
   475 F. Supp. 3d (2019) ........................................................................................................ 18

*Massachusetts v. Franklin*
   505 U.S. 788 (1992) ............................................................................................................. 13

*Mayor & City Council of Balt. v. Trump*
   416 F. Supp. 3d 452 (D. Md. 2019) ...................................................................... 5, 13, 17, 18

*Mendoza v. Perez*
   754 F.3d 1002 (D.C. Cir. 2014) ..................................................................................... 17, 18

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*
   18 F.3d 1468 (9th Cir. 1994) ............................................................................................... 12

*Occidental Eng'g Co. v. INS*
   753 F.2d 766 (9th Cir. 1985) ............................................................................................... 12

*Rivas v. Napolitano*
   714 F.3d 1108 (9th Cir. 2013) ............................................................................................. 25

*Trump v. Hawaii*
   585 U.S. ___, 138 S. Ct. 2392 (2018) .................................................................................. 4

*Wilson v. Lynch*
   835 F.3d 1083 (9th Cir. 2016) ............................................................................................. 16

SMRH:4875-1594-8315.2

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Statutes

5 U.S.C. § 553 ........................................................................................................... 16

5 U.S.C. § 553(b)(3)(A) ............................................................................................ 16

5 U.S.C. § 553(b)-(c) ................................................................................................ 16

5 U.S.C. § 704 ........................................................................................................... 13

5 U.S.C. § 706(2)(A) ................................................................................................. 20

5 U.S.C. § 706(2)(D) ................................................................................................. 16

44 U.S.C. § 1507 ......................................................................................................... 2

Other Authorities

22 C.F.R. §§ 40-42 (2019) ........................................................................................ 18

82 Fed. Reg. at 45,165-67 § 2(a)-(c) ..................................................................... 2, 3

82 Fed. Reg. at 45,165-67 § (e) .............................................................................. 2, 3

82 Fed. Reg. at 45,165-67 § (g) .............................................................................. 2, 3

82 Fed. Reg. at 45,165-67 § (h) .............................................................................. 2, 3

82 Fed. Reg. at 45,166 § 2(d) ..................................................................................... 3

82 Fed. Reg. at 45,166 § 2(f) ...................................................................................... 3

82 Fed. Reg. at 45,168 ............................................................................................... 19

82 Fed. Reg. at 45,168-69 § 3(c)(iv) .......................................................................... 4

82 Fed. Reg. at 45,168 § 3(c). ......................................................................... 3, 4, 12

82 Fed. Reg. at 45,168 § 3(c)(ii) ................................................................................. 4

82 Fed. Reg. 45161 (2017) .......................................................................................... 2

85 Fed. Reg. 6,699 (Feb. 5, 2020) .............................................................................. 3

85 Fed. Reg. 12,313 (Mar. 2, 2020) ......................................................................... 15

86 Fed. Reg. 7005, 7005 (Jan. 25, 2021) ................................................................... 8

86 Fed. Reg. at 7006 § 2(b) ......................................................................................... 8

87 Fed. Reg. 2,703 (Jan. 19, 2022) ............................................................................. 9

Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

SMRH:4875-1594-8315.2

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) ................................................................................................................... 12

SMRH:4875-1594-8315.2

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Shortly after taking office, former President Trump sought to follow through on his campaign promise to ban Muslims from entering the United States, issuing a proclamation barring immigration from several Muslim-majority countries. Courts across this country repeatedly enjoined these attempts to fulfill that unconstitutional promise. However, each time, the Trump Administration responded by issuing a new Ban, modified with an eye towards evading the previous rulings barring the Ban from being implemented.

The waiver provision was one of those evasive efforts. In the Muslim Ban's final iteration, Presidential Proclamation 9645, the Administration dangled before applicants the prospect that they could obtain a waiver of the Ban, permitting travel to the United States. Specifically, the Proclamation provided that an applicant could be admitted to the country notwithstanding the Ban if they could establish: 1) that the applicant would face undue hardship if barred from traveling; 2) that the applicant's travel was in the national interest; and 3) that allowing the applicant's entry would not be adverse to the United States' national security interests. Success or failure in obtaining a waiver decided whether a person would receive their visa.

The gambit of including the waiver provision met Defendants' purpose, serving as a part of the Supreme Court's eventual justification for allowing the animus-borne Ban to stand.

The waiver program was a sham.

Over the life of the Ban, Defendants denied roughly two waivers for every one granted. That abysmal rate existed only following a dramatic *up*tick in grants, which for years were in the single-digit percentages or lower.

Defendants implemented the waiver provision in a manner designed to ensure precisely that waivers be rarely obtained. Specifically, without subjecting their implementation rules to notice and comment, Defendants issued binding materials containing such unexplained and irrational limitations as providing that residing in a conflict zone is not an undue hardship. Tens of thousands of visa applicants never obtained waivers, and thus remained refused.

1    On January 20, 2021, previously harmed visa applicants had reason for hope. On his first

2  day in office, President Biden rescinded the Muslim Ban, and a subsequent African-focused

3  expansion, righteously declaring it to be discriminatory and describing the Ban as "a stain on our

4  national conscience[,] . . . inconsistent with our long history of welcoming people of all faiths and

5  no faith at all."  In addition to the rescission, the President directed Defendants to assess how to

6  alleviate the harm done to tens of thousands of people before the Ban's rescission.

7    The President's words have not materialized in Defendants' actions. Today, over one year

8  after the rescission, the failure to grant a waiver during the Ban remains a but-for cause of the

9  inability of tens of thousands of visa applicants to obtain their visas. Rather than seek to erase the

10  Ban's stain, Defendants have attempted repeatedly to deny that those harms exist.

11    But saying those people are no longer hurt will not make it so. Defendants' actions to

12  implement the waiver program were demonstrably unlawful and the time has come for those who

13  are still harmed by that lawlessness to be made whole. Plaintiffs are entitled to summary judgment

14  to make that eventuality a reality.

15  **II.    STATEMENT OF RELEVANT FACTS**

16    On September 24, 2017, then-President Donald Trump signed Presidential Proclamation

17  9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the

18  United States by Terrorists or Other Public-Safety Threats." 82 Fed. Reg. 45161 (2017) (the

19  "Proclamation" or "Ban").[1]  The Proclamation prohibited entry into the United States on

20  immigrant visas and certain nonimmigrant visas for nationals of six Muslim-majority countries:

21  Chad,[2] Iran, Libya, Somalia, Syria, and Yemen. Proclamation 9645 § 2(a)-(c), (e), (g), (h), 82 Fed.

22

---

23  [1] While the Proclamation is not included in the Administrative Record, the Proclamation is subject

24  to judicial notice. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially
     noticed . . . ."); *see also American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069-

25  70 (9th Cir. 1995) (taking judicial notice of Executive Order in assessing strength of
     Government's interests in due process challenge).

26
     [2] In April 2018, the administration removed Chad from the list of targeted countries. *See*

27  Administrative Record, *Emami* ECF No. 98-1 at 95 (noting removal of Chad from banned
     countries). The Proclamation banned: all Syrian nationals; all Libyan and Yemeni nationals

28

SMRH:4875-1594-8315.2

Reg. at 45,165-67. Subsequently, then-President Trump expanded the number of countries covered by the Ban to include several countries, most located in Africa.[3]

The Proclamation, which followed federal injunctions blocking earlier blanket travel bans from certain Muslim-majority countries, incorporated an individualized "waiver" process, whereby the Ban would not foreclose visa issuance for individuals who could "demonstrate" three criteria: (1) that denying the applicant entry "would cause undue hardship," (2) that the applicant's travel "would not pose a threat to national security or public safety of the United States," and (3) that the applicant's entry "would be in the national interest." *Id.* § 3(c)., 82 Fed. Reg. at 45,168. The Proclamation specified non-exhaustive examples of circumstances under which issuance of a waiver may be appropriate, including:

> (A)     the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date ... of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

> (B)     the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date ... of this proclamation for work, study, or other lawful activity;

> (C)     the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

> (D)     the foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

> (E)     the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case ....

---

seeking immigrant or nonimmigrant B1/B2 visas; all Iranian nationals except nonimmigrants seeking F, M, or J visas; and all Somali nationals seeking immigrant visas. Proclamation 9645 §§ 2(a)-(c), (e), (g), (h), 82 Fed. Reg. at 45,165-67. The Proclamation also prevented entry of certain Venezuelan government officials and their family members and of all North Korean nationals. See *Id.* § 2(d), (f), 82 Fed. Reg. at 45,166. On January 31, 2020, then-President Trump expanded the list of countries to include additional countries, most located in Africa.

[3] *See generally* Presidential Proclamation 9983, 85 Fed. Reg. 6,699 (Feb. 5, 2020). Proclamation 9983 incorporated Proclamation 9645's waiver text. *See id.* at 6,705 (noting that expanded ban would be "subject to . . . any waiver under section 3(c) of Proclamation 9645).

1    *Id.* § 3(c)(iv), 82 Fed. Reg. at 45,168-69.

2          The Proclamation instructed the Secretaries of State and Homeland Security "to adopt

3    guidance addressing the circumstances in which waivers may be appropriate for foreign nationals

4    seeking entry as immigrants or nonimmigrants." *Id.* It further directed the Secretaries to:

5          [A]ddress the standards, policies and procedures for:

6          (A)    determining whether the entry of a foreign national would not pose a threat to the
                  national security or public safety of the United States;

7

8          (B)    determining whether the entry of a foreign national would be in the national
                  interest;

9          (C)    addressing and managing the risks of making such a determination in light of the
                  inadequacies in information sharing, identity management, and other potential dangers

10                posed by the nationals of individual countries subject to the restrictions and limitations
                  imposed by this proclamation;

11

12         (D)    assessing whether the United States has access, at the time of the waiver
                  determination, to sufficient information about the foreign national to determine whether
                  entry would satisfy the requirements of subsection (i) of this subsection; and

13

14         (E)    determining the special circumstances that would justify granting a waiver under
                  subsection (iv)(E) of this subsection.

15   *Id.* § 3(c)(ii), 82 Fed. Reg. at 45,168.

16         Subsequently, the U.S. Supreme Court explicitly relied in part on the existence of the

17   waiver process "open to all covered foreign nationals seeking entry as immigrants or

18   nonimmigrants" in allowing the Proclamation to go into full effect. *Trump v. Hawaii*, 585 U.S.

19   ___, 138 S. Ct. 2392, 2422-23 (2018). Four dissenting justices took a different view, relying in

20   part on the record showing that waivers were not being granted in practice as raising a serious

21   question about whether the program was mere "window dressing." *Id.* at 2432-33 (Breyer, J.,

22   dissenting). The dissent noted that without a functioning waiver program, the "argument for the

23   Proclamation's lawfulness becomes significantly weaker." *Id.* at 2430.

24         On May 15, 2019, Defendants produced what they certified to be the complete

25   Administrative Record ("AR"). *See* AR, *Emami* ECF No. 98-1 at 1 (certifying "that the attached

26

27

28

SMRH:4875-1594-8315.2                    MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
                                         PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1   non-classified, non-privileged documents are the full and complete administrative record").[4]  The

2   AR consists of 362 pages, many of which were heavily redacted. While Plaintiffs made numerous

3   subsequent discovery requests, each requiring a motion to compel following Defendants' refusal

4   to even properly raise objections,[5] Defendants routinely asserted that there need be no further

5   discovery or supplementation of the AR.[6]

6       The AR shows that Defendants issued guidance to consular officers on how to assess a visa

7   applicant's eligibility for a waiver through cables, question-and-answer documents, and trainings.

8   *See generally* AR 15-362. Defendants then incorporated much of the guidance into the Foreign

9   Affairs Manual, specifically 9 FAM 302.14-10, which provides controlling guidance to consular

10  officers when processing visa applications. *See* AR 6-14; *see also Mayor & City Council of Balt.

11  v. Trump*, 416 F. Supp. 3d 452, 473 (D. Md. 2019) (noting State Department describes FAM as "a

12  single, comprehensive, and authoritative source for the Department's . . . policies[ ]and procedures

13  that govern the operation of the State Department [and] the Foreign Service[.]"). The materials not

14  incorporated directly into the FAM were used to supplement the FAM. *See, e.g.*, A.R. 94 ("This

15  Q&A is intended to supplement guidance found at 9 FAM 302.14-10 and 304.5.").

16      Much of the guidance answered generally applicable questions, instead of case-specific

17  circumstances. The guidance provided broadly applicable instructions, phrased in mandatory

18  language, for the processing of entire categories of applicants. For example, with respect to the

19  "undue hardship" waiver requirement, the guidance established that:

20

21

22

23

---

[4] Where pincites to the AR are provided, the page numbers of those citations refer to the ECF
24  header on the document. With the exception of citations to the *Pars* Complaint, ECF citations are
to those appearing on the *Emami* docket.

25  [5] Plaintiffs filed six letter-motions pursuant to the Court's April 25, 2014 Standing Order for
Discovery in Civil Cases ¶ 18. (ECF Nos. 136, 147, 151, 154, 159.) These motions were
26  terminated when the Court stayed this case on March 23, 2021. ECF No. 176.

27  [6] *See, e.g.,* ECF No. 96 at 3 (arguing that Plaintiffs had not rebutted presumption that the
28  Administrative Record is complete).

SMRH:4875-1594-8315.2

- The fact that an applicant resided in a conflict zone could not establish an undue burden. *See* AR 46 (answering "no" when asked "May consular officers consider" such conditions); *see also* AR 75, 106, 138-39 (same).

- Consular officers could not consider *any* conditions in an applicant's home or third country to establish undue hardship. *See* AR 46 (continuing in response to conflict zone question that "[c]onsular officers should not consider applicants' home country or third country conditions when evaluating undue hardship"); *see also* AR 75, 106, 138-39 (same).

- An undue hardship required establishing three elements: (1) existence of an "unusual situation;" (2) that compelled "immediate" travel; and that (3) delaying visa issuance until the indefinite Ban ended would "defeat the purpose of travel."  *See* AR 23 (providing definition in response to question of "[w]hat constitutes an 'undue hardship'?"); *see also* AR 43, 72, 103, 135 (same), AR 215 (providing same definition in Power Point presentation).

As to the "national interest" requirement, the guidance established that:

- An undue hardship would entail establishing that "a U.S. person or entity would suffer hardship" if the applicant was not permitted to travel during the indefinite Ban. *See* AR 22 (establishing requirements to meet national interest criterion); *see also* AR 41-42, 70-71, 101 (same), AR 72 (providing same definition in response to question of what constitutes national interest).

- "Personal obligations" that could be considered in the national interest analysis would be those where "the applicant's failure to attend by [a] required date could result in substantial harm to existing or potential commercial relationships."  *See* AR 24 (defining obligations in response to question about meaning of term); *see also* AR 45, 74 104-05, 137 (same).

- "Close family relatives," a term the Proclamation used in an exemplar of when a waiver would be appropriate, would exclude any person's children who were either married or over age 21. AR 43, AR 72 (same).

- The national interest prong would take precedence over the undue hardship prong. *See* AR 80 (establishing that a higher national interest would permit finding sufficient a less severe hardship), 143 (same).

As to the "national security prong," the AR as redacted provides no explanation for how the prong was interpreted and no support for those determinations. However, the AR does make clear that consular officers could not adjudicate those claims on their own, instead requiring they be sent to a purpose-made email account for a required concurrence. *See, e.g.*, AR 11 (requiring consular officers to send to a specific email address "facts [the officer] believe[s] meet the undue hardship and national interest requirements" to see "if the Visa Office concurs" before proceeding with the national security prong).

On the day the Proclamation took effect in December 2017, tens of thousands of visa applications were summarily refused without the applicants having been given the opportunity required by the waiver provision to "demonstrate" their eligibility. Throughout the remainder of Ban's existence, the waiver process had an incredibly low grant rate. When the waiver process was first implemented, according to "[t]he Court's math," two waivers were granted over the first month, "an approval rate of 0.02%." Order Re Motion to Dismiss, ECF No. 73 at 5-6 (Feb. 4, 2019) (citing Letter from Mary K. Waters, U.S. Department of State, to Chris Van Hollen, U.S. Senator (Feb. 22, 2018)).[7] By April 2018, the approval rate had only risen to 1.75%. *Id*. at 6-7 (citing Letter from Mary K. Waters, U.S. Department of State, to Chris Van Hollen, U.S. Senator (June 22, 2018)). Over the next two years, the grant rate remained in the low single-digit percentages, while tens of thousands of applicants continued to be denied waivers.[8]  While the

---

[7] The letter cited in the Court's opinion is no longer accessible at the address therein, but is available at https://www.aila.org/File/DownloadEmbeddedFile/75180).

[8] *See* Department of State Report, Implementation of Proclamation 9645 December 8, 2017 to June 30, 2019 (2019), https://travel.state.gov/content/dam/visas/presidentialproclamation/Quarterly-Report-of-Implementation-of-Presidential-Proclamation-9645_June_2019.pdf ("The data below reflect that . . . approximately six percent of subject applicants hav[e] been issued a visa pursuant to the waiver process as of June 30, 2019.") Though presently still accessible, a copy of this report is attached as

grant rate increased slowly over time, it never rose above approximately two denials for every one waiver issued.[9]

On January 20, 2021, President Biden rescinded the Proclamation, calling it "a stain on our national conscience[,] . . . inconsistent with our long history of welcoming people of all faiths and no faith at all."  Ending Discriminatory Bans on Entry to the United States, 86 Fed. Reg. 7005, 7005 (Jan. 25, 2021). As part of that rescission, President Biden directed Defendants to conduct a 45-day review to ascertain how to ameliorate the harms the Proclamation inflicted upon tens of thousands of visa applicants, as well as their families, employers, and communities, prior to the rescission. *Id.* § 2(b), 86 Fed. Reg. at 7006.

After this rescission, the Court *sua sponte* stayed all proceedings, terminated the pending discovery motions, and administratively closed this case pending the outcome of the 45-day review. ECF No. 176.

Following the 45-day review, Defendants determined that only some of the people harmed by the Ban would be entitled to any recourse. Specifically, Defendants declared that only those immigrant visa applicants who were denied pursuant to the Ban *after* January 20, 2020, would be permitted to seek reconsideration of their original applications, and that they would not be required to pay fees to do so.[10] Nearly one year later, and despite spending the entire intervening time assuring this Court that no remedies remained necessary, Defendants purported to also

---

Exhibit A. The Court is permitted to take judicial notice of "undisputed publicly available information displayed on government websites."  *See King v. Cty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (relying upon California Department of State website to establish conditions at subject hospital).

[9] *See* Department of State Report, Implementation of Presidential Proclamations (P.P.) 9645 and 9983 December 8 2017 to January 20, 2021 at 3 (2021) (noting 24,750 waivers granted against 41,876 applicants deemed ineligible pursuant the proclamations—a 63-percent denial rate), https://travel.state.gov/content/dam/visas/presidentialproclamation/PP-9645_Montly-Public-Reporting-January%202021.pdf. Though presently still available, a copy of this report is attached as Exhibit B. The post-January-2020 statistics do not disaggregate those subject to Proclamation 9983's expansion of the Ban and waiver's applicability.

[10] Press Statement, Ned Price, Department Spokesperson, Department of State (March 8, 2021), https://www.state.gov/the-departments-45-day-review-following-the- revocation-of-proclamations-9645-and-9983. Although this statement is still accessible, a copy is attached to this filing as Exhibit C.

Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1   exempt only from application fees those people denied immigrant visas prior to January 20, 2020

2   who then reapplied. 87 Fed. Reg. 2,703 (Jan. 19, 2022).

3       This relief covers only the immigrant visa applications and does not purport to cover the

4   28,267 nonimmigrant visa applicants denied visas by virtue of failing to obtain waivers.[11]

5   Moreover, for all but post-January 20, 2020 immigrant visa applicants, it provides at most relief

6   from application fees alone and not the additional, substantial, logistical costs and hurdles. In any

7   event, as discussed *infra*, removing application fees is relief without impact given applicants'

8   inability to reapply at all.

9       As such, all nonimmigrant visa applicants, and all immigrant visa applicants denied prior

10  to January 20, 2020, and who have not subsequently received visas, remain harmed by pre-

11  rescission denials issued pursuant to the Proclamation. Furthermore, plaintiffs and members of the

12  putative class cannot, as a practical matter, get the visa interview appointments that Defendants

13  claim are necessary to adjudicate applications denied pursuant to the Proclamation. Five years

14  have passed since Defendants denied Plaintiffs' applications, yet as detailed by *Emami* Plaintiff

15  Mitra Farnoodian-Tedrick, visa interviews are by and large unavailable. *See* Declaration of Mitra

16  Farnoodian-Tedric ("Farnoodian-Tedric Decl.") ¶ 16 ("I continue to check embassy websites

17  almost daily to see if I can schedule my mother for an appointment, but I never see any

18  appointments available.").

19      Defendants have identified multiple plaintiffs in the *Emami* and *Pars* matters who, on the

20  face of Defendants' submissions, are not eligible for reconsideration, and thus necessarily remain

21  harmed by visas denied as a result of waiver denials. *See* ECF No. 179 at 10 (identifying *Emami*

22  plaintiffs subject to reconsideration while separately identifying "eight visa applicants who were

23  denied visas in 2017 and 2018 who have not subsequently reapplied for visas[.]"); *id.* at 11 (same

24  as to several individuals associated with an individual *Pars* plaintiff).

25

26

27

28  [11] *See* Department of State Report, *supra* note 9 at 3 (noting 28,267 nonimmigrant visa applicants as "[n]ot qualified for waiver" and ineligible under the Proclamations).

1      Organizational Plaintiff Pars Equality Center likewise remains harmed, both as an

2 organization and via its clients on whose behalf Pars also brought suit. *See generally* Declaration

3 of Paris Etemadi Scott ("Scott Decl.").

4      Specifically, Paris Etemadi Scott, the Legal Director of Pars Equality Center, details the

5 diversion of resources wrought by the Ban waiver program—including requiring hiring additional

6 staff and curtailing other areas of work. *Id.* ¶¶ 34-35. Ms. Scott notes that "[t]his diversion of

7 resources has continued post-rescission including recently hiring a managing attorney in [Pars']

8 L[os] A[ngeles] office to support [Pars'] work assisting people denied a visa by the ban." *Id.* ¶ 34.

9      Moreover, Ms. Scott, whose organization has sued both on behalf of itself and its clients,

10 notes that the rescission has "changed nothing for Pars' clients" past and present, and that the

11 organization represented "non-immigrant visa applicants who were denied a visa as a result of the

12 travel ban and who were denied a waiver" and whom the organization has been told "must

13 reapply" in order to benefit from the Ban's rescission. *Id.* ¶ 8. Ms. Scott likewise explains that

14 reapplication is not a remedy for those unable to access reconsideration, particularly for immigrant

15 visas, given that reapplying will require "paying application and consular fees for a second time,

16 travel and, for some, overnight stays for consular appointments, as well as medical exams[, all of

17 which] can quickly add up to thousands of dollars." *Id.* ¶ 12; *see also id.* ¶ 13 (providing rough

18 estimation of costs reapplication would entail).

19      Even were her clients able and willing to endure those harms, Ms. Scott notes that logistics

20 would still prevent or delay their efforts. Specifically, Ms. Scott notes that the computerized

21 system through which her clients would need to reapply or seek reconsideration does not permit

22 further action on previously refused applications. *See id.* ¶¶ 22-27. Ms. Scott likewise notes that

23 attempting to submit a new initial visa petition would stand to add years to her clients' already

24 long-lived delay. *Id.* ¶ 28. Ms. Scott makes clear that her organization's immigrant visa clients and

25 families "are in an indefinite state of limbo" despite the Ban's rescission.[12] *Id.* ¶ 10.

26 _____

27 [12] Plaintiffs note that these matters are brought on behalf of classes of similarly situated
individuals. Plaintiffs have not had the opportunity to litigate the class allegations—being instead

28

SMRH:4875-1594-8315.2    MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Given the ongoing harms and nonexistent prospects for resolution, on July 31, 2021, Plaintiffs moved to lift the stay of proceedings. ECF No. 181. Defendants opposed, repeatedly contending that this matter is now moot. On September 3, 2021, this Court held a hearing on the motion to lift the stay and directed the parties to identify their respective positions as to which Plaintiffs continued to have live claims. ECF No. 188. The parties submitted that filing on October 4, 2021. ECF No. 189. On March 15, 2022, noting that the record did not at the time establish mootness, this Court dissolved the stay and directed Plaintiffs to file the instant motion for summary judgment. ECF No. 192.

Plaintiffs now move for summary judgment on their Administrative Procedure Act notice-and-comment and arbitrary-and-capricious claims.[13] *See Emami* First Am. Compl. ECF No. 34 ¶ 316 (grounding First Claim for Relief, in part, in APA bar on arbitrary and capricious action), *Pars* Compl., ECF No. 1 ¶¶ 278-87 (asserting First Claim for Relief including both notice-and-comment and arbitrary-and-capricious claims). Plaintiffs seek an order from this Court making whole those individuals harmed by Defendants' unlawful waiver guidance. Specifically, Plaintiffs seek an order requiring that Defendants reconsider the applications of individuals who were denied visas due to waiver refusals pursuant to the unlawful waiver implementation process, and who have not subsequently been granted visas. Plaintiffs further seek an order requiring that

---

forced to stand idly by as Defendants coincidentally granted relief at a higher-than-population rate to individuals in this case—due to Defendants' refusal to engage in any of the requisite class discovery. *See, e.g.,* ECF No. 101 (seeking order compelling Defendants to comply with class discovery); *see also generally* ECF No. 122 (terminating certain discovery motions while noting the discovery issues may change following the Court's ruling—later a denial—of Defendants' motion to dismiss). Plaintiffs intend to litigate the class certification issue as part of the scope-of-relief question if the Court determines they prevail on the merits.

[13] Plaintiffs move for summary judgment on those counts because Defendants' Administrative Record establishes their entitlement to judgment as a matter of law. Plaintiffs do not move for summary judgment on their *Accardi* claims, *see Emami* First Am. Compl., ECF No. 34 ¶¶ 319-20 (noting Defendants' unlawful failure to follow own policies and regulations); *Pars* Compl. ¶¶ 288-94 (asserting claim for relief pursuant to *Accardi* doctrine), because Defendants' obstinate refusals to comply with the rules of discovery precluded establishing the record necessary to do so. Plaintiffs submit that this Court can provide full relief to all injuries under the Administrative Record-based counts, and thus submit that the Court need not address the *Accardi* counts to resolve this case.

1  reconsideration occur without the requirement of repetition of applications, fees, or other costly

2  travel and logistics. If successful, in the remedial phase of this matter, Plaintiffs would seek to

3  certify the class, a request that Defendants' refusal to engage in class certification discovery has so

4  far foreclosed.

5  **III.    LEGAL STANDARD**

6        Summary judgment is required where there is "no genuine dispute as to any material fact

7  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a

8  summary judgment motion pertains to agency action, the court's review is ordinarily limited to the

9  administrative record developed by the agency. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883–

10  84 (1990); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1472 (9th Cir.

11  1994). In reviewing agency action, the district court's sole function is "to determine whether or

12  not as a matter of law the evidence in the administrative record permitted the agency to make the

13  decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir. 1985).

14  **IV.    ARGUMENT**

15      **A.    The Administrative Procedure Act Requires Holding Defendants' Actions
         Unlawful**

16        The Proclamation directed Defendants to "adopt guidance addressing the circumstances in

17  which waivers may be appropriate[.]"  Proclamation 9645 § 3(c), 82 Fed. Reg. at 45,168.

18  Defendants followed this express delegation, promulgating specific requirements to apply the

19  broadly phrased waiver criteria. Though characterized as guidance, Defendants' directives on their

20  face were phrased in mandatory language, directing and binding consular officers, and ensuring

21  that people would fail to meet waiver prongs by virtue of the irrationally restrictive guidance.

22  Defendants took those actions, which substantively altered the rights of thousands of visa

23  applicants, without engaging in any of the legally mandated procedure. Defendants' actions

24  likewise imposed arbitrary and capricious limitations without offering any explanation for doing

25  so. The APA requires holding unlawful both that guidance and the thousands of visa denials made

26  pursuant to that guidance.

27

28

SMRH:4875-1594-8315.2      MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### B.    Defendants' Guidance Constituted Final Agency Action Subject to the Administrative Procedure Act

As this Court has already held, Defendants' guidance to implement the Ban's waiver provision constitutes final agency action. *See* ECF No. 150 at 3 (rejecting Defendants' argument to the contrary as being "not a fair characterization of *Pars* plaintiffs' complaint"). The APA provides for judicial review of "final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency actions are final where they: (1) "mark the consummation of the agency's decisionmaking process;" and (2) are actions "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted); *see also Massachusetts v. Franklin*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). An agency action's finality must be determined "in a pragmatic and flexible manner." *Dietary Supplemental Coal., Inc. v. Sullivan*, 978 F.2d 560 (9th Cir. 1992) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149-50 (1967)).

Courts routinely hold that agency guidance materials, including the Foreign Affairs Manual ("FAM"), qualify as final agency action subject to APA review. *See Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 257 (S.D.N.Y. 2020) (determining that changes to FAM guidance for public charge determinations constituted final agency action subject to APA review); *Mayor & City Council of Balt.*, 416 F. Supp. 3d at 499-501 (same); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1067 (N.D. Cal. 2018) (holding that revisions to USCIS Consolidated Handbook of Adjudication Procedure constituted final agency action); *cf. also Doe #1 v. Trump*, 423 F. Supp. 3d 1040, 1046 (D. Or. 2019) (requiring administrative record to determine if State Department had finished drafting FAM modifications implementing Presidential Proclamation in which case actions would be final agency action).

Training materials likewise fall within the APA-subject realm. For example, in *Kiakombua v. Wolf*, then-District Judge Ketanji Brown Jackson addressed a challenge to various lesson plans that DHS officials relied upon for training to adjudicate, and adjudicating, whether a

1    person facing expedited removal possessed a credible fear of persecution or torture if removed.

2    *See generally*, 498 F. Supp. 3d 1 (D.D.C. 2020). In addition to defending the merits of those

3    lesson plans, Defendants sought to defeat the *Kiakombua* challenge by arguing that the lesson

4    plans did not constitute materials with "the force of law" and were merely "interpretive material."

5    *Id.* at 33. The court rejected these contentions, holding that, "to the extent the Lesson Plan's

6    provisions *are* binding on asylum officers, they are not reasonably characterized as something

7    other than a written policy directive, guidance, or procedure" and were thus subject to the APA.

8    *Id.* (emphasis in original).

9        So too here did Defendants' waiver implementation guidance constitute agency action.

10    First, Defendants' actions were sufficiently final. Defendants implemented the waiver provisions

11    by issuing cables and Q&A's, which Defendants then incorporated into, or used to supplement, the

12    FAM. *Accord, e.g.,* A.R. at 10 (instructing in the FAM what applicant must demonstrate to

13    establish undue hardship) *with* AR 19 (same language in Operational Q&A document); *see also*

14    AR 94 ("This Q&A is intended to supplement guidance found at 9 FAM 302.14-10 and 304.5.").

15    While the AR makes clear that the guidance expanded over time, it likewise demonstrates that

16    much of the material remained unchanged throughout. *Compare* AR 35 (providing in January 23,

17    2018 Q&A that "[c]onsular officers should not consider applicants' home country or third country

18    conditions when evaluating undue hardship") *with* AR 106 (stating same in September 20, 2018

19    Q&A) *and* AR 138 (same in November 5, 2018 Q&A). The apparent later steps in the

20    implementation process—the FAM amendments and the accompanying supplementary November

21    2018 Q&A—do not indicate that the limitations on consular discretion are nonfinal or should not

22    then have been immediately applied to applications.

23        Second, Defendants' guidance necessarily determined the outcome of cases and impacted

24    legal rights. Defendants' actions included unequivocal and mandatory language establishing that

25    consular officers could not independently decide that visa applicants satisfied the waiver prongs.

26    *See, e.g.,* A.R. at 160 (providing that if first two waiver criteria are met "the consular officer *must*

27    *follow this guidance* in determining the third element of the applicant's waiver eligibility"

28    (emphasis added)); *see also, e.g.,* A.R. at 10 (instructing in the FAM that "[t]o establish that a visa

1    denial . . . would cause undue hardship, the applicant *must* demonstrate" (emphasis added)); *see*

2    *also id.* at 19 (same language in Operation Q&A document); *cf. also* 9 FAM 101.1-1 ("The

3    Foreign Affairs Manual (FAM) contains *directives* and guidance for Department of State

4    personnel based on statutes, regulations, Executive Orders, Presidential Proclamations, OMB

5    circulars and other sources.").  Using one of Defendants' more irrational decisions as an example:

6    Defendants provided that an applicant's residing in a conflict zone had absolutely no bearing on

7    whether the denial of a visa would constitute an undue hardship to the visa applicant. AR 138.

8    That language necessarily defined and limited the potential to obtain a waiver for any of a

9    presumably significant number of individuals, including for Yemeni nationals, a country

10   Defendants warn has a continuing civil war, "significant[ly] destr[oyed] infrastructure," limited or

11   unavailable medical supplies and treatment, and a likelihood that "[t]errorists may attack with little

12   or no warning, targeting public sites, transportation hubs, markets/shopping malls, and local

13   government facilities."[14]  Absent Defendants' actions, consular officers would have had discretion

14   to consider circumstances in an applicant's country of residence when evaluating whether a waiver

15   denial—and an indefinite ban on travel to the United States—would inflict an undue hardship on

16   the applicant. Subsequently, officers could not. Defendants' actions thus significantly reduced the

17   potential for applicants to meet one of the three necessary waiver criteria, in turn reducing the

18   potential for visa issuance.

19          There is no basis to question this Court's prior determination that Plaintiffs have identified

20   final agency action.

---

[14] *Yemen Travel Advisory*, Department of State – Bureau of Consular Affairs (June 28, 2021), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/yemen-travel-advisory.html (last visited Mar. 30, 2022). While Defendants' warning exists post-rescission, the circumstances in Yemen predate the end of the Ban. *See generally* Extension of the Designation of Yemen for Temporary Protected Status, 85 Fed. Reg. 12,313 (Mar. 2, 2020) (detailing conditions in Yemen as sufficient to justify granting Temporary Protected Status). Though presently still available, a copy of this advisory is attached as Exhibit D.

**C.      Defendants Unlawfully Promulgated the Waiver Implementation Guidance Because Defendants Failed to Engage in Notice-and-Comment Rulemaking**

Defendants' waiver implementation constituted rulemaking that was required to go through a notice-and-comment process. Defendants' failure to subject their actions to notice and comment violated the APA and renders the actions invalid. *See* 5 U.S.C. § 706(2)(D) (requiring that courts "hold unlawful and set aside agency actions . . . found to be . . . [made] without observance of procedure required by law"). The APA has clear procedural requirements that ordinarily require that an agency provide "[g]eneral notice of proposed rulemaking" and enable "interested persons [to have] an opportunity to participate in the rulemaking through submission of written data, views, or arguments[.]" 5 U.S.C. § 553(b)-(c). The notice-and-comment requirement applies to legislative rules as differentiated from interpretive rules. *See Wilson v. Lynch*, 835 F.3d 1083, 1098-99 (9th Cir. 2016) (noting exemption of interpretive rules from rulemaking requirements); *see also* 5 U.S.C. § 553(b)(3)(A) (exempting from procedural requirements "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice"). Failure to comply with the requisite notice-and-comment period renders an agency's legislative rules invalid. *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003).

Legislative rules are agency-made rules that " 'create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress.' " *Wilson*, 835 F.3d at 1099 (quoting *Hemp Indus. Ass'n*, 333 F.3d at 1087). Legislative rules carry the force of law. *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004). Legislative rules must undergo notice-and-comment procedures. *See generally* 5 U.S.C. § 553 (establishing general requirements for notice-and-comment rulemaking). In contrast, interpretive rules, which "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule" are not required to be subject to notice and comment. *Wilson*, 835 F.3d at 1099 (quoting *Hemp Indus. Ass'n*, 333 F.3d at 1087); *see also* 5 U.S.C. § 553(b)(3)(A). An agency cannot evade notice-and-comment requirements by labeling their substantive actions as mere policy. *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("[C]ourts have long looked to the *contents* of the agency's

action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply.").

The Ninth Circuit has identified three circumstances to differentiate legislative and interpretive rules; a rule is legislative: "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Hemp Indus. Ass'n*, 333 F.3d at 1087 (developing this Ninth Circuit test from a four-part test originally outlined in *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)).

Rules traceable to proclamations or regulations are legislative so long as they comprise "substantive regulatory change[s] to the statutory or regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (analyzing both statutory and regulatory provisions that the Department of Labor used to revise its Training and Employment Guidance Letters) (internal quotation omitted). When an agency rule imposes specific requirements not found in the statutory or regulatory regimes, the agency supplements the regimes in a way that cannot be considered interpretive. *See id.* (finding that the Department of Labor had supplemented the relevant statute "by imposing specific duties on employers seeking certification under the statute"); *see also Hemp Indus. Ass'n*, 333 F.3d at 1091 ("An agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning.") (internal quotation omitted).

Moreover, agencies must provide opportunities for notice and comment when they rely on expressly designated authority to establish new policies. *See Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984) (holding that substantive rules include those that "incrementally impos[e] general, extra-statutory obligations pursuant to authority properly delegated by the legislature"); *see also Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 622 (4th Cir. 2018) ("When an agency relies on expressly delegated authority to establish policy—as the Secretary does with regard to FAQ 33—courts generally treat the agency action as legislative, rather than interpretive, rulemaking"); *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452 (holding that FAM

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1   revisions were legislative, in part, because State Department relied on expressly delegated

2   authority to establish the new policy). Additionally, where the underlying policy does not establish

3   a standard for the agency to apply, the agency "cannot claim its implementing rule is an

4   interpretation of the statute." *Mendoza*, 754 F.3d at 1022.

5        Other district courts have already held that changes to FAM guidance can constitute

6   legislative rulemaking. In *Mayor & City Council of Baltimore v. Trump*, the district court

7   determined that amendments to the FAM's public charge provisions constituted legislative rules

8   that required notice and comment. *See* 416 F. Supp. 3d 452 (holding that "the FAM's public

9   charge provisions, contain all the hallmarks of a legislative rule," including the fact that the

10   updated FAM language on public assistance was not "a factor that the statute explicitly requires

11   consular officers to consider"). According to the court, the agency's amendments were legislative

12   because they supplemented the INA by creating a new factor for consular officers to consider

13   when making visa determinations. *See id.* at 506 (holding that the rule did not "derive from an

14   existing [statute or regulation] whose meaning compels or logically justifies the proposition,

15   thereby weighing in favor of treating the [challenged FAM provisions] as a legislative rule"). In

16   effect, the new amendments changed how visa determinations were to be made. *See id.* ("The

17   FAM changes also 'expand the footprint of a regulation by imposing new requirements, rather

18   than simply interpreting the legal norms Congress or the agency itself has previously created' ")

19   (quoting *Children's Hosp. of the King's Daughters*, 896 F.3d 615). The court further noted that

20   "the FAM derives its authority from the INA and 22 C.F.R. §§ 40-42 (2019), which govern the

21   State Department's visa operations." 416 F. Supp. 3d at 507. The court thus reasoned that the

22   Secretary's reliance on their delegated authority to implement FAM provisions "militates in favor

23   of finding the provisions legislative, rather than interpretive." *Id.*

24        Similarly, the court in *Make the Road New York v. Pompeo* determined that those same

25   public charge-related FAM amendments required notice and comment. 475 F. Supp. 3d at 264. In

26   finding that the FAM amendments required notice and comment, the court looked beyond the

27   "labels given by the agency."  *See id.* (finding the 2018 FAM Revisions to be legislative because

28   they imposed "new legal limitations on visa applicants not previously reflected in the FAM or

1  INA, including eliminating a safe harbor for non-cash public assistance utilized by applicants or

2  their family members"). The court held that the FAM constituted legislative rulemaking given that

3  "many of the directives [were] mandatory" for consular officers, and they created new duties and

4  requirements for visa applications that were not outlined in the INA. *Id.* The district court enjoined

5  the FAM revisions despite the agency's attempts to "skirt notice-and-comment requirements by

6  shoehorning a comprehensive legal regime into 'guidance' for agency personnel and the public."

7  *Id.*

8         Here, Defendants' implementation actions constituted legislative rulemaking that was

9  required to go through notice-and-comment. First, Defendants' narrowing of the waiver eligibility

10  prongs compelled numerous bases for denying waivers that were not required or specified on the

11  face of the Proclamation. In so doing, Defendants necessarily decreased applicants' opportunities

12  to obtain visas.

13         For example, when Defendants declared that third-country conditions could not be

14  considered in the undue burden analysis, AR 46, 75, 107, Defendants deprived all applicants of an

15  entire category of harms upon which to establish the requisite burden. Nothing in the Proclamation

16  required this approach. Thus, prior to Defendants' actions, consular officers could consider the

17  conditions in the applicant's current country; subsequently, they could not. A similar example is

18  presented by Defendants' decision to define "national interest" as only implicated when a denial

19  would harm a U.S. entity, and not when it would provide a benefit to a U.S. entity or to broader

20  U.S. interests. AR 10, 23, 41, 43, 70, 171, 182-83. The Proclamation did not require that

21  limitation, and imposing that limitation narrowed the availability of the waivers and visas. Prior to

22  Defendants' actions, a person could argue that they would confer a benefit on the United States to

23  meet the prong; subsequently that person could only rely upon a harm to the United States if

24  denied entry.

25         Second, Defendants acted in reliance upon multiple explicit delegations of authority. The

26  Ban itself unequivocally delegated to Defendants the responsibility to promulgate the waiver

27  provisions. 82 Fed. Reg. at 45,168 ("The Secretary of State and the Secretary of Homeland

28  Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be

-19-                 Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

appropriate[.]"). Additionally, the entirety of the FAM's waiver guidance is provided by virtue of both statutory and regulatory delegations. *See* 9 FAM 101.1-1 ("The Foreign Affairs Manual (FAM) contains directives and guidance for Department of State personnel based on statutes, regulations, Executive Orders, Presidential Proclamations, OMB circulars and other sources.").

Defendants' actions plainly entailed making substantive changes to the Proclamation's scope and not simply providing public information on Defendants' interpretation of existing law and regulations. This was precisely the type of administrative action that should have gone through notice-and-comment. Defendants' failure to do so should void their action in issuing the guidance and any administrative decisions made under the waiver policy to deny visa requests.

> **D.     Defendants' Waiver Implementation is Unlawful because it is Replete With Arbitrary and Capricious Decisionmaking, None of Which is Explained in the Administrative Record.**

Defendants' waiver implementation guidance significantly narrowed applicants' eligibility to meet the waiver criteria. The AR provides no explanation or basis for these limitations and the limitations are thus arbitrary and capricious.

The APA requires that a court hold unlawful and set aside arbitrary and capricious decisionmaking. 5 U.S.C. § 706(2)(A). The court's review "look[s] only to the administrative record to determine whether the agency has articulated a rational basis for its decision." *Arrington v. Daniels*, 516 F.3d 1106, 1112-13 (9th Cir. 2008). Where the AR provides justifications for the challenged actions, the court affords those justifications substantial deference. *See id.* at 1112 (noting that reviewing court considers only whether record shows that agency "considered relevant factors" and whether agency committed "clear error in judgment"). However, where the AR does not explain agency decisions, those actions are arbitrary and capricious regardless of whether the agency might otherwise have been permitted to take the challenged actions. *See id.* ("[A] rule that survives a challenge to agency authority [can still] fail arbitrary and capricious review where the agency neglects to articulate a rational basis for the manner in which it exercises its discretion."); *see also DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1914-15 (2020) (overturning Government's rescission of immigration program due to failure to consider and explain disregard of States' reliance interests).

1      Where the record does not explain the agency's actions, "'[t]he reviewing court should not

2  attempt itself to make up for any deficiencies' [and] may 'not supply a reasoned basis for the

3  agency's action that the agency itself has not given.'"  *Crickon v. Thomas*, 579 F.3d 978, 982 (9th

4  Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29,

5  43 (1983)). Likewise, a court "cannot infer an agency's reasoning from mere silence." *Crickon*,

6  579 F.3d at 982 (internal quotation omitted). Only contemporaneous explanations may be

7  considered; *post hoc* rationalizations cannot sustain agency action. *See Regents of the Univ. of

8  Calif.*, 140 S. Ct. at 1908-09 (rejecting attempted justifications for terminating government

9  program where such justifications were not relied upon by agency when agency actually

10  terminated program); *see also Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)

11  (noting an agency's "*post hoc* rationalizations . . . cannot serve as a sufficient predicate for agency

12  action").

13      As noted *supra*, Defendants promulgated numerous limitations to reduce the availability of

14  waivers by unduly adopting narrow and crouched definitions of the criteria identified in the

15  Proclamation for granting a waiver. The AR is devoid of any explanation (or facial rational basis)

16  for any of those limitations. With respect to the "undue burden" criterion:

17      •      The AR contains no explanation for Defendants declaring that residing in a conflict

18  zone would not constitute an undue hardship for purposes of the waiver. *See, e.g.,* AR 138-39.

19  Nothing about the Proclamation mandated such a callous limitation.

20      •      Relatedly, the AR contains no explanation for Defendants declaring that *no*

21  conditions in the applicant's current country could establish an undue hardship for purposes of the

22  waiver. *See, e.g.*, *id.* The Proclamation neither expressly nor implicitly limited the undue burden

23  assessment to exclude the very conditions in which a person resided.

24      •      The AR contains no explanation for Defendants declaring that establishing an

25  undue burden would require meeting three elements: 1) the existence of an unusual situation; 2)

26  which compelled immediate travel; and 3) that delaying visa issuance until the indefinite ban

27  ended would defeat the purpose of travel. *See, e.g.,* AR 135. The AR contains no explanation for

28  the "unusual situation" requirement even though circumstances can be burdensome despite being

SMRH:4875-1594-8315.2

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ordinary. The AR contains no explanation for Defendants declaring that an undue burden must require "immediate" travel, even though a significant burden can be long-term, rather than acute. The AR contains no explanation for why Defendants chose to require that delay would defeat the purpose of travel.

With regard to the "national interest" waiver criterion:

- The AR contains no explanation for Defendants declaring that an applicant's travel would only meet this prong where a U.S. person or entity "would suffer hardship" if the applicant did not travel. *See, e.g.,* AR 72. The AR contains no explanation for Defendants' decision to implicitly exclude from the definition travel that would confer a benefit on a U.S. person or entity, or further broader national interests.

- Likewise, the AR contains no explanation for Defendants defining personal obligations as those where "the applicant's failure to attend by [a] required date could result in substantial harm to existing or potential commercial relationships." *See, e.g.,* AR 24. The AR contains no explanation why only avoiding harm qualified and not enabling a benefit as well.

- The AR contains no explanation for Defendants defining the term "close family relative" such that it excluded any person's child who was either married or above 21 years old. *See, e.g.,* AR 40. Defendants cannot have rationally decided, particularly without explanation, that a person ceases to be a close family member of their parent after marriage or aging.

- The AR contains no explanation for Defendants providing that a stronger claim of an applicant's travel being in the national interest could reduce the degree of undue hardship the applicant must show, while not providing that a more severe degree of hardship could decrease the necessary level of national interest. *See, e.g.,* AR 80.

With regard to the "national security" criterion, the as-redacted AR contains no explanation at all how that criterion was defined or established. Agency action that is unsupported by the AR is by definition arbitrary and capricious.

Defendants used each provision of this guidance to reach decisions that, expressly or implicitly, significantly altered individuals' eligibility to obtain waivers and visas. While Plaintiffs submit that many of the determinations would not have survived substantive arbitrary-and-

capriciousness review had Defendants provided a rational basis or explanation for the

determinations, the absolute silence of the AR on the reasoning for these significant limitations

compels their being held unlawful.

> **E.** **Plaintiffs Continue to Face Harm from their Pre-Rescission Waiver and Visa Denials.**

The APA requires that courts set aside those administrative actions that the court

determines to have been unlawful. Where the unlawful agency actions have been applied to

subsequent agency decisionmaking, the subsequent decisions based on that unlawful agency

action are likewise rendered unlawful and set aside. *See generally, e.g.*, *Arrington*, 516 F.3d 1106

(reversing and remanding denials of habeas corpus for individuals in prison who were denied early

release pursuant to an unlawfully promulgated agency rule); *see also Kiakombua*, 498 F. Supp. 3d

at 49-50 (requiring that the Government return to the United States those persons removed

pursuant to unlawful lesson plan and ordering that the Government refrain from allowing any

portion of the unlawful denial to infect new proceedings); *Gomez v. Biden*, No. 20-cv-01419

(APM), 2021 WL 3663535, at *22-24 (D.D.C. Aug. 17, 2021) (directing Department of State to

process diversity visas despite end of relevant Fiscal Year because Department violated APA

when denying visas pursuant to since-rescinded proclamation-implementing policies).

Here, Defendants promulgated guidance in violation of the procedural and substantive

requirements of the APA. While the Proclamation's recission means that it is no longer necessary

for this Court to set aside the agency's unlawful rulemaking implementing the Ban, the thousands

of waiver decisions that Defendants reached by applying those unlawful rules remain impactful

and must be set aside. Specifically, Defendants only considered waivers for those individuals who

otherwise met all requirements to obtain a visa, but who were subject to the Ban. *See, e.g.,* AR 132

(noting that consular officers must consider waiver for any applicant "subject to the [Ban's]

restrictions . . . , otherwise eligible for a visa, and to whom a [Ban] exception does not apply").

Defendants' unlawful actions narrowed all applicants' ability to obtain waivers, and visas by

extension. Necessarily then, waiver denials stood as a but-for cause—apparently *the* but-for

cause—of applicants' inability to obtain visas.

1    Defendants' own reports demonstrate the ongoing harms despite the Ban's rescission.

2  Defendants' data shows that tens of thousands of applicants who were denied waivers do not fall

3  into the limited category of people qualifying for reconsideration. Defendants, for example, denied

4  waivers for over 28,000 nonimmigrant visa applications and have not offered to reconsider any.

5  Defendants likewise do not claim to be offering reconsideration to any immigrant visa applicant

6  denied prior to January 20, 2020. It is extremely unlikely that most of the almost 25,000

7  immigrant visa waiver denials are being treated as denied subsequent to that date.

8    Organizational Plaintiff Pars Equality Center's experiences further belie any claim that

9  rescission cured all harms. The declaration refers to dozens of organizational clients who are not

10  receiving reconsideration and who are thus forced to either remain denied due to their Ban-era

11  rejections or reapply and encounter substantial financial, procedural, and logistical hurdles. *See*

12  Scott Decl., ¶¶ 10-32. Likewise, the Pars declaration makes clear that the organization continues to

13  divert substantial resources to remedying those ongoing harms. *Id.* ¶¶ 34-35. Simultaneously, the

14  inability to assist Ban-harmed individuals renders pointless outreach and effort to assist others

15  harmed by the Ban. This dovetails with *Emami* Plaintiff Ms. Farnoodian-Tedrick's experience that

16  near-daily checking has not identified available consular appointments. *See* Farnoodian-Tedric

17  Decl. ¶ 16.

18    Remedying those direct and ongoing impacts of Defendants' unlawful actions requires

19  ordering Defendants to reconsider and process those applications for whom failing to grant a

20  waiver continues to be a but-for cause of a still-in-effect visa refusal.

21  **V.    CONSULAR NON-REVIEWABILITY REMAINS IRRELEVANT TO THIS CASE**

22    This Court has twice determined that Plaintiffs' claims are not foreclosed by consular

23  nonreviewability. *See Emami* ECF No. 150 (holding that neither Emami nor Pars complaints

24  challenge merits of individual consular decisions); *see also Emami* ECF No. 74 at 11-12 (denying

25  Defendants' consular nonreviewability arguments for original Emami complaint). Those holdings

26  remain proper.

27    The doctrine of consular nonreviewability precludes courts reviewing certain individual

28  immigration or exclusion determinations. *See Emami* ECF No. 74 at 11-12 (citing *Trump v.*

-24-                    Case No. 3:18-cv-1587-JD, 3:18-cv-7818-JD

MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Hawaii*, 138 S. Ct. at 2407); *Rivas v. Napolitano*, 714 F.3d 1108, 1110 (9th Cir. 2013)). However, consular nonreviewability does not restrict a court's authority in a "challenge [regarding] the substance and implementation of immigration policy." *Hawaii v. Trump*, 878 F.3d 662, 679 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (rejecting defendants' claim that consular nonreviewability forbade challenge to Ban's constitutionality).

Plaintiffs here do not challenge any individual visa application decision; rather, they challenge "the substance and implementation" of the Proclamation's waiver provision. Plaintiffs' claims do not hinge on, and thus do not require this Court to probe, the accuracy of any consular officers' decisions. Instead, Plaintiffs' challenge requires considering whether Defendants unlawfully promulgated binding guidance directing how consular officers would make all waiver decisions. Such challenges are plainly reviewable by the courts as demonstrated by the numerous court rulings in policy-based cases against the Proclamation itself. *See generally, e.g., Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018) (*en banc*), *rev'd on other grounds*, 138 S. Ct. 2710 (2018); *Hawaii v. Trump*, 878 F.3d 662; *Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017). As this Court has twice determined, consular nonreviewability provides no bar to this action.

## VI.   CONCLUSION

In light of the above, Plaintiffs respectfully request that this Court grant summary judgment in their favor, declare that Defendants' implementation of the Ban's waiver provision violated the Administrative Procedure Act, and order Defendants to reconsider those visa applications that were denied pursuant to the Ban.


DATED: April 7, 2022                              Respectfully submitted,


/s/ *Shabnam Lotfi*                              /s/ *Max S. Wolson*

**Counsel for *Emami* Plaintiffs**              **Counsel for *Pars* Plaintiffs**

1

2  **MUSLIM ADVOCATES**
CHRISTOPHER GODSHALL (*pro hac vice*)
3  P.O. Box 34440
Washington, DC  20043
4  Telephone:    (202) 873-1550
Facsimile:    (202) 508-1007
5  christopher@muslimadvocates.org

6  **LOTFI LEGAL, LLC**
SHABNAM LOTFI (*pro hac vice*)
7  VERONICA SUSTIC (*pro hac vice*)
P.O. Box 64
8  Madison, WI  53701

9  †*Not admitted to practice in DC; practice
limited to federal courts and agencies*
10

**PERKINS COIE LLP**
11  ERIC EVANS (SBN 232476)
3150 Porter Drive
12  Palo Alto, CA 94304-1212
T. (650) 838-4334
13  F. (650) 838-4350
EEvans@perkinscoie.com
14

15      ***ATTORNEYS FOR EMAMI PLAINTIFFS***

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**ARNOLD & PORTER KAYE SCHOLER LLP**
JOHN A. FREEDMAN (*pro hac vice*)
601 Massachusetts Ave., NW
Washington, DC  20001-3743

DANIEL B. ASIMOW (SBN 165661)
Three Embarcadero Center, 10th Floor
San Francisco, CA  94111

**NATIONAL IMMIGRATION LAW CENTER**
JOSHUA T. STEHLIK (SBN 220241)
3450 Wilshire Blvd. #108-62
Los Angeles, CA  90010
Telephone:    (213) 639-3900
Facsimile:    (213) 639-3911

MAX S. WOLSON (*pro hac vice*)
P.O. Box 34573
Washington, D.C.  20043
Telephone:    (202) 216-0261
Facsimile:    (202) 216-0266
sung@nilc.org
stehlk@nilc.org
wolson@nilc.org

**ASIAN AMERICANS ADVANCING
JUSTICE-ASIAN LAW CAUCUS**
HAMMAD A. ALAM (SBN 303812)
55 Columbus Ave.
San Francisco, CA  94111
Telephone:    (415) 848-7711
hammada@advancingjustice-alc.org

**IRANIAN AMERICAN BAR ASSOCIATION**
BABAK G. YOUSEFZADEH (CA SBN 235974)
5185 MacArthur Blvd. NW, Suite 624
Washington, DC  20016
Telephone:    (415) 774-3191
president@iaba.us

***Pro Hac Vice* motion forthcoming

***ATTORNEYS FOR PARS PLAINTIFFS***

---

**ATTESTATION OF CONCURRENCE IN THE FILING**

Pursuant to Civil Local Rule 5-1(h)(3), I declare that concurrence has been obtained from all signatories to file this document with the Court.

/s/ *Max S. Wolson*
MAX S. WOLSON